UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DETROIT WILL BREATHE,**
**TRISTAN TAYLOR, NAKIA WALLACE,**              Case No.
**JAZTEN BASS, LAUREN ROSEN, LAURYN**           Hon:
**BRENNAN, AMY NAHABEDIAN, ZACHARY**
**KOLODZIEJ, LAUREN BRANCH,**
**LILLIAN ELLIS, OLIVIA PUENTE,**
**IMAN SALEH, MARGARET HENIGE,**
**CAYLEE ARNOLD,** and **ALEXANDER ANEST,**

          Plaintiffs,

vs.

**CITY OF DETROIT,** a municipal corporation,
**MAYOR MICHAEL DUGGAN,** acting in his official
and individual capacities, **CHIEF JAMES CRAIG,** acting in his official
and individual capacities, **OFFICER STEPHEN ANOUTI, SERGEANT**
**TIMOTHY BARR**, **OFFICER DAVID HORNSHAW, OFFICER MARIAH**
**ERARD,** and **OFFICER DOES 1-100 inclusive,**
acting in their respective individual capacities, all jointly and severally,

          Defendants.

_____/

| | |
|---|---|
| Jack W. Schulz (P78078) | GOODMAN HURWITZ & JAMES, PC |
| Amanda M. Ghannam (P83065) | Julie H. Hurwitz (P34720) |
| SCHULZ LAW PLC | William H. Goodman (P14173) |
| PO Box 44855 | Melissa A. Brown (P79127) |
| Detroit, MI 48244 | 1394 E. Jefferson Ave. |
| (313) 246-3590 | Detroit, MI 48207 |
| jackwschulz@gmail.com | (313) 567-6170 |
| amandamghannam@gmail.com | jhurwitz@goodmanhurwitz.com |
| *On behalf of the National Lawyers* | bgoodman@goodmanhurwitz.com |
| *Guild, Detroit/Michigan Chapter* | mbrown@goodmanhurwitz.com |
| *Attorneys for Plaintiffs* | *On behalf of the National Lawyers* |
| | *Guild, Detroit/Michigan Chapter* |
| | *Co-counsel for Plaintiffs* |

Sean Riddell (P81302)
The Riddell Law Firm PLLC
400 Renaissance Center, Ste. 2600
Detroit, MI 48243
(313) 497-0074
sriddell@riddelllawfirm.com
*On behalf of the National Lawyers*
*Guild, Detroit/Michigan Chapter*
*Co-counsel for Plaintiffs*

_____/

## VERIFIED COMPLAINT FOR DAMAGES
## AND FOR DECLARATORY AND INJUNCTIVE RELIEF

> There is no other civil action pending
> in this Honorable Court or any other
> Court arising out of the same
> transaction and occurrence.

**NOW COME** Plaintiffs, Detroit Will Breathe, Tristan Taylor, Nakia Wallace,

Jazten Bass, Lauren Rosen, Lauryn Brennan, Amy Nahabedian, Zachary Kolodziej,

Lauren "Graham" Branch, Lillian Ellis, Olivia Puente, Iman Saleh, Margaret

Henige, Caylee Arnold, and Alexander Anest ("Plaintiffs") for their Complaint

against the Defendants City of Detroit, Mayor Michael Duggan, Chief James Craig,

Officer Stephen Anouti, Officer David Hornshaw, Officer Mariah Erard, Sergeant

Timothy Barr, and Officer Does 1-100 inclusive, in their individual capacities and

official capacities pursuant to *Monell v. Department of Social Services,* 436 U.S. 658

(1978) and state as follows:

## INTRODUCTION

1.      The death of George Floyd at the hands of Minneapolis police officers on May 25, 2020 sparked ongoing nationwide protests against unjustified police violence and systemic racism. Since May 29, 2020, Plaintiffs, along with hundreds of others, have participated in daily demonstrations in Detroit. Defendant Police Officers, all acting in their individual capacities and pursuant to the customs, policies and/or practices of Defendant City of Detroit, by and through the Detroit Police Department (hereafter "DPD"), and Defendants Duggan and Craig, who authorize and condone the use of unnecessary, unreasonable, and excessive force, have repeatedly responded with violence and brutality.

2.      Beginning on May 29, 2020, the first night of protests, peaceful protesters, including Plaintiffs, were, among other things, tear-gassed, pepper-sprayed, beaten and otherwise subjected to unconstitutional excessive force, shot with rubber bullets, blasted with deafening and disorienting sound cannons and flash grenades, put in chokeholds, cordoned off in small groups ("kettled"), and arrested en masse without probable cause, by Defendant Officers, all acting within the scope of their respective authorities and pursuant to the customs, policies or practices of Defendants City of Detroit, Duggan and/or Craig and all in violation of Plaintiffs' rights under the United States Constitution and laws of the State of Michigan.

3.     In the months since, Plaintiff Detroit Will Breathe has continued to lead peaceful protests on a near-daily basis. Each of the more than 90 protests have been widely publicized on social media and some have been widely broadcast on live television and social media by local news organizations.

4.     DPD has repeatedly reverted to brutal tactics to punish and abuse peaceful protesters, including Plaintiffs, all pursuant to the customs, policies and/or practices of Defendants City of Detroit, Duggan and/or Craig.

5.     In response to the continued protests, Defendants escalated their use of unlawful force with new and increasingly violent tactics.

6.     On June 28, 2020, several Defendant Officers Doe drove their police vehicles into a group of highly recognizable protest leaders, including Plaintiff Jazten Bass, causing injury.

7.     On July 10, 2020, Defendant Doe Officers, all acting within the scope of their respective authorities and pursuant to the customs, policies or practices of Defendants City of Detroit, Duggan and/or Craig, again resorted to the use of dangerous chokeholds, teargas, and other excessively forceful means of crowd control and unlawful arrests in response to peaceful protests over the killing of Hakim Littleton, a Black civilian, by members of the DPD.

8.     On August 22, 2020, Defendants again responded to the presence of peaceful demonstrators, including Plaintiffs, with pepper spray, tear gas,

chokeholds, brutal beatings, and mass arrests. Multiple demonstrators were hospitalized, and legal observers, members of the press, and bystanders were severely beaten and arrested, prompting numerous calls for an independent investigation.

9.      Defendants responded with unjustified violence to these protests in direct reaction to the fact that the protests confront the racial disparity in police violence and the systemic racism that pervades our society. By contrast, DPD has protected other protesters in recent history — including protests led by white supremacists -- rather than subjecting them to arbitrary curfews, excessive force, and unlawful arrests. Defendants' treatment of racial justice demonstrators based on the racial content of their message violates their rights pursuant to the First Amendment, Fourth Amendment, and 42 U.S.C. § 1981.

10.      This civil rights action arises out of Defendants' unlawful practices as described above. Plaintiffs seek relief for violations, under color of state law, of their rights, privileges and immunities secured by the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, pursuant to the Civil Rights Act of 1871, 42 U.S.C. §1981 and 1983.

11.      Plaintiffs seek declaratory relief and immediate temporary and permanent injunctive relief prohibiting Defendants from continuing their patterns and/or practices of perpetrating illegal and unconstitutional violence and unlawful

arrests against peaceful protesters seeking police accountability and racial justice. The failure to provide such relief will result in these unlawful practices continuing, thereby causing irreparable harm to Plaintiffs, for which no plain, adequate, or complete remedy at law is otherwise available.

## **JURISDICTION AND VENUE**

12.    This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction).

13.    This Court has jurisdiction to issue injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

14.    Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391, as most or all events giving rise to the claims herein occurred in the Eastern District of Michigan.

## **PARTIES**

15.    Plaintiff Detroit Will Breathe ("DWB") is a domestic nonprofit corporation organized under the laws of the State of Michigan. DWB is one of the organizers of the protests subjected to unconstitutional violence and continues to organize daily protests at which the ongoing risk of similar violence is ever present.

16.     Plaintiff Tristan Taylor ("T. Taylor") is an individual and a resident of Detroit, MI.  T. Taylor is a leader and member of DWB. At all relevant times, T. Taylor has participated in and been one of the organizers of the demonstrations.

17.     Plaintiff Nakia Wallace ("N. Wallace") is an individual and a resident of Detroit, MI. N. Wallace is a leader and member of DWB. At all relevant times, N. Wallace has participated in and been one of the organizers of the demonstrations.

18.     Plaintiff Jazten Bass ("J. Bass") is an individual and a resident of Detroit, MI. J. Bass is a leader and member of DWB. At all relevant times, J. Bass has participated in and been one of the organizers of the demonstrations.

19.     Plaintiff Lauren Rosen ("L. Rosen") is an individual and a resident of Oak Park, MI. L. Rosen is a leader and member of DWB. At all relevant times, L. Rosen has participated in and been one of the organizers of the demonstrations.

20.     Plaintiff Lauryn Brennan ("L. Brennan") is an individual and Michigan resident. L. Brennan has participated in the demonstrations starting on or about June 4, 2020.

21.     Plaintiff Amy Nahabedian ("A. Nahabedian") is an individual and a resident of Highland Park, MI. At all relevant times, A. Nahabedian has participated in the demonstrations as a volunteer medic.

22.     Plaintiff Zachary Kolodziej ("Z. Kolodziej") is an individual and a resident of Detroit, MI. Z. Kolodziej participated in the demonstrations starting on or about May 29, 2020.

23.     Plaintiff Lauren Branch (a/k/a and hereinafter "Graham Branch" or "G. Branch") is an individual and a resident of Saline, MI. At all relevant times, G. Branch has participated in the demonstrations as a volunteer medic.

24.     Plaintiff Lillian Ellis ("L. Ellis") is an individual and a resident of Ypsilanti, MI. At all relevant times, L. Ellis has participated in the demonstrations.

25.     Plaintiff Olivia Puente ("O. Puente") is an individual and a resident of Detroit, MI. O. Puente participated in the demonstrations starting on or about July 10, 2020.

26.     Plaintiff Iman Saleh ("I. Saleh") is an individual and a resident of Dearborn, MI. At all relevant times, I. Saleh has participated in the demonstrations.

27.     Plaintiff Margaret Henige ("M. Henige") is an individual and a resident of Detroit, MI. At all relevant times, M. Henige has participated in the demonstrations.

28.     Plaintiff Caylee Arnold ("C. Arnold") is an individual and a resident of Southeast Michigan. C. Arnold participated in the demonstration starting on or about August 22, 2020.

29.     Plaintiff Alexander Anest ("A. Anest") is an individual and a resident of Southeast Michigan. A. Anest served as a volunteer medic at the demonstration on August 22, 2020.

30.     Defendant City of Detroit is a municipal corporation duly organized and existing under the Constitution and laws of the State of Michigan. It is, and has been at all times relevant hereto, authorized by law to maintain and operate the Detroit Police Department ("DPD"). By and through its agents, including but not limited to the Mayor, the Chief of Police, its supervisors, operating officers, Boards, Commissions, and Committees and its final policymakers, Defendant City, at all times relevant hereto, acting through its official policy makers, established, promulgated and implemented the policies, customs and practices, written and unwritten, of the DPD, with regard to hiring, training, supervision, discipline of the employees of said department, as well as the Departmental response to protected protest activity.

31.     Defendant Mayor Michael Duggan is and was, at all relevant times, the Mayor of Detroit and an official policymaker for Defendant City of Detroit and was personally involved in the decisions that caused the harm giving rise to this litigation. He is sued in his individual and official capacities.

32.     Defendant Chief James Craig is and was, at all relevant times, the Police Chief for the Detroit Police Department, an official policymaker for DPD,

and was personally involved in the decisions that caused the harm giving rise to this litigation. He is sued in his individual and official capacities.

33.    Defendant Officer Stephen Anouti is a police officer with the DPD. Upon information and belief, he is a resident of Wayne County, Michigan and at all relevant times was employed by the City of Detroit, specifically DPD, as a police officer, and acting pursuant to his authority on its behalf. He is sued in his individual capacity.

34.    Defendant Sergeant Timothy Barr is a police sergeant with the DPD. Upon information and belief, he is a resident of Wayne County, Michigan, and at all relevant times was employed by the City of Detroit, specifically DPD, as a police officer, and acting pursuant to his authority on its behalf. He is sued in his individual capacity.

35.    Defendant Officer David Hornshaw is a police officer with the DPD. Upon information and belief, he is a resident of Wayne County, Michigan and at all relevant times was employed by the City of Detroit, specifically DPD, as a police officer, and acting pursuant to his authority on its behalf.  He is sued in his individual capacity.

36.    Defendant Officer Mariah Erard is a police officer with the DPD. Upon information and belief, she is a resident of Wayne County, Michigan and at all relevant times was employed by the City of Detroit, specifically DPD, as a police

officer, and acting pursuant to her authority on its behalf. She is sued in her individual capacity.

37.     Plaintiffs are informed, believe, and thereupon allege that Officers Doe 1 through 100 were the agents, servants, and employees of Defendant City of Detroit and/or the DPD. Plaintiffs are unaware of the true names and capacities of Defendants sued herein as Does 1 through 100, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Upon information and belief, they are residents of Wayne County, Michigan, and at all relevant times were employed by the City of Detroit, specifically DPD, as police officers, and acting pursuant to their authority on its behalf. The individual Doe Defendants are sued in their individual capacities. The Doe Officers were, at all times relevant to this lawsuit, deployed by Defendant City of Detroit at the demonstrations, and engaged in the unconstitutional conduct alleged herein.

## FACTUAL ALLEGATIONS

### *Black Lives Matter: Context of Current Demonstrations*

38.     The pursuit of equal justice under law for Black residents of the City of Detroit ("Detroit" or "the City") has a long, storied past. The current demonstrations against systemic violence and racism are a continuation of Detroit's history of

residents rising up to protest egregious mistreatment of Black residents by the City and its law enforcement.

39.    More broadly, police violence in America is disproportionately deployed against Black Americans. The demonstrations at issue in this matter arose out of some of the most egregious and widely publicized police killings in recent months and are a continuation of the widespread "Black Lives Matter" protests that have occurred around the country in response to innumerable police killings over approximately the past decade.

40.    In March 2020, Breonna Taylor, a Black woman, was shot eight times and killed as she slept by three plainclothes Louisville police officers who used a battering ram to force their way into her home in the middle of the night to execute a no-knock warrant for two unrelated individuals. The officers then attempted to cover up Ms. Taylor's death by filing an incident report stating that she had no injuries and no forced entry had occurred. They were not punished.

41.    Breonna Taylor's death resonated particularly strongly with Detroiters due to its similarity to the death of Aiyana Stanley-Jones, a seven-year-old African-American girl who was shot in the head by a Detroit police officer as she slept at her grandmother's home on May 16, 2010.

42.    On May 25, 2020, George Floyd was murdered by Minneapolis police. Mr. Floyd, a Black man, was arrested after being accused of a non-violent, petty

offense. For nearly nine minutes, then-Officer Derek Chauvin placed his knee—and the weight of his body—on Mr. Floyd's neck as Mr. Floyd lay handcuffed and pinned to the ground and three other officers stood by. In his dying moments, Mr. Floyd struggled to breathe, pleaded for mercy, and called out to his deceased mother. Among Mr. Floyd's last words were "I can't breathe."

43.     Video footage of George Floyd's death was widely publicized, and images of Mr. Floyd and Breonna Taylor joined countless others as symbols of the ongoing fight for police accountability and equality for Black Americans.

44.     Against this backdrop of police killings of Black people across the country, thousands of Americans have joined together in massive nationwide demonstrations calling for justice and have been consistently met with brutal force by police.

45.     Beginning May 29, 2020, hundreds of people in Detroit, including Plaintiffs, have participated in near-daily demonstrations to peacefully protest police brutality against Black people in Detroit, as well as nationwide. Plaintiff Detroit Will Breathe has joined numerous other community organizations in Detroit to organize marches, rallies, teach-ins, and other events to educate their communities, confront racism, and demand systemic change.

46.     Notably, demonstrators have exercised their constitutional rights to voice their concerns during a global pandemic. Attendees of the demonstrations have

acted to participate safely by wearing masks, social distancing, and providing widespread access to hand sanitizer.

47.    These demonstrations have been overwhelmingly peaceful. However, Defendants have responded with grossly disproportionate violence. DPD, with the endorsement of Defendants Duggan and Craig and additional mid-level police commanders, including Defendant Anouti and Defendant Barr, has arrested hundreds of peaceful demonstrators and used unnecessary, unreasonable, and excessive force against hundreds more.

48.    The weapons DPD has utilized for "crowd control" purposes during demonstrations, sometimes referred to as "non-lethal" weapons, indisputably have the ability to injure and cause great bodily harm, and have done so to Plaintiffs and innumerable other demonstrators. In addition to mass arrests without probable cause, the types of crowd control weapons and techniques utilized by DPD include the use of batons, riot shields, officers' own fists, chemical irritants such as tear gas and pepper spray, rubber bullets, zip ties, chokeholds, and police vehicles to inflict unreasonable, unnecessary, and excessive force and deter demonstrators, including Plaintiffs, from exercising their constitutional rights.

*Defendants Used Batons, Riot Shields, and Excessive Physical Force to Brutalize Demonstrators*

49.     On May 29, 2020, the first night of demonstrations in Detroit, demonstrators gathered outside of DPD's Third Precinct at approximately 4:00 P.M. and proceeded to march throughout the downtown area.

50.     At approximately 6:00-7:00 P.M., police officers accelerated their vehicles towards demonstrators and stopped suddenly on several occasions, alarming and intimidating demonstrators.

51.     At approximately 11:00 P.M., DPD began to deploy chemical agents including tear gas and pepper spray, riot shields, and batons against the demonstrators, without audible warning.

52.     Plaintiff Lauren "Graham" Branch ("G. Branch") attended the demonstration as a field medic for the purpose of assisting with injuries caused by police violence. They[1] carried several water bottles and a first aid kit.

53.     When G. Branch arrived at approximately 10:00 P.M., DPD had already begun to surround or "kettle" a group of demonstrators in between a parking structure and a lot for police cars and equipment. The only way to escape the kettle was through a line of police officers in riot gear.

---

[1] G. Branch is a transgender person who goes by the pronoun "they."

15

54.     About half of the group of demonstrators, mostly teenagers and young adults, attempted to leave by marching up an incline towards the road. As they progressed, DPD officers in riot gear formed a line to prevent the group from being able to move in any direction and began to advance upon them while striking their shields with batons in unison.

55.     Unknown Doe Officers began to physically push the demonstrators back, without audible warning, yelling, cheering, and whooping when they struck one of the young demonstrators and calling the demonstrators "animals."

56.     As G. Branch tried to protect the young people by physically placing their body in between the police and the youth, Doe Officers struck G. Branch directly in the face with shields three times then shoved them backwards into the street.

57.     While on the ground, unknown Doe Officers repeatedly and forcefully kicked G. Branch all over their body while calling G. Branch a "bitch," and snarling "you aren't even from here." G. Branch was in extreme pain and could not breathe as police officers repeatedly kicked their arms, legs, abdomen, and lower back.

58.     An officer kneeled on G. Branch's back while another one grabbed for their arms, screaming "STOP RESISTING!" and "GIVE ME YOUR HANDS!" despite the fact that G. Branch had gone limp from pain. The pressure to G. Branch's

body from the officers on top of them was so intense that G. Branch believed they were going to die. G. Branch finally uttered "I'm trying!"

59.    An officer then grabbed their left hand so hard that G. Branch's pinky finger was dislocated, handcuffed them, and left them in the street.

60.    G. Branch then heard an officer growl, "Welcome to Detroit, bitch!" directly into their ear.

61.    When G. Branch was able to sit up and orient themselves with their surroundings, they realized that the officers had removed their mask with no regard for the deadly coronavirus pandemic. They saw several other handcuffed demonstrators whose masks had also been pulled down.

62.    G. Branch, along with the other handcuffed demonstrators, was left in the street for approximately one hour as the police rounded up more demonstrators and brought them back. While they waited, another officer took G. Branch's water bottles and threw them with such force that one exploded against the concrete.

63.    Police eventually loaded the group of handcuffed demonstrators onto a bus. G. Branch was sent onto the bus, then removed. It soon became clear that detained people perceived to be women, who were predominantly Caucasian, were being removed from the bus and ticketed and released, while detained men, who were predominantly Black, were kept on the bus.

17

64.     The officers grouped G. Branch with the female demonstrators despite the fact that G. Branch is transgender and does not identify as a woman.

65.     The officers led G. Branch and four female demonstrators to a garage and issued G. Branch a Disorderly Conduct misdemeanor ticket that had been prepared in advance -- the officers merely filled in G. Branch's name and address. An officer then called for another officer to "unleash" G. Branch, and threatened that if they were arrested again, they would be facing felony charges.

66.     That night, DPD stalked the remaining demonstrators throughout the streets of Detroit, launching tear gas at small groups of fleeing demonstrators, and arrested approximately 60 people.

67.     Despite this show of force by DPD, hundreds of residents of Detroit and the surrounding area returned the next day to continue the demonstrations. However, G. Branch was not among them. The events of May 29, 2020 had a significant emotional effect on G. Branch and have deterred them from attending subsequent demonstrations and exercising their First Amendment rights. G. Branch has not attended a demonstration since.

68.     DPD again responded to the demonstrators with weaponry including tear gas, pepper spray, flash grenades, and rubber bullets, without audible warning.

69.     On May 31, 2020, Defendant Duggan declared a state of emergency and implemented a citywide curfew of 8:00 P.M. in an attempt to deter and silence the demonstrators.

70.     Plaintiff Lillian Ellis[2] ("L. Ellis") attended the demonstration on May 31, 2020.

71.     After marching around the city, the demonstrators stopped at the Detroit Police headquarters at the intersection of Third Street and Michigan Avenue at approximately 7:00 P.M.

72.     As the peaceful demonstration concluded, L. Ellis witnessed DPD Doe Officers suddenly advance on demonstrators with no audible warning or discernible provocation and launch tear gas into the crowd. No demonstrator had approached or threatened police in any way.

73.     L. Ellis attempted to avoid the cloud of tear gas and DPD officers as they advanced upon the demonstrators. L. Ellis was standing off to the side, away from the larger group, when a number of Doe Officers accosted them. L. Ellis had not approached or provoked any officers.

74.     A Doe Officer pushed L. Ellis to the ground and zip tied their hands behind their back, then pulled them up and dragged them to a DPD vehicle.

---

[2] Plaintiff L. Ellis uses the pronouns "they" and "them."

75.     Doe Officers placed L. Ellis with a group of women in the police vehicle for an unknown amount of time as they were taken to an unknown location that turned out to be the basement of Little Caesar's Arena. During this time, L. Ellis and the others had their hands zip-tied behind their backs and were unable to reposition their protective face masks, which Doe Officers had removed or pulled down, again without regard for the deadly pandemic.

76.     L. Ellis, along with many others, was eventually transported to the Detroit Detention Center, then released without their phone or a way to get home.

77.     The demonstrations continued, Plaintiffs continued to participate along with hundreds of others, and Defendants continued to brutally beat demonstrators.

78.     On July 10, 2020, Detroit police shot and killed Hakim Littleton, a young Black man. The demonstrations grew to demand justice for Mr. Littleton.

79.     Plaintiff L. Brennan attended the demonstration on July 10, 2020. When she arrived at around 4:15 P.M., she was near a group of approximately 15-20 DPD officers; after about thirty minutes, they were joined by a number of additional DPD officers wearing helmets and carrying shields and batons, including Defendant Officers Hornshaw and Erard.

80.     With no audible warning to disperse, the second group of DPD officers began to approach the demonstrators, banging their batons on their shields in unison in a frightening and intimidating manner.

20

81. When the DPD officers reached the demonstrators, they immediately attacked, beating demonstrators with their batons.

82. Demonstrators did not engage in any provocation prior to the attack. As on the previous days, demonstrators merely stood together, with the situation safe, contained, and under control, until the police officers pounced on them.

83. Defendant Officer Erard ran into the crowd and intentionally struck L. Brennan on her forehead with her baton, gritting her teeth as she did so.



84. Defendant Erard then shoved L. Brennan to the ground and began to strike another demonstrator in the back of the head.

85. L. Brennan got back to her feet and pulled the other demonstrator out of the crowd and attempted to flee. Both L. Brennan and the other demonstrator had gotten pepper spray in their eyes during the police-initiated melee, presumably sprayed by another officer.

86.     L. Brennan later rejoined the demonstration and approached Defendant Erard to demonstrate the severity of her injuries. Defendant Erard merely laughed.

87.     L. Brennan experienced headaches, dizziness, clumsiness, and confusion after Defendant Erard struck her. She sought medical attention after approximately five days of continuous headaches and was diagnosed with both a concussion and a hematoma on her arm where Defendant Erard had hit her.



88.     Plaintiffs also observed Defendant Hornshaw beating and brutalizing demonstrators with excessive and unnecessary force on July 10, 2020.



22

89.     Plaintiff Olivia Puente also attended the demonstration in response to the death of Hakim Littleton on July 10, 2020.

90.     Upon her arrival, O. Puente watched as a group of police in riot gear advanced upon the demonstration at approximately 4:00 P.M.

91.     Like L. Brennan, O. Puente was unarmed, not engaging with police, and not refusing to comply with any audible police commands when she was attacked by Defendant Erard. Defendant Erard beat O. Puente over the head with her baton, striking O. Puente's left temple twice, and used her shield to push and shove O. Puente backwards.

92.     O. Puente fell backwards and saw an arc of pepper spray descending from above. The spray covered O. Puente's face, causing a painful burning sensation in her eyes, nose, and mouth.

93.     O. Puente scrambled to escape the chaos and avoid further injury. She subsequently experienced concussion symptoms, including a consistent headache that lasted for days, nausea, difficulty sleeping, confusion, forgetfulness, and an intense sensitivity to light and sound.

94.     Plaintiff Iman Saleh also attended the demonstration on July 10, 2020. I. Saleh had attended demonstrations on a regular basis since they began in May 2020. Like other Plaintiffs, I. Saleh had already been beaten, pepper sprayed, and tear gassed by Defendants on multiple occasions by July 10, 2020.

23

95.     Approximately 20 minutes after I. Saleh's arrival, DPD officers in riot gear began to push and shove demonstrators backwards, beat them with batons, and trample on those who fell to the ground.

96.     As I. Saleh attempted to avoid the wave of police violence, an unknown Doe Officer struck I. Saleh on her right hip with a baton with such force that I. Saleh buckled and fell to the ground.

97.     Other demonstrators were able to quickly remove I. Saleh from the crowd and transport her to the hospital, where her treating physicians determined that her pelvis had been fractured. I. Saleh's treating physician instructed her that her injury would take several months to heal and not to walk again until she could do so without pain.

98.     Plaintiff Jazten Bass ("J. Bass") also attended the demonstration on July 10, 2020, as he had on a near-daily basis since June 2, 2020.

99.     As police officers converged upon the demonstrators, a Doe Officer approached J. Bass, striking his riot shield with his baton and shouting "COME ON!" in an attempt to antagonize and provoke J. Bass.

100.    When that attempt failed, the Doe Officer slammed his riot shield directly into J. Bass's face two consecutive times. Like the other Plaintiffs, J. Bass was unarmed, had not responded to the officer's provocations, and posed no threat to the officer or anyone else at the time of the attack (or any other time).

101.   Plaintiff Tristan Taylor ("T. Taylor") also attended the demonstration on July 10, 2020, as he had on a near-daily basis since May 29, 2020.

102.   After advancing upon the demonstrators, DPD officers threw T. Taylor to the ground, where a Doe Officer intentionally kicked T. Taylor's head and trampled over him. T. Taylor was unarmed, subdued, and posed no threat to the officer or anyone else at that or any other point in time.

103.   The Doe Officer then struck Plaintiff T. Taylor in his abdomen with the tip of his baton, knocking the wind out of T. Taylor as he lay helpless on the ground.

104.   On August 22, 2020, Plaintiff Detroit Will Breathe organized a peaceful sit-in in downtown Detroit at the intersection of Woodward and John R -- a public intersection where groups frequently congregate. For example, Detroit sports fans gather there on a regular basis to celebrate their teams' victories (or mourn their losses).

105.   Approximately 100 demonstrators, including Plaintiffs T. Taylor, J. Bass, N. Wallace, I. Saleh, L. Rosen, O. Puente, M. Henige, A. Nahabedian, C. Arnold, and A. Anest, were present at the gathering, which attendees described as "relaxed," "jovial," "festive," and "like a block party." Participants danced, blew bubbles, played music, read books, and chatted with one another.

106.   The relaxed and jovial atmosphere was destroyed when Defendants once again sent a number of officers in riot gear to attack the group. Demonstrators

did not engage in any provocation prior to the attack. As on the previous days, demonstrators merely stood together, with the situation safe, contained, and under control, until the police officers pounced on them.

107.   The officers charged into the crowd, deployed chemical weapons (described *infra*), and began tackling demonstrators to the ground and beating demonstrators with their batons, shields, and fists.

108.   Defendant Stephen Anouti was observed directing and instructing DPD officers as they attacked the demonstrators.

109.    Plaintiffs observed DPD officers aiming for demonstrators' knees with their batons to incapacitate demonstrators and prevent them from marching in future protests.

110.   DPD officers attacked demonstrators (including Plaintiffs), legal observers, members of the press, and bystanders. Officers beat multiple people so severely that they had to be hospitalized.



111.   One bystander (pictured below), who lives on Woodward Avenue, simply opened his front door to provide respite to demonstrators as they dispersed. Multiple Doe Officers seized him, held him down, punched him in the face over ten times (leaving him with two black eyes) and arrested him.



112.   Plaintiff Alexander Anest ("A. Anest") attended the demonstration on August 22 as a volunteer street medic; he carried first aid supplies and wore a red cross emblazoned on his clothing and helmet.

113.   Not long after the DPD officers rushed into the crowd, A. Anest observed three officers violently tackling another street medic; one appeared to grab her in a chokehold and threw her to the ground.

114.   As A. Anest tried to approach the fallen medic to offer help, a Doe Officer struck A. Anest's back with his baton several consecutive times with an extreme amount of force, knocking him to the ground.



115.   A. Anest was blinded with pain as the Doe Officer dragged him approximately fifteen feet across the pavement, handcuffed him, and tossed him to the curb with several other arrestees.

116.   A. Anest begged the DPD officers to call an ambulance, but they ignored him. One ambulance had already arrived, but the DPD officers refused to permit the EMT to examine A. Anest, saying that they had already done so – which was a blatant lie.

117.   Eventually, A. Anest was able to pull his cell phone out of his pocket and dial 911 himself. But before he could complete the call, a Doe Officer took the phone and hung up.

28

118.   After some more time, the officers placed A. Anest and the others in a van, then transferred them to a bus full of other arrestees, again with no regard for social distancing or masks during the global COVID-19 pandemic.

119.   Only after the other medics insisted that A. Anest needed immediate medical attention did the police finally call an ambulance.

120.   When the ambulance arrived, the police made A. Anest wait for another hour for an officer to accompany him to the hospital. That officer never arrived, so the police finally released A. Anest at approximately 3:30 A.M. – three hours after he had been beaten.

121.   A. Anest was lost, disoriented, and in severe pain. Other demonstrators found him and drove him to the emergency room at approximately 4:00 A.M.

122.   A. Anest suffered severe injury as a result of the Doe Officer's attack, including being hospitalized with a broken rib, a collapsed right lung, and a tube in his chest (pictured below).



*Defendants Fired Rubber Bullets at Demonstrators*

123.   Rubber bullets (also referred to as baton rounds), despite their less-lethal-sounding name, are often composed of a metal core and thin polymer coating or hardened plastic. They are significantly larger than average bullets and indisputably have the capacity to cause serious and permanent injury.[3]

---

[3] https://www.thecut.com/2020/06/rubber-bullets-are-not-rubber.html; https://www.forbes.com/sites/davidhambling/2020/06/08/the-deadly-truth-behind-rubber-bullets/#2c5e0ae21f8a

124.   Defendants shot rubber bullets at fleeing demonstrators beginning on May 29, 2020, and on multiple occasions since.

125.   Plaintiff A. Nahabedian attended the demonstration on May 31, 2020. As the demonstration reached DPD Headquarters, A. Nahabedian witnessed a line of police officers wearing gas masks and holding zip ties, pistols, and rifles.



126.   As demonstrators kneeled and chanted peacefully, posing no threat of danger whatsoever, the police suddenly advanced and began to beat and pepper spray demonstrators. Demonstrators did not engage in any provocation prior to the attack.

127.   Four unknown Doe Officers approached A. Nahabedian as she knelt on the ground, posing no threat to any officer, and lifted her up, one officer holding each of her arms and legs, then dropped her back to the ground.

128.   A. Nahabedian was then surrounded on three sides by lines of Doe Officers. Defendants deployed tear gas, which engulfed A. Nahabedian.

129.   Next, Doe Officers approached A. Nahabedian from behind, shouting at her to back up. A. Nahabedian attempted to comply, but a Doe Officer used his shield to shove A. Nahabedian with an unnecessary amount of force, causing her to fly forwards and up into the air and lose her footing. The Doe Officers shoved A. Nahabedian forward in this manner approximately four times, causing her to sustain bruises to her shoulders and numbness in her left hand.

130.   A. Nahabedian was eventually able to disperse from this group of officers and escape the cloud of tear gas. However, she and another handful of demonstrators were then approached by officers who launched tear gas canisters directly at them—despite the protest having disintegrated and demonstrators fleeing in different directions.

131.   As A. Nahabedian attempted to flee the cloud of tear gas, she was suddenly and without warning struck above her left breast with a rubber bullet.

132.   For the next several hours, A. Nahabedian walked around the city of Detroit in an attempt to return to her car while avoiding police, who continued to hunt down, beat, arrest, and indiscriminately fire tear gas, rubber bullets, and other projectiles at fleeing demonstrators.

133.   A. Nahabedian was alone, terrified, and in a great deal of pain from the beatings, tear gas, and rubber bullet. After eventually reaching safety, she was unable to stand up straight for several days; could not cough without doubling over in pain for a week; and had bruises on her shoulder and numbness in her hand for days. The rubber bullet had torn her skin and pierced the tissue between her skin and ribs, causing the sensation of cracked ribs and a painful, swollen lump that lasted over two months.



134.   Since May 31, 2020, A. Nahabedian has experienced anxiety, panic attacks, and difficulty sleeping on a regular basis as a direct result of the trauma caused by Defendants' actions.

135.   On July 30, 2020, felony assault charges were issued against DPD officer Daniel Debono after he openly fired rubber bullets at three journalists without provocation. All three suffered injuries.[4]

*Defendants Used Chokeholds Against Demonstrators*

136.   Plaintiff Nakia Wallace attended the July 10 demonstration in response to the death of Hakim Littleton. As a member of Detroit Will Breathe, N. Wallace has organized and participated in the demonstrations on a regular basis since they began in May and had already been detained, beaten, pepper sprayed, tear gassed, and arrested.

137.   On July 10, 2020, N. Wallace witnessed a group of DPD officers rush into the crowd and begin to beat, detain, and arrest demonstrators without provocation.

138.   N. Wallace witnessed several Doe Officers detaining a young man. One Doe Officer pressed his knee on the young man's neck as others held the young man down. Reminded instantly of the murder of George Floyd, N. Wallace shouted, "Get off his neck, get off his neck!"

139.   As officers swarmed around her and shouted at her to move, N. Wallace stated, "I live here!" A male Doe officer then approached N. Wallace and shouted, "arrest her!"

---

[4] https://www.cnn.com/2020/07/21/us/detroit-police-officer-charged-three-journalists/index.html

140. Used to this aggressive treatment, N. Wallace placed her hands behind her back.

141. A female Doe Officer then approached N. Wallace, screamed "get on the ground!" and unsuccessfully attempted to trip N. Wallace to cause her to fall to the ground.

142. N. Wallace shouted: "I am not resisting."

143. The female Doe Officer then grabbed N. Wallace from behind and slammed her to the ground, placing her in a chokehold.



144. After holding N. Wallace in a chokehold for some time, pulling her head back, the Doe Officer snatched N. Wallace's keys and wallet and left.

145.    Another Doe Officer in plainclothes, wearing blue jeans and a blue shirt bearing the emblem "Detroit" in the shape of a gun (pictured *infra* handcuffing Plaintiff T. Taylor) then grabbed N. Wallace, pulled her roughly to her feet, and escorted her up San Juan.

146.    N. Wallace asked him: "Do they pay you enough to defend murderers and attack demonstrators?" In response, the Doe Officer screamed "Yes they do, and shut the fuck up before I make you the next victim!"

### *Defendants Drove Police Vehicles Into Crowds and Demonstrators*

147.    Defendants utilized their police vehicles to assault demonstrators, first blocking off demonstrators' path and then driving their vehicles directly into the crowds. These vehicular assaults have caused physical injury to multiple demonstrators, including Plaintiff Jazten Bass ("J. Bass").

148.    On June 28, 2020, Plaintiff J. Bass attended the nightly demonstrations against racism and police violence, as he had every night for the past month. After a month of organizing and participating in demonstrations, Mr. Bass, too, had already been detained, beaten, pepper sprayed, tear gassed, and arrested on multiple occasions.

149.    On June 28, DPD continued their attempts to silence the demonstrators by driving through the crowd (even hitting one biker) and attempting to unplug sound systems.

150.   Towards the end of the demonstration that night, J. Bass noticed five police vehicles blocking the demonstrators' route back to Patton Park, where the group had parked their cars and began their march. With no choice but to make their way back to Patton Park despite the roadblock, demonstrators marched down Vernor towards the DPD vehicles so they could end their demonstration and go home.

151.   As the demonstrators walked alongside the vehicles, two Doe Officers *(pictured below)* began to slowly and simultaneously drive their SUVs through the group without provocation and without making an announcement asking demonstrators to disperse to allow the vehicle to pass.



152.   About 30 demonstrators, including J. Bass, who was at the front of the group carrying a microphone, had passed the DPD vehicles when J. Bass turned around and saw a DPD vehicle hit a demonstrator from behind and cause the

demonstrator to roll onto the hood of the vehicle. Shocked and concerned, J. Bass stopped marching.

153.   The DPD vehicle continued to accelerate and then hit J. Bass, who had no choice but to try to roll onto the hood of the vehicle to avoid being completely run over, along with the other demonstrator. The vehicle hit approximately 4-5 other demonstrators, who were either thrown to the ground or forced to jump out of the way.

154.   The Doe Officer driving the DPD vehicle then slammed on the gas, almost running over the head of another demonstrator who had been thrown to the ground, jerking the car forward, and causing J. Bass and the other organizer to spin wildly on the hood of the vehicle.

155.   J. Bass grabbed the grill on the front of the vehicle to avoid being thrown to the ground and run over and held on as the driver of the vehicle continued to drive, alternating accelerating and braking, causing the DPD vehicle to jerk back and forth. J. Bass was eventually able to roll off the side of the vehicle, slamming into the ground and sustaining scrapes and bruises to his knee and hip.



156.    J. Bass posed no immediate threat to the officers or others to warrant the use of deadly force by the officers.

157.    The DPD officers who ran over J. Bass were followed in a second police vehicle by Defendant Hornshaw, who also drove through the crowd of demonstrators.

158.    Defendant Craig later publicly claimed that J. Bass and the other organizer had "damaged" the police vehicle, despite the overwhelming video evidence to the contrary.

### *Defendants Deployed Chemical Irritants to Injure and Deter Demonstrators*

159.    Since the demonstrations began, Defendants have deployed chemical irritants against demonstrators, including tear gas and pepper spray, both by targeting specific protesters with handheld devices and by launching canisters of

chemical irritants into a crowd, releasing the irritants indiscriminately in every direction.

160.   The Sixth Circuit has recognized the significant damage caused by irritants such as tear gas: the gas "burns the face [and] nostrils, restricts breathing passages, and causes blindness. It causes a burning sensation that causes mucus to come out of the nose, and involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx." *United States v. Mosley*, 635 F.3d 859, 862 (6th Cir. 2011) (internal quotation marks and citations omitted).

161.   Not only is tear gas painful, it can be lethal. High-dose exposure in an enclosed space can "lead to the development of airway edema, non-cardiogenic pulmonary edema, and possibly respiratory arrest.[5]" Exposure can trigger a fatal asthma attack and increases the risk of developing acute respiratory illnesses.[6] In 1993, the United Nations General Assembly banned the use of tear gas in warfare due to the severity of its adverse health effects.

162.   The use of chemical irritants during the ongoing novel coronavirus-19 (COVID-19) pandemic creates additional risks for those exposed. By design, the incapacitating effects of tear gas and pepper spray cause immediate increased nasal

[5] See Toxic Syndrome Description, Riot Control Poisoning, Centers for Disease Control and Prevention, https://emergency.cdc.gov/agent/riotcontrol/agentpoisoning.asp.
[6] Joseph J. Hout, et al., o-Chlorobenzylidene Malonotrile (CS Riot Control Agent) Associated Acute Respiratory Illnesses in a U.S. Army Basic Combat Training Cohort, 179 Military Medicine 7:793 (2014), https://academic.oup.com/milmed/article/179/7/793/4259353#101149356.

secretions, eye irritation, coughing, spitting, sneezing, and/or vomiting. Coughing, spitting, vomiting, and rubbing eyes all spread respiratory droplets and bodily fluids that carry viruses.

163.   Defendants have subjected each and every Plaintiff, and hundreds of other demonstrators, to both tear gas and pepper spray on multiple occasions, including on May 29, May 30, May 31, June 1, June 2, July 10, 2020, and August 22-23, 2020.

164.   On at least one day (June 2, 2020), DPD teargassed demonstrators after preventing them from dispersing and ensuring they had no means to escape.

165.   On July 10, 2020, Plaintiff M. Henige attended the demonstration after the death of Hakim Littleton at the hands of Detroit police.

166.   Like other Plaintiffs, M. Henige witnessed a line of DPD officers in riot gear converge upon the demonstration without provocation, pushing down demonstrators with their clubs and shields.

167.   Defendant   Stephen   Anouti   was   observed   pepper-spraying demonstrators who had not engaged in any provocation.

168.   Doe Officers knocked M. Henige to the ground, with her head hitting the pavement. Once on the ground, she was trampled by several Doe Officers as she screamed for her life.

169.   M. Henige was eventually lifted up by another demonstrator; however, she had severe head trauma and was experiencing blurred vision.

170.   Next, M. Henige attempted to take a photograph of the Doe Officers' badges.  At that point, a Doe Officer charged into the crowd of people and shoved her aside again with his shield.

171.   Shortly after, the DPD officers began firing tear gas into the crowd. M. Henige was trapped and inhaled the tear gas heavily.

172.   Once the DPD officers dispersed, M. Henige dry heaved. She continued to experience headaches, nausea, vomiting, and blurred vision after leaving the demonstration.

173.   M. Henige rested for four days, but the symptoms only intensified. She visited Detroit Receiving Hospital where she was diagnosed with a post-traumatic concussion and a closed head injury. Her treating physicians provided a shot of Toradol for the pain, Prochlorperazine for the nausea, and a Benadryl to help offset any jitters that may come from the Toradol, and prescribed prescription-strength Tylenol and anti-nausea medication.

174.   M. Henige's treating physician instructed her to make an appointment with a neurology clinic. There, M. Henige was prescribed Gabapentin, an anti-seizure medication, because she was still suffering from severe headaches and

migraines. As of the date of this filing, she is required to attend follow-up appointments to determine the full extent of her head injuries.

175. M. Henige also experienced abnormal heavy menstrual bleeding and spotting for approximately 30 days straight immediately after her exposure to tear gas, and has had irregular or nonexistent periods since.

176. On August 22, 2020, Defendants again deployed tear gas and pepper spray against approximately 100 demonstrators without issuing an audible warning to disperse.

177. Plaintiff Caylee Arnold ("C. Arnold") attended the demonstration on August 22, 2020.

178. C. Arnold was standing by, not approaching, speaking to, or engaging with any police officers in any way, when an officer shoved her from behind with his riot shield. C. Arnold put her hands in the air and shouted, "I am leaving" and "I am walking away."

179. Despite C. Arnold clearly trying to walk away and not approaching or threatening anyone, the officer began to beat her with his baton.

180. Multiple Doe Officers then tackled C. Arnold, threw her to the ground, and handcuffed her hands behind her back.

181. A Doe Officer then sprayed C. Arnold directly in her face with pepper spray as she was completely subdued by multiple officers holding her down – a

blatantly punitive and unnecessary use of a dangerous chemical agent. C. Arnold's

mask and goggles were completely filled with pepper spray; she gagged and was

unable to see or breathe.



182.   As C. Arnold lay on the ground in agony, she heard the Doe Officers

laughing and saw them smiling, high-fiving, and hugging one another. In her own

words, the officers looked at C. Arnold and the other arrestees "like they were the

predators and we were the prey."

### Defendants Deployed a Long Range Acoustic Device (LRAD) to Injure and Deter Demonstrators

183.   On June 2, 2020, Defendants utilized a Long Range Acoustic Device

("LRAD") on demonstrators, including Plaintiffs.

184.   The LRAD emits a sound referred to as a "deterrent tone" that causes immediate pain, disorientation, dizziness, and panic and can cause permanent hearing loss in a matter of seconds.

185.   On June 2, 2020, Plaintiff Lauren Rosen attended the nightly demonstrations. The group of demonstrators marched on Gratiot Street, a public street,  at approximately 8:00 P.M.

186.   As the demonstrators marched down Gratiot, police surrounded them from all sides, kettling the demonstrators to prevent their escape.

187.   L. Rosen could not clearly hear any audible warning to disperse or any comments which could be conceived as a warning an LRAD Sound Cannon would be deployed.

188.   DPD officers were again dressed in riot gear and carrying shields and batons. Further, they were accompanied by armored vehicles.

189.   The officers who had kettled L. Rosen and other demonstrators approached the demonstrators, striking their shields with their batons in unison. As L. Rosen linked arms with other demonstrators to form a protective circle, DPD deployed the LRAD, or sound cannon.

190.   L. Rosen was exposed to the LRAD's sound for several minutes. By the time the police reached the demonstrators, she was in severe discomfort as the

LRAD's sound radiated throughout her body; she was very dizzy and nauseous and could no longer remain standing, causing her to tumble backwards and fall.

191.    From the ground, L. Rosen watched as DPD officers then approached her and other demonstrators and began to beat, detain, and arrest those around her, despite the fact that they posed no threat whatsoever to officers. In fact, demonstrators chanted in unison: "We do not approach" as they stood together and did not approach the officers.

192.    Next, L. Rosen attempted to help another demonstrator off the ground.

193.    A Doe Officer grabbed L. Rosen roughly by her left arm and pulled her aside, bruising her and causing her to fall to the ground again. As she attempted to get back up, another Doe Officer grabbed her by the shirt and arm and threw her back down to the ground, then screamed at her to "GET UP!"

194.    L. Rosen assumed a fetal position in an attempt to protect herself, but to no avail; a male Doe Officer stomped on her right foot and then grabbed L. Rosen around her chest and torso, groping her breasts in the process, while yelling "WHY DIDN'T YOU JUST LEAVE?"

195.    Still disoriented from the LRAD, and terrified by the sounds of demonstrators screaming around her as they too were beaten and arrested, L. Rosen began to cry. The male Doe Officer eventually left, and L. Rosen was able to leave

the scene, as the officers had instructed demonstrators to do, and reach a place of relative safety.

196.   For approximately two weeks after June 2, 2020, L. Rosen experienced severe vertigo, dizziness, nausea, tinnitus, and difficulty eating, sleeping, and hearing as a direct result of Defendants' actions; she lost a significant amount of weight as a result. As of the date of this filing, L. Rosen is still experiencing tinnitus. She sought medical attention, and her treating physician confirmed damage to her right ear.

197.   Despite the brutality Plaintiff L. Ellis had experienced at the hands of Detroit Police on May 31, L. Ellis also attended the demonstration again on June 2, 2020.

198.   Like L. Rosen, L. Ellis was part of the group that marched down Gratiot at approximately 8:00 P.M. and was surrounded by hundreds of DPD officers.

199.   Upon hearing the LRAD emit its sound, L. Ellis was frightened, confused, disoriented, and in pain when police officers suddenly charged at them.

200.   L. Ellis witnessed a DPD Doe Officer grab a demonstrator, remove her goggles, and spray her directly in the face with pepper spray, some of which hit L. Ellis's eyes, clothes, and hair, causing stinging pain.

201.   A Doe Officer then grabbed L. Ellis, dragged them out of the crowd, zip-tied their hands behind their back, and threw them to the ground, displacing L. Ellis's mask in the process.

202.   When L. Ellis asked a Doe Officer to replace their mask, the officer mocked them, saying, "if you're worried about coronavirus, why did you come out here?"

203.   For the second time, L. Ellis was shepherded towards a bus along with a group of demonstrators many of whom were in pain from too-tight zip ties, pepper spray, tear gas, and DPD dragging and shoving them around. During this time, the DPD officers found an opportunity to pose for a "solidarity" photo, portraying themselves as supportive of the protests, as the arrestees suffered.

204.   The demonstrators were then loaded onto a bus. Many demonstrators' masks had been displaced or removed by DPD. Because all of the arrestees had their hands zip-tied behind their back, they had no way to address these conditions. Approximately 127 people had been arrested.

205.   L. Ellis and the group were transported to Little Caesar's Arena. When L. Ellis stated that they did not want to speak to police without an attorney present, the Doe Officer attempting to speak to them began to shout and scream at them.

206.   After hours in Little Caesar's Arena, L. Ellis and one other demonstrator were driven to the Detroit Detention Center.

207.   Doe Officers left L. Ellis in the car for at least an hour with their hands zip-tied and, again, the heat inexplicably turned on. As L. Ellis began to sweat, their sweat interacted with the chemical irritants found in tear gas and pepper spray, causing a painful burning sensation.

208.   The officers eventually processed and jailed L. Ellis, referring to them as female and using she/her pronouns the entire time, despite the fact that L. Ellis does not identify as a woman and does not use those pronouns.

209.   L. Ellis was jailed from approximately 1:30 A.M. to 7:30 A.M. They were placed into a solitary cell with blood smeared on the walls, a fluorescent overhead light that could not be turned off, and a sleeping pad with no pillow or blanket; they could hear other detainees screaming throughout the night.

*Defendants Restrained Demonstrators with Intentionally Tightened Zip Ties to Cause Injury and Deter Protests*

210.   Defendants have placed numerous demonstrators, including Plaintiffs J. Bass and Z. Kolodziej, in zip ties that were intentionally tightened more than is necessary to immobilize, in a manner that serves no purpose other than to inflict punishment by causing pain and discomfort.

211.   Plaintiff Zachary Kolodziej attended the demonstration on July 10, 2020. Like other Plaintiffs, he arrived at approximately 4:30 P.M.

212.   Z. Kolodziej was standing at the front of the protest when he witnessed a line of riot police converge upon the demonstrators, beating their shields with

batons in unison. The police rammed their shields into Z. Kolodziej and the other demonstrators at the front line.

213.   As police surrounded and kettled the demonstrators, Doe Officers pushed Z. Kolodziej back with their shields and beat him back with blows to his torso and legs. Z. Kolodziej had not approached, provoked, or engaged with police; he posed no threat to justify their use of force.

214.   A Doe Officer made eye contact with Z. Kolodziej, shouted something indiscernible, then grabbed Z. Kolodziej's neck in a chokehold and threw him to the ground.

215.   Z. Kolodziej stood up, only for the same Doe Officer to seize him around the neck and throw him to the ground a second time.

216.   When Z. Kolodziej stood up again, multiple Doe Officers tackled him, ripping his shirt and raincoat off of his body and his mask from his face. Other demonstrators attempted to pull Z. Kolodziej away from the brutality, but the Doe Officers seized Z. Kolodziej and threw him to the ground a third time.

217.   A Doe Officer then placed his knee on Z. Kolodziej's neck, twisted his arms behind his back, handcuffed him, and dragged him across the road for approximately 30-50 feet before handing him off to another officer who placed him in a police vehicle.



218.   Before transferring Z. Kolodziej from the police cruiser to a bus, the Doe Officer exchanged his handcuffs for zip ties, and intentionally tightened the zip ties so as to cut off circulation to Z. Kolodziej's hands.

219.   Once placed in the tight zipties, the Doe Officer roughly moved Z. Kolodziej in a manner to place additional force on his wrists.

220.   Defendant Officer Timothy Barr was the arresting officer who issued Z. Kolodziej's misdemeanor ticket.

221.   Z. Kolodziej told the officer that the zip ties were too tight, but the officer told Z. Kolodziej that his circulation was "fine," ignoring his pleas.

222.   For the next few hours, the police kept Z. Kolodziej on the bus with several other demonstrators as he bled from a head injury. None of the demonstrators were given masks or water.

223.   The officers eventually brought Z. Kolodziej and the others to DPD's 12th Precinct and processed them to be jailed. When Z. Kolodziej alerted the officers to his head injury, he was taken to Detroit Receiving Hospital, where a physical examination revealed that Z. Kolodziej had sustained bruising to his back, sides, and vertebrae; bloody abrasions to his knees, elbows, and head; and bruising, abrasions, and a loss of sensation indicating nerve injury to both of his hands.

224.   After receiving medical treatment, officers brought Z. Kolodziej back to the jail for processing, and released around 3:30 A.M.

225.   Since his arrest, Z. Kolodziej has experienced symptoms of lasting nerve damage to his right hand, including numbness, pain, and sensitivity. Further, after Defendants kept him and others on a bus for hours without their protective masks, Z. Kolodziej experienced symptoms of COVID-19 including headaches, fatigue, sore throat, fever, coughing, and shortness of breath that have continued for weeks.

226.   On August 22, 2020, after DPD had arrested over 40 demonstrators, Plaintiffs, including C. Arnold, T. Taylor, and N. Wallace, witnessed demonstrators screaming and sobbing in pain as their hands turned blue and gray from overtightened zip ties.

227.   One demonstrator inexplicably had no less than five zip ties placed around his wrists and intentionally over-tightened, cutting off circulation to his

hands. (He had also been beaten so severely that he had to be hospitalized, and received stitches in his face).

228.   Another demonstrator's zip ties had been tightened so severely that multiple arrestees begged and insisted on her behalf that the DPD officers remove them, and when the officers finally relented, it took several minutes to fit scissors underneath to cut them off. The demonstrator screamed in pain the entire time.

*Defendants Detained Demonstrators in Punitive, Unnecessary, and Torturous Conditions*

229.   In addition to the punitive, unnecessary, and torturous conditions of Plaintiff L. Ellis's detention in a police cruiser and jail and Plaintiff Z. Kolodziej's detention in tightened zip ties, described above, Defendants arrested and detained demonstrators, including Plaintiffs T. Taylor and J. Bass, on repurposed buses with the windows up and the heat turned on while the outside temperature was greater than 90 degrees.

230.   Plaintiff T. Taylor, a publicly recognized protest leader, was one of the first demonstrators to be arrested without probable cause on June 2, 2020. After his arrest, DPD officers placed T. Taylor in the back of a police vehicle that, in T. Taylor's own words, "was like being in a windowless iron box."

231.   The officers detained T. Taylor in the vehicle, handcuffed with his hands behind his back, for approximately twenty-five minutes as they steadily filled the vehicle with other arrestees.

53

232.    T. Taylor and the other arrestees felt hot air coming from the vehicle's air vents. Defendants had turned on the heat in the windowless vehicle on a 90-degree summer day.

233.    Defendants also arrested Plaintiff J. Bass, along with over one hundred other demonstrators, on June 2, 2020. DPD officers had already pepper-sprayed and tear-gassed the crowd when they tacked J. Bass to the ground and arrested him.

234.    The officers poured water on arrestees, including J. Bass, and then loaded them onto a bus. Water activates the chemical irritants contained in tear gas, causing severe and painful stinging and burning of the affected areas.

235.    The officers kept the windows closed and the heat on the bus turned on. J. Bass and the others were sweating, their skin burning from tear gas, with their hands cuffed behind their back. The zip ties on J. Bass's wrists had been intentionally tightened to cause pain and discomfort; J. Bass asked the officers to loosen the ties, but they refused.

236.    J. Bass asked the officers to open the windows or turn on the air conditioning, and the officers refused. The officers detained J. Bass and the others in these excruciating conditions for approximately one hour before taking them to Little Caesar's Arena for processing, where they were left on the bus in the heat again for another twenty to thirty minutes.

237.   On August 22, 2020, DPD officers arrested over 40 demonstrators, including Plaintiffs T. Taylor, N. Wallace, J. Bass, M. Henige, A. Nahabedian, C. Arnold, and A. Anest.

238.   After holding arrestees in various conditions of injury on buses, as described above, the officers brought the arrestees to the Detroit Detention Center, then kept them detained outside in a small fenced-in concrete area until approximately 8:00 in the morning.

239.   The officers refused repeated requests for water. One officer approached M. Henige with a bag of snacks, then pulled the bag away from her, laughing.

240.   One demonstrator showed signs of heatstroke as she slipped in and out of consciousness and was unable to speak in coherent sentences. The officers refused the other arrestees' requests for water and medical attention for her.

241.   Several officers used their cell phones to take photo and video of the arrestees, laughing to one another and mocking the injured and suffering demonstrators.

### *Defendants Arrested Demonstrators En Masse Without Probable Cause in an Attempt to Silence and Deter Demonstrators*

242.   Throughout the demonstrations, DPD has arrested hundreds of peaceful demonstrators without probable cause, including Plaintiffs T. Taylor, G. Branch, N. Wallace, J. Bass, L. Ellis, M. Henige, and Z. Kolodziej, as described above.

243.   As of the date of this filing, DPD has made approximately 500 arrests of peaceful demonstrators, without issuing an audible warning to disperse prior to making arrests. Defendants targeted highly recognizable protest leaders and organizers, including Plaintiffs T. Taylor, N. Wallace, and J. Bass, for repeated arrests on multiple days.

244.   DPD officers issued cookie-cutter misdemeanor tickets that appeared to have been filled out in advance. Among the charges brought against demonstrators were "disorderly conduct" and "loitering."

245.   DPD purported to arrest many demonstrators for violating the curfew between May 29-June 2, 2020. However, DPD allowed other people in Detroit, who were not participating in the demonstrations, to violate the curfew. Further, DPD has in recent history protected other demonstrators – including at protests led by white supremacists – rather than subjecting them to unconstitutional violence[7].

246.   Plaintiffs did not at any time during any of the demonstrations act violently or pose any danger whatsoever to DPD officers.

247.   On June 2, 2020, after DPD arrested Plaintiff T. Taylor and detained him in the punitive conditions described above, plainclothes officers informed him

---

[7] On June 8, 2019, a protest was held in Detroit by armed Neo Nazis who, among other things, screamed racist epitaphs and openly urinated on an Israeli flag. Not only did DPD refrain from any tactics deployed against Plaintiffs, they provided protection to the demonstrators. https://slate.com/news-and-politics/2019/06/armed-neo-nazis-police-escort-detroit-pride.html https://www.detroitnews.com/story/news/local/detroit-city/2019/06/11/pride-fest-attendees-blast-detroit-police-handling-nazis/1418432001/

that he faced felony charges of "inciting a riot" -- a blatant attempt to silence a protest leader and shut down the demonstrations.

248.   On July 10, 2020, DPD targeted T. Taylor for arrest a second time (pictured below). When T. Taylor asked for the name and badge number of the arresting officer, the officer told him to "shut the fuck up."



249.   Plaintiff N. Wallace was also arrested on July 10, 2020, along with many other demonstrators. Defendant Officer Timothy Barr was inexplicably named as the arresting officer on the misdemeanor tickets issued to T. Taylor, N. Wallace, Z. Kolodziej, and the majority of arrestees on July 10, 2020.

250.   On August 22, 2020, DPD officers again arrested Plaintiffs T. Taylor, N. Wallace, J. Bass, A. Nahabedian, M. Henige, and L. Ellis, along with approximately 40 others, without probable cause and in retaliation for their continued lawful exercise of their First Amendment right to protest.

251.   Upon information and belief, large groups of sports fans occupy the space at the intersection of Woodward Avenue and John R in downtown Detroit on a regular basis to celebrate the victories (or mourn the losses) of Detroit's sports teams. In stark contrast to Defendants' treatment of Plaintiff Detroit Will Breathe's gathering of August 22, 2020, Defendants do not shut down those gatherings, which do not convey a message of racial justice, nor arrest their attendees, who are predominantly non-Black.

252.   The curfew and ensuing arrests, as well as DPD's other tactics described above, were a blatant attempt to retaliate against Plaintiffs for exercising their First Amendment rights and to chill and deter the demonstrators' exercise of constitutionally protected activity. Persons of reasonable firmness, including G. Branch, have been, and will continue to be, deterred from joining the demonstrations after the widely publicized police brutality and arrests described above.

253.   Further, Plaintiffs have heard Doe Officers make racially motivated remarks to demonstrators, including calling non-Black demonstrators "white trash" and stating "you're not even from here" to non-Black demonstrators for participating in protests supportive of Black equality (despite the fact that over 80% of DPD officers do not reside in the City of Detroit).

254.   Defendants' actions were motivated by retaliation against Plaintiffs and other demonstrators for exercising their First Amendment rights and specifically in retaliation for their support of racial justice.

*The City's Policy, Practice, and Custom (Monell Allegations)*

255.   Plaintiffs bring each claim against Defendants Duggan and Craig in their official capacities pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

256.   The above-described violations of Plaintiffs' constitutional rights are a direct result of the City's policy, practice, and custom of authorizing DPD to use less-lethal weapons to control and suppress protests.

257.   Defendant Mayor Michael Duggan and Defendant Police Chief James Craig are final decision-makers with respect to authorization of the use of force against protesters.

258.   The City, through Defendants Duggan, Craig, and the DPD, has failed to train its officers in constitutional responses to peaceful demonstrations.

259.   The City has a custom and policy of using excessive force against peaceful demonstrators; using chemical irritants and LRAD sound cannons to disperse peaceful demonstrators; kettling lawful assemblies and subjecting kettled demonstrators to collective corporal punishment and detention without individualized suspicion; assaulting and/or arresting participants without legal

justification; conducting seizures lacking in reasonable suspicion and arrests lacking in probable cause; and using excessive force when detaining and restraining demonstrators including the use of painful and unnecessary use of restraints such as zip ties, causing injury. The unlawful crowd control and use-of-force policies and the long-standing customs and practices of the Defendants do not meet constitutional requirements.

260. Plaintiffs are informed and believe and thereon allege that the DPD officers acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by the DPD and the City of Detroit. Moreover, the sheer frequency with which such techniques have been used—at different times, in different places, by different officers, and after prior publicized uses of such methods—makes it clear that what occurred to Plaintiffs reflects a pattern and practice of misconduct rather than isolated incidents.

261. DPD's pattern and practice of using excessive force against peaceful demonstrators has been on display since the demonstrations began, as officers have repeatedly coordinated with each other to march in formation towards demonstrators, strike their riot shields with batons in unison in a synchronized attempt at intimidation, kettle groups of demonstrators to prevent their escape, and drive straight into demonstrators on multiple occasions.

262.   Defendants Duggan and Craig have each vocalized support of the Doe Officers' decision to hit J. Bass with a police vehicle.

263.   DPD policymakers including Mayor Duggan and Chief Craig have acted with utter disregard for the constitutional rights of protesters and would-be protesters by authorizing, both explicitly and implicitly, the use of less-lethal force against protesters who do not pose any safety threat; by failing to properly train, supervise, condemn, and discipline DPD officers regarding appropriate use of force against protesters; and by failing to rectify the DPD's unconstitutional custom of using less-lethal force to control and suppress demonstrations.

264.   Defendants Duggan and Craig have received ample notice that the DPD is using force against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including a public tribunal held by Plaintiff Detroit Will Breathe, widely publicized videos, and firsthand accounts circulated through the local, state, and international press.

265.   Despite receiving ample notice that DPD officers were using "non-lethal force" to control and suppress demonstrations in the absence of any immediate threat to safety, Defendants Duggan, and Craig failed to act to remedy the ongoing violations of protesters' constitutional rights by DPD officers, including by failing to train, supervise, or discipline DPD officers or issue corrective policies to prevent further violations.

266.   Defendants have continued to authorize the use of force and weaponry to control demonstrations even while acknowledging that the majority of protesters have been peaceful.

267.   Not only has Defendant Craig continuously authorized the use of force against peaceful demonstrators, he has publicly endorsed the above-described brutality, stating on July 28, 2020 that he is "just ecstatic over the men and women in the Detroit Police Department"[8] and on August 24, 2020 that he was "very proud" of the DPD officers.

268.   Also on August 24, 2020, DPD Deputy Chief Todd Bettison stated at a press conference regarding the brutality of August 22: "To Detroit Will Breathe: You're not welcome. Go."[9]

269.   As officers brutalized and arrested approximately 40 demonstrators on August 22-23, 2020, multiple Doe Officers told arrestees that they were "just following orders" and that the above-described actions were "just orders that they had to follow."

270.   As a direct and proximate cause of the conduct described herein, the named individual Plaintiffs (and countless other protesters) have been denied their

---

[8]https://www.washingtontimes.com/news/2020/jul/29/james-craig-detroit-police-chief-on-why-city-isnt-/
[9] https://www.freep.com/story/news/local/michigan/detroit/2020/08/24/detroit-police-chief-james-craig-black-lives-matter-protests/3431311001/

constitutional, statutory, and legal rights as stated herein, and have suffered general and special damages, including but not limited to, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, anxiety, mental and emotional distress, and other damages in an amount according to proof.

271.   Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious or reckless disregard for Plaintiffs' rights.

272.   Defendants' policies, practices, customs, conduct and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrong described herein. The Plaintiffs were subjected to police violence as described above at times when they were engaged in peaceful protest and intend in the future to exercise their constitutional rights of freedom of speech and association by continuing to engage in such expressive activities in the City of Detroit. Defendants' conduct described herein has created uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights. Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

273.    An actual controversy exists between Plaintiffs and Defendants in that Plaintiffs contend that the policies, practices, and conduct of Defendants alleged herein are unlawful and unconstitutional, whereas Plaintiffs are informed and believe that Defendants contend that said policies, practices, and conduct are lawful and constitutional. Plaintiffs seek a declaration of rights with respect to this controversy.

274.    The purpose and effect of the excessive force described herein has been to restrict, frustrate, and deter protesters from exercising their rights under the First Amendment to the United States Constitution to peacefully assemble, petition for redress of grievances, exercise freedom of speech, and exercise freedom of the press, and the Fourth Amendment to be free from unwarranted seizures by the government.

*Plaintiffs Seek Injunctive Relief because Defendants' Actions Have Caused and Continue to Cause Harm*

275.    Detroit Will Breathe, as well as the individually named Plaintiffs, plan to assist, plan, participate in, and hold similar events in the future, on their own or in conjunction with others, and are fearful that the police actions in response to these and similar protests will be repeated absent injunctive relief to prohibit the practices, policies, and customs of the DPD that resulted in the unlawful action in response to the recent protests throughout the City.

276.   Plaintiffs want to participate in these demonstrations without being exposed to the excessive force and "non-lethal" weapons regularly deployed by the DPD against protesters as a method of crowd control.

277.   Plaintiffs fear for their safety from Defendants' violence because they have been attacked and injured repeatedly and without warning throughout their demonstrations.

278.   Given the degree of risk that merely attending a protest presents to protesters, many would-be protest attendees, including G. Branch, choose not to participate, or leave earlier than they wish to, for fear that they will not have access to medical care in the likely event the police hurt them.

279.   If this Court issues an injunction prohibiting Defendants from continuing the unlawful practices described above, Plaintiff G. Branch would return to the daily demonstrations.

280.   Plaintiffs bring this action to enjoin the City of Detroit from continuing to respond to peaceful protest with unconstitutional and indiscriminate force.

281.   Without an injunction restraining their unconstitutional use of force, DPD will continue to deploy the same abusive and illegal tactics, threatening the constitutional rights and physical safety of Plaintiffs.

282.   All of the following claims for relief are asserted against all Defendants.

## COUNT I
### First Amendment to the United States Constitution:
### Free Speech and Assembly
### 42 U.S.C. § 1983

283.   All preceding paragraphs are incorporated by reference

284.   At all relevant times, Defendants have acted—and continue to act—under color of state law.

285.   Defendants' above-described conduct violated Plaintiffs' rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution. Lawful protests that posed no threat were interrupted by police declaring unlawful assemblies without justification.

286.   In dispersing such assemblies, Defendants repeatedly relied on violence and excessive force despite the peaceful nature of Plaintiffs' actions.  The DPD's tactics and methods would, and in fact did, deter protesters of reasonable firmness from participating in future protests.

287.   The Defendants' repeated use of violence and excessive force against peaceful demonstrators can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment, and in fact has deterred demonstrators from participating in future events. Indeed, this has proven to be the obvious intent of Defendants' tactics.

288.   Defendants' policy, practice, and custom of using "non-lethal" weapons and the types of force described in this lawsuit to control and suppress

demonstrations is not a reasonable regulation of the time, place, or manner of Plaintiffs' First Amendment protected activity.

289.   Defendants have acted with deliberate indifference to Plaintiffs' First Amendment rights.

290.   Plaintiffs suffered and will continue to suffer harm as a direct and proximate result of Defendants' actions, including but not limited to physical injury and pain and suffering.

291.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have sustained injuries and damages including, physical injury, mental anguish and emotional distress, humiliation and embarrassment, and have incurred attorney fees.

### COUNT II
### Fourth Amendment to the U.S. Constitution:
### Unreasonable and Excessive Force
### 42 U.S.C. 1983

292.   All preceding paragraphs are incorporated by reference.

293.   At all relevant times, Defendants have acted—and continue to act— under color of state law.

294.   Defendants' above-described conduct violated Plaintiffs' clearly established rights pursuant to the Fourth Amendment of the United States Constitution to be free from unreasonable, excessive and arbitrary force and seizures under color of law.

295.   The arbitrary and indiscriminate use of force against Plaintiffs and other peaceful protesters, described in detail above, was excessive and objectively unreasonable, in direct violation of Plaintiffs' rights under the Fourth Amendment.

296.   Defendants engaged in the indiscriminate use of "non-lethal" weapons including zip ties, chokeholds, baton strikes, rubber bullets, teargas, pepper spray, the LRAD Sound Cannon, and fisticuffs, against peaceful demonstrators who did not present a physical threat to police officers or any member of the public, contrary to law.

297.   Defendants deployed these "non-lethal" tactics largely without an audible prior notice or warning.

298.   No Plaintiffs have been accused of any crimes severe enough to justify such egregious, and sometimes deadly, force.

299.   In many instances, Plaintiffs were subjected to violent force despite not being accused of a crime at all.

300.   The Plaintiffs have not posed any reasonable immediate threat to the safety of any officer nor have Defendants provided sufficient evidence asserting so.

301.   The Defendants were not met with split second decisions as in almost each incident they were present on the scene observing for a substantial period of time prior to deploying chemical irritants, the LRAD Sound Cannon, rubber bullets, and other methods of physical force.

302.   Defendants intentionally removed the facemasks of demonstrators, including Plaintiffs, without any purpose beyond increasing the potency of their chemical weapons and/or to expose them to a deadly virus.

303.   Defendants intentionally hit demonstrators, including Plaintiff J. Bass, with a police vehicle for the purpose of causing great bodily injury or with willful indifference to his wellbeing.

304.   Defendants' attacks were done not to compel Plaintiffs to retreat, but to injure and punish them on site.  Many individuals were attempting to disperse the scene or helping an injured citizen at the scene.  In some cases, Plaintiffs and others had force inflicted upon them while they were already detained or subdued.

305.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have sustained injuries and damages including, physical injury, mental anguish and emotional distress, humiliation and embarrassment, and have incurred attorney fees.

## COUNT III
### Fourth Amendment to the United States Constitution:
### Arrests Without Probable Cause
### 42 U.S.C. 1983

306.   All preceding paragraphs are incorporated by reference.

307.   At all relevant times, Defendants have acted—and continue to act—under color of state law.

308.   Defendants detained, seized, handcuffed, arrested, and searched Plaintiffs' persons and their personal property despite the lack of any individualized probable cause or reasonable suspicion that Plaintiffs committed any crime.

309.   Defendants issued "cookie cutter" misdemeanor tickets that had been filled out prior to the arrests, simply filling in the names of arrestees as they were rounded up.

310.   The "arresting officers" did not actually witness or assert any facts describing Plaintiffs' alleged violations of law.

311.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have sustained injuries and damages including physical injury, mental anguish and emotional distress, humiliation and embarrassment, and have incurred attorney fees.

**COUNT IV**
**Fourth Amendment to the United States Constitution:**
**False Imprisonment/Conditions of Confinement/**
**Failure to Provide Medical Attention**

312.   All preceding paragraphs are incorporated by reference.

313.   At all relevant times, Defendants have acted—and continue to act—under color of state law.

314.   Defendants placed several demonstrators, including Plaintiffs T. Taylor, L. Ellis, and J. Bass, on repurposed school buses and/or police cruisers for prolonged periods of time with the windows up and heat turned on during days in

70

which the temperature was over 90 degrees without access to bathrooms, water, food, or medical attention. In some cases, Plaintiffs also still had pepper spray in their eyes.

315.   Defendants removed and displaced Plaintiffs' protective face masks, exposing them to great risk of contracting the deadly COVID-19 in the midst of a global pandemic.

316.   Defendants fired tear gas canisters into crowds of non-violent demonstrators, including Plaintiffs, while preventing them from dispersing.

317.   Defendants have denied or otherwise significantly delayed medical attention to Plaintiffs while holding them in custody, including A. Anest, who experienced serious injuries requiring hospitalization.

318.   Conditions of confinement under which Plaintiffs were held violated their rights to due process of the law, were knowingly and objectively unreasonable, and were punitive, with no rational relationship to any lawful purpose for which Plaintiffs were being detained.

319.   Defendants acted with deliberate and reckless indifference towards Plaintiffs' health, safety, and medical needs.

320.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have sustained injuries and damages including physical injury, mental

anguish and emotional distress, humiliation and embarrassment, and have incurred attorney fees.

## COUNT V
## First, Fourth, Fifth and Fourteenth Amendment to the United States Constitution:
## Free Speech and Assembly/Curfew Orders

321.   All preceding and subsequent paragraphs are incorporated by reference.

322.   At all relevant times, Defendants have acted—and continue to act— under color of state law.

323.   The curfew order was not narrowly tailored, insofar as it suppressed far more speech, assembly, and other protected First Amendment activity than necessary to deal with any emergency that was currently in existence.

324.   The imposition of a curfew to the entire City of Detroit which was only enforced against Plaintiffs and those others who were peacefully protesting racist violence by law enforcement was not a reasonable regulation of the time, place, or manner of Plaintiffs' First Amendment protected activity.

325.   Defendants have acted with deliberate indifference to Plaintiffs' First Amendment rights.

326.   Plaintiffs suffered and will continue to suffer harm as a direct and proximate result of Defendants' actions, including but not limited to physical injury and pain and suffering.

## COUNT VI
## 42 U.S.C. § 1981 - Retaliation

327.   All preceding paragraphs are incorporated by reference.

328.   The Plaintiffs have engaged in activity protected by 42 U.S.C. § 1981 when they vocalized, marched, and demonstrated in support of Black people's rights to the full access to and equal benefit of all laws, particularly at the hands of law enforcement personnel.

329.   Defendants, both individually and pursuant to the customs, policies and/or practices of Defendants City of Detroit, Craig and Duggan, retaliated against Plaintiffs by utilizing the excessive force and unlawful arrests described within this Complaint.

330.   Defendants retaliated against Plaintiffs by using both force, ticketing, and arresting Plaintiffs in a manner completely dissimilar to methods used by DPD Officers in response to other similar protests that do not directly address the equal rights of Black citizens to the full and equal benefit of all laws.

331.   There is no valid explanation for the disparate treatment of Plaintiffs and other demonstrators other than the fact that Plaintiffs' message is one that specifically seeks to protect Black people in Detroit and America from the disproportionately excessive use of violence and unlawful criminal process by officers of the law.

332.   Defendants' treatment of and egregious actions against Plaintiffs violate Plaintiffs' rights under 42 U.S.C. § 1981.

333.   Defendants knowingly acted with malice and/or with reckless indifference to Plaintiffs' federally protected rights.

334.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have sustained injuries and damages including, physical injury, mental anguish and emotional distress, humiliation and embarrassment, and have incurred attorney fees.

**COUNT VII**
**42 U.S.C. § 1983**
***Monell* Liability**

335.   All preceding and subsequent paragraphs are incorporated by reference.

336.   At all times herein, Defendant City of Detroit, through its Police Department, supervisors and/or policymakers, established and/or maintained the following customs, usages, policies and/or practices:

a) Deploying chemical weapons, including tear gas and pepper spray, against demonstrators without warning or justification;

b) Deploying LRADs against demonstrators without warning;

c) Beating, shoving, tackling, and brutalizing demonstrators with batons and riot shields, including aiming for demonstrators' legs to incapacitate them;

d)  Using chokeholds to detain demonstrators;

e)  Arresting demonstrators en masse without probable cause;

f)  Detaining demonstrators in intentionally overtightened zip ties and heated police vehicles;

g)  Using police vehicles to run through and over demonstrators; and

h)  Shooting rubber bullets at fleeing demonstrators.

337.   In particular, Defendant City of Detroit, acting through its Police Department, supervisors and/or policymakers, was on actual notice that its police officers, including Defendants Anouti, Erard, Hornshaw, Barr, and Does 1-100, engaged in the above-listed practices, thereby condoning and/or acquiescing in Defendants Anouti, Erard, Hornshaw, Barr, and Officer Does' unconstitutional use of force, arrests, detentions, invasion of First and Fourth Amendment rights, and retaliatory conduct in violation of 42 USC §1981;

338.   Each of the aforementioned policies, customs, and/or practices was known to Defendant City of Detroit, and Defendants Craig and Duggan, each acting in their official capacities, as being highly likely and probable to cause violations of the constitutional rights of members of the public, including but not limited to Plaintiffs herein.

339.   The conduct of the individually named Defendants herein was committed pursuant to the customs, policies and/or practices of Defendant City of Detroit.

340.   Each such custom, policy and/or practice, referenced above, was a moving force in the violations of Plaintiffs' constitutional rights, as set forth herein.

341.   DPD policymakers including Mayor Duggan and Chief Craig have acted with utter disregard for the constitutional rights of protesters and would-be protesters by authorizing, both explicitly and implicitly, the use of less-lethal force against protesters who do not pose any safety threat; by failing to properly train, supervise, condemn, and discipline DPD officers regarding appropriate use of force against protesters; and by failing to rectify the DPD's unconstitutional custom of using less-lethal force to control and suppress demonstrations.

342.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have sustained injuries and damages including, physical injury, mental anguish and emotional distress, humiliation and embarrassment, and have incurred attorney fees.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request this Court to:

A.   Enter an injunction restraining Defendants from engaging in the unlawful and unconstitutional practices described above, including enjoining

Defendants from using chemical irritants, deploying LRAD sound cannons, arresting demonstrators without probable cause, placing demonstrators in chokeholds, restraining demonstrators in dangerously tight zip ties, shooting rubber bullets at demonstrators, and using batons and riot shields as tools of excessive force;

B.     Enter a declaratory judgment that Defendants' conduct detailed herein was a violation of the rights under the Constitution and laws of the United States and of Plaintiffs;

C.     Award general and compensatory damages for Plaintiffs for the violations of their federal constitutional and statutory rights, pain and suffering, all to be determined according to proof;

D.     Award punitive damages as available, pursuant to both 42 U.S.C. §1983 and 42 U.S.C. §1981;

E.     Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

F.     Award costs of suit;

G.     Award pre- and post-judgment interest as permitted by law; and

H.     Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By: */s/ Jack W. Schulz*
*/s/ Amanda M. Ghannam*
Jack W. Schulz (P78078)
Amanda M. Ghannam (P83065)
SCHULZ LAW PLC
PO Box 44855

Detroit, MI 48244
(313) 246-3590
jackwschulz@gmail.com
amandamghannam@gmail.com
*Attorneys for Plaintiffs*

Dated: August 31, 2020

## VERIFICATION

I declare that the facts stated above are true to the best of my personal knowledge, information, and belief.

By:

_____
Tristan Taylor

_____
Nakia Wallace

_____
Jazten Bass

_____
Lauren Rosen

_____
Lauryn Brennan

_____
Amy Nahabedian

_____
Caylee Arnold

_____
Zachary Kolodziej

_____
Lauren "Graham" Branch

_____
Lillian "Peatmoss" Ellis

_____
Olivia Puente

_____
Iman Saleh

_____
Margaret Henige

_____
Alexander Anest

75

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DETROIT WILL BREATHE,**
**TRISTAN TAYLOR, NAKIA WALLACE,**          Case No.
**JAZTEN BASS, LAUREN ROSEN, LAURYN**       Hon:
**BRENNAN, AMY NAHABEDIAN, ZACH**
**KOLODZIEJ, LAUREN BRANCH,**
**LILLIAN ELLIS, OLIVIA PUENTE,**
**IMAN SALEH, MARGARET HENIGE,**
**CAYLEE ARNOLD, AND ALEXANDER ANEST,**

        Plaintiffs,

vs.

**CITY OF DETROIT,** a municipal corporation,
**MAYOR MICHAEL DUGGAN,** acting in his official
and individual capacities, **CHIEF JAMES CRAIG,** acting in his official
and individual capacities, **OFFICER STEPHEN ANOUTI**, **SERGEANT
TIMOTHY BARR**, **OFFICER DAVID HORNSHAW, OFFICER MARIAH
ERARD,** and **OFFICER DOES 1-100 inclusive,**
acting in their respective individual capacities, all jointly and severally,

        Defendants.

_____/

| | |
|---|---|
| Jack W. Schulz (P78078) | GOODMAN HURWITZ & JAMES, PC |
| Amanda M. Ghannam (P83065) | Julie H. Hurwitz (P34720) |
| SCHULZ LAW PLC | William H. Goodman (P14173) |
| PO Box 44855 | Melissa A. Brown (P79127) |
| Detroit, MI 48244 | 1394 E. Jefferson Ave. |
| (313) 246-3590 | Detroit, MI 48207 |
| jackwschulz@gmail.com | (313) 567-6170 |
| amandamghannam@gmail.com | jhurwitz@goodmanhurwitz.com |
| *On behalf of the National Lawyers* | bgoodman@goodmanhurwitz.com |
| *Guild, Detroit/Michigan Chapter* | mbrown@goodmanhurwitz.com |
| *Attorneys for Plaintiffs* | *On behalf of the National Lawyers* |
| | *Guild, Detroit/Michigan Chapter* |
| | *Co-counsel for Plaintiffs* |

Sean Riddell (P81302)
The Riddell Law Firm PLLC
400 Renaissance Center, Ste. 2600
Detroit, MI 48243
(313) 497-0074
sriddell@riddelllawfirm.com
*On behalf of the National Lawyers*
*Guild, Detroit/Michigan Chapter*
*Co-counsel for Plaintiffs*

_____/

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38 and 39, and to the Eastern District LR 38.1,

Plaintiffs demand a trial by jury on each and every one of their claims at law which

seek compensatory and/or punitive damages.

Respectfully submitted,

By: */s/ Jack W. Schulz*
*/s/ Amanda M. Ghannam*
Jack W. Schulz (P78078)
Amanda M. Ghannam (P83065)
SCHULZ LAW PLC
PO Box 44855
Detroit, MI 48244
(313) 246-3590
jackwschulz@gmail.com
amandamghannam@gmail.com
*Attorneys for Plaintiffs*

Dated: August 31, 2020

2