UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DETROIT WILL BREATHE,**
**TRISTAN TAYLOR, NAKIA WALLACE,**            Case No.
**JAZTEN BASS, LAUREN ROSEN, LAURYN**         Hon:
**BRENNAN, AMY NAHABEDIAN, ZACH**
**KOLODZIEJ, LAUREN BRANCH,**
**LILLIAN ELLIS, OLIVIA PUENTE,**
**IMAN SALEH, MARGARET HENIGE,**
**CAYLEE ARNOLD, AND ALEXANDER ANEST,**

         Plaintiffs,

vs.

**CITY OF DETROIT,** a municipal corporation,
**MAYOR MICHAEL DUGGAN,** acting in his official
and individual capacities, **CHIEF JAMES CRAIG,** acting in his official
and individual capacities, **OFFICER STEPHEN ANOUTI, SERGEANT**
**TIMOTHY BARR**, **OFFICER DAVID HORNSHAW, OFFICER MARIAH**
**ERARD,** and **OFFICER DOES 1-100 inclusive,**
acting in their respective individual capacities, all jointly and severally,

         Defendants.

_____/

| | |
|---|---|
| Jack W. Schulz (P78078) | Julie H. Hurwitz (P34720) |
| Amanda M. Ghannam (P83065) | William H. Goodman (P14173) |
| SCHULZ LAW PLC | Melissa A. Brown (P79127) |
| PO Box 44855 | GOODMAN HURWITZ & JAMES, PC |
| Detroit, MI 48244 | 1394 E. Jefferson Ave. |
| (313) 246-3590 | Detroit, MI 48207 |
| jackwschulz@gmail.com | (313) 567-6170 |
| amandamghannam@gmail.com | jhurwitz@goodmanhurwitz.com |
| *On behalf of the National Lawyers* | bgoodman@goodmanhurwitz.com |
| *Guild, Detroit/Michigan Chapter* | mbrown@goodmanhurwitz.com |
| *Attorneys for Plaintiffs* | *On behalf of the National Lawyers* |
| | *Guild, Detroit/Michigan Chapter* |
| Sean Riddell (P81302) | *Co-counsel for Plaintiffs* |
| The Riddell Law Firm PLLC | |

400 Renaissance Center, Ste. 2600
Detroit, MI 48243
(313) 497-0074
sriddell@riddelllawfirm.com
*On behalf of the National Lawyers*
*Guild, Detroit/Michigan Chapter*
*Co-counsel for Plaintiffs*

_____/

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
### *(EXPEDITED HEARING REQUESTED)*

Plaintiffs, Detroit Will Breathe, Tristan Taylor, Nakia Wallace, Jazten Bass, Lauren Rosen, Lauryn Brennan, Amy Nahabedian, Zachary Kolodziej, Graham Branch, Lillian Ellis, Olivia Puente, Iman Saleh, Margaret Henige, Caylee Arnold, and Alexander Anest ("Plaintiffs") move for a temporary restraining order and preliminary injunction pursuant to Federal Rule of Civil Procedure 65 and the First and Fourth Amendments to the United States Constitution. Plaintiffs support this motion with the contents of their Verified Complaint, Brief in Support, and affidavits from witnesses and individuals who suffered violations similar to those of Plaintiffs.

Plaintiffs specifically seek an order enjoining Defendant City of Detroit, its police department, and its officers, agents, and employees (collectively "DPD") as follows:

1.    That the DPD be enjoined from utilizing striking weapons, such as batons and shields, against demonstrators who do not pose a threat to any officer and

have not committed any crimes or otherwise been accused of misdemeanors or civil infractions.

2.     That the DPD be enjoined from utilizing striking weapons, such as batons and shields, on any individual who is subdued, attempting to disperse, assisting an injured demonstrator, or otherwise not resisting any lawful command.

3.     That the DPD be enjoined from using any striking weapons, such as batons or shields, or other forms of physical combat against individuals attending demonstrations for the purpose of providing medical support or to legal observe.  To facilitate DPD's identification of these individuals, Medics will be clearly marked with a large red cross and legal observers will be wearing a National Lawyers' Guild issued or authorized Legal Observer hat (a neon green hat).

4.     That the DPD be enjoined from deploying tear gas against demonstrators without first issuing an audible warning and notice to disperse, and time to comply with a legitimate dispersal order.

5.     That the DPD be enjoined from using pepper spray against non-violent demonstrators who have not committed any crimes or otherwise accused of misdemeanors or civil infractions.

6.     That the DPD be enjoined from utilizing chemical irritants against individuals who are already subdued or are otherwise attempting to disperse.

7.     That the DPD be enjoined from utilizing chemical irritants against individuals who have not been accused of any crimes.

8.     That the DPD be enjoined from utilizing rubber bullets against demonstrators who have not committed any crimes or are otherwise accused of misdemeanors or civil infractions.

9.     That the DPD be enjoined from placing demonstrators in chokeholds.

10.    That the DPD be enjoined from ramming demonstrators with their vehicles or using moving vehicles for crowd control.

11.    That the DPD be enjoined from using the LRAD Sound Cannon.

12.    That the DPD be enjoined from removing protective face masks from individuals who are shielding themselves from Covid-19 or otherwise denying individuals the ability to replace or reposition their protective facial masks or maintaining social distance.

13.    That the DPD be enjoined from tightening zip ties to the point in which an individual's hands lose circulation, intentionally or to a standard that a reasonable trained police officer would be aware such injury is possible.  If an arrestee alerts an officer that they have lost circulation to their hands or are otherwise in pain the officer must give attention and remedy the issue by removing or loosening the zip ties.

14.    That the DPD be enjoined from denying timely medical attention to individuals it has arrested or otherwise seized.

15.    That the DPD be enjoined from denying arrestees access to water and restrooms for extended periods of time.

16.    That the DPD be enjoined from deliberately subjecting arrestees to torturous conditions including, but not limited to, placing arrestees in oppressively hot vehicles for several hours or placing restrained arrestees outdoors in the sun for several hours without shade or water.

17.    That the DPD be enjoined from arresting, or otherwise seizing, any demonstrator and/or demonstrators en masse unless they have individualized probable cause to believe that such individual(s) committed a crime justifying arrest.

18.    That the DPD be enjoined from arresting individuals attending demonstrations for the purpose of providing medical support or to legal observe.  To facilitate DPD's identification of these individuals, Medics will be clearly marked with a large red cross and legal observers will be wearing a National Lawyers' Guild issued or authorized Legal Observer hat (a neon green hat).

The materials submitted in support of this motion demonstrate that "immediate injury, loss, or damage will result to the movants before the adverse party can be heard in opposition." Fed. R. Civ. P 65(b)(1)(A). They demonstrate a threat of irreparable harm to the Plaintiffs, likely to be repeated as to said named

Plaintiffs, and other demonstrators or potential demonstrators who are not parties to the suit, the Plaintiffs are likely to succeed on the merits, that the balance of this harm against any harm the TRO may inflict on others parties weighs in favor of granting the TRO, and that the public interest favors issuing a TRO. There is no place in Detroit or this County for intentionally brutalizing, injuring, and maiming, non-violent protestors, medics, and spectators.

If the Court grants the requested relief, Plaintiffs seek an expedited hearing under Federal Rule of Civil Procedure 65(b)(3). To demonstrate the *necessity* of the requested relief, Plaintiffs respectfully request the ability to play video footage and present witnesses.

Respectfully submitted,

**SCHULZ LAW PLC**

By:   _/s/    Jack W. Schulz_
Jack W. Schulz (P78078)
Amanda M. Ghannam (P83065)
SCHULZ LAW PLC
PO Box 44855
Detroit, MI 48244
(313) 246-3590
jackwschulz@gmail.com
amandamghannam@gmail.com
*On behalf of the National Lawyers*
*Guild, Detroit/Michigan Chapter*
*Attorneys for Plaintiff*

Dated:        August 30, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DETROIT WILL BREATHE,**
**TRISTAN TAYLOR, NAKIA WALLACE,**          Case No.
**JAZTEN BASS, LAUREN ROSEN, LAURYN**       Hon:
**BRENNAN, AMY NAHABEDIAN, ZACH**
**KOLODZIEJ, LAUREN BRANCH,**
**LILLIAN ELLIS, OLIVIA PUENTE,**
**IMAN SALEH, MARGARET HENIGE,**
**CAYLEE ARNOLD, AND ALEXANDER ANEST,**

          Plaintiffs,

vs.

**CITY OF DETROIT,** a municipal corporation,
**MAYOR MICHAEL DUGGAN,** acting in his official
and individual capacities, **CHIEF JAMES CRAIG,** acting in his official
and individual capacities, **OFFICER STEPHEN ANOUTI, SERGEANT
TIMOTHY BARR**, **OFFICER DAVID HORNSHAW, OFFICER MARIAH
ERARD,** and **OFFICER DOES 1-100 inclusive,**
acting in their respective individual capacities, all jointly and severally,

          Defendants.

_____/

| | |
|---|---|
| Jack W. Schulz (P78078) | Julie H. Hurwitz (P34720) |
| Amanda M. Ghannam (P83065) | William H. Goodman (P14173) |
| SCHULZ LAW PLC | Melissa A. Brown (P79127) |
| PO Box 44855 | GOODMAN HURWITZ |
| Detroit, MI 48244 | & JAMES, PC |
| (313) 246-3590 | 1394 E. Jefferson Ave. |
| jackwschulz@gmail.com | Detroit, MI 48207 |
| amandamghannam@gmail.com | (313) 567-6170 |
| *On behalf of the National Lawyers* | jhurwitz@goodmanhurwitz.com |
| *Guild, Detroit/Michigan Chapter* | bgoodman@goodmanhurwitz.com |
| *Attorneys for Plaintiffs* | mbrown@goodmanhurwitz.com |
| | *On behalf of the National Lawyers* |
| Sean Riddell (P81302) | *Guild, Detroit/Michigan Chapter* |
| The Riddell Law Firm PLLC | *Co-counsel for Plaintiffs* |

400 Renaissance Center, Ste. 2600
Detroit, MI 48243
(313) 497-0074
sriddell@riddelllawfirm.com
*On behalf of the National Lawyers*
*Guild, Detroit/Michigan Chapter*
*Co-counsel for Plaintiffs*

_____/

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
### *(EXPEDITED HEARING REQUESTED)*

# TABLE OF CONTENTS

Index of Authorities…...………………………………………………...iv

Statement of Issues Presented……………………...……………………...vii

Controlling or Most Appropriate Authority….........................................…xi

Introduction…….……………………………….....……………….....…………..1

Statement of Facts…….……………………………….....……………...…………..1

Discussion…....……………………………………...………………..………...5

    I.     Plaintiffs are likely to succeed on the merits…………...………………6

    A. Plaintiffs are likely to succeed on their excessive force claims
       under the Fourth Amendment…………………………………...………...6

        1.  *The Plaintiffs were accused of minor crimes of in several cases
           no crime at all……………………………….…………….…………7*

        2.  *The Plaintiffs posed no immediate threat to the safety of the
           officers or others…………………………………….…………..8*

        3.  *The Plaintiffs were not actively resisting or attempting to
           evade arrest……………………………………….………...….8*

        4.  *It was a violation of the Fourth Amendment when Defendants
           used batons, riot shields, and excessive physical force to
           brutalize Plaintiffs and other demonstrators……………………….9*

        5.  *It was a violation of the Fourth Amendment when Defendants
           fired rubber bullets at demonstrators………………………...10*

6. *It was a violation of the Fourth Amendment when Defendants used chokeholds against Plaintiff Nakia Wallace and other demonstrators*……………………………….……………10

7. *It was a violation of the Fourth Amendment when Defendants utilized deadly force by ramming Plaintiff Jazten Bass and other demonstrators with a police vehicle*…………………………11

8. *It was a violation of the Fourth Amendment when Defendants deployed chemical irritants to injure and deter Plaintiffs and other demonstrators*…………………………………………….…12

9. *It was a violation of the Fourth Amendment when Defendants deployed a Long Range Acoustic Device ("LRAD") to injure and deter Plaintiffs and other demonstrators*…………………………..12

10. *It was a violation of the Fourth Amendment when Defendants restrained Plaintiffs and other demonstrators with intentionally tightened zip ties*……………………………………………….…..13

B. Plaintiffs are likely to succeed on claims that they were subjected to punitive, unnecessary, and torturous conditions in violation of the Fourth Amendment……………………………………………………...13

C. Plaintiffs are likely to succeed on claims that they were falsely arrested in violation of the Fourth Amendment……………………….…...14

D. Plaintiffs are likely to succeed on their First Amendment claims…….....15

1. *Plaintiffs engaged in activity protected by the First Amendment*...…….15

2. *The use of force against Plaintiffs and mass arrests of Plaintiffs have chilled their First Amendment Rights*……………………….……16

3. *Defendants' conduct was motivated by Plaintiffs' protected activity*…..17

E.  Plaintiffs are likely to succeed on their *Monell* claims……………..………18

II.  Plaintiffs will suffer irreparable harm without the
Court's intervention…………….…………...........................................19

III.  The public's interest and balance of equities weigh strongly in
favor of Plaintiffs………………………………………………………..20

IV.  Courts across the country have enjoined similar police conduct
arising from Black Lives Matter protests………………..……..……...21

Conclusion……………………………...……………..………………………..25

# INDEX OF AUTHORITIES

## CASES

*Southern Glazers Distribs. of Ohio, LLC v. Great Lakes Brewery Co.*,
860 F.3d 844 (6th Cir. 2017)**…**…………………...……………………………..6

*Obama for America v. Husted*,
697 F.3d 423 (6th Cir. 2012)………………………………………………………6

*Liberty Coins, LLC v. Goodman*,
748 F.3d 682 (6th Cir. 2014)………………………………………………………6

*Graham v. Connor*,
490 U.S. 386 (1989)…………………………………………………..……6, 7

*Scott v. Clay County*,
205 F.3d 867  (6th Cir. 2000)………………………………………………....7

*Ciminillo v. Streicher*,
434 F.3d 461 (6th Cir. 2006)…………………………………………...……7, 10

*Grawey v. Drury*,
567 F.3d 302 (6th Cir. 2009)………………………………………………7, 8

*Crawford v. Geiger*,
656 Fed. Appx. 190 (6th Cir. 2013)………………………………………..……7

*Solomon v. Auburn Hills Police Dept.*,
389 F.3d 167 (6th Cir. 2004)………………………………………………....9

*Jones v. City of Cincinnati*,
521 F.3d 555 (6th Cir. 2008)………………………………………………9

*Schreiber v. Moe*,
596 F.3d 323 (6th Cir. 2010)…………………………………………..….9, 10

*King v. United States*,
917 F.3d 409 (6th Cir. 2019)………………………………………………...11

*Tennessee v. Garner*,
471 U.S. 1 (1985)………………………………………………………………………11

*Champion v. Outlook Nashville, Inc.,*
380 F.3d 893 (6th Cir. 2004)……………………………………………….....12

*Atkins v. Township of Flint*,
94 F. App'x 342 (6th Cir. 2004)…………………………………………….…..12

*Edrei v. Maguire*,
892 F.3d 525 (2nd Cir. 2018)……………………………..……...12, 13

*Vance v. Wade*,
546 F.3d 774 (6th Cir. 2008)………………………………………………..….13

*Phelps v. Coy*,
286 F.3d 295 (6th Cir. 2002)…………………………………………...……13

*Burchett v. Kiefer*,
310 F.3d 937 (6th Cir. 2002)…………………………………………….....14

*Estate of Owensby v. City of Cincinnati*,
414 F.3d 596 (6th Cir. 2005)…………………………………………….…...14

*Donovan v. Thames*,
105 F.3d 291 (6th Cir. 1997)……………………………………….…..15

*Hartman v. Moore*,
547 U.S. 250 (2006)……………………………………………………………15

*Thaddeus–X v. Blatter*,
175 F.3d 378 (6th Cir. 1999)…………………………………………..15, 16, 17

*Leonard v. Robinson*,
477 F.3d 347 (6th Cir. 2007)………………………………………………...16

*Glasson v. City of Louisville*,
518 F.2d 899 (1975)………………………………………………….....16

***Black Lives Matter Seattle-King County v. City of Seattle,***
***Seattle Police Department***, No. 2:20-cv-00887-RAJ,
2020 WL 3128299 (W.D. Wash. June 12, 2020)………………....16, 17, 22, 23, 24

***Monell v. Dep't of Soc. Servs***.,
436 U.S. 658 (1978)………………………………………………………...…18

***City of Canton v. Harris***,
489 U.S. 378 (1989)………………………………………………………...…18

***Bd. of County Comm'rs v. Brown***,
520 U.S. 397 (1997)…………………………………………………….18, 19

***Elrod v. Burns***,
427 U.S. 347 (1976)……………………………………………..…………..19

***Overstreet v. Lexington-Fayette Urban Cty. Govt***.,
305 F.3d 566 (6th Cir.2002)…………………………………………….....19

***Connection Distrib. Co. v. Reno***,
154 F.3d 281 (6th Cir. 1998)……………………………………...………20

***Anti Police-Terror Project v. City of Oakland***,
Case no. 20-cv-03866-JCS, 2020 WL 4584185 (N.D. Cal. 2020)………..21, 23, 24

***Abay et al. v. City of Denver***,
Case no. 20-cv-01616-RBJ, 2020 WL 3034161 (D. Col. 2020)………..…21, 23, 25

***Don't Shoot Portland v. City of Portland***,
Case no. 3:20-cv-00917-HZ, 2020 WL 3078329 (D. Oreg. 2020)……………..…22

***Woodstock et al. v. City of Portland***,
Case no. 3:20-cv-1035-SI, 2020 WL 3621179 (D. Oreg. 2020)……………….…22

***Goyette v. City of Minneapolis***,
Case no. 20-cv-1302, 2020 WL 3056705 (D. Minn. 2020)……………..…….22, 23

**RULES**

Fed. R. Civ. P. 65…………………………………………….…………………6, 25

## STATEMENT OF ISSUES PRESENTED

1.   Should the Court enjoin Defendants from utilizing striking weapons such as batons and shields, against demonstrators who do not pose a threat to any officer and have not committed any crimes or otherwise been accused of misdemeanors or civil infractions.

   Plaintiffs' Answer: Yes
   Defendants' Answer: No

2.   Should the Court enjoin Defendants from utilizing striking weapons, such as batons and shields, on any individual who is subdued, attempting to disperse, assisting an injured demonstrator, or otherwise not resisting any lawful command?

   Plaintiffs' Answer: Yes
   Defendants' Answer: No

3.   Should the Court enjoin Defendants from using any striking weapons, such as batons or shields, or other forms of physical combat against individuals attending demonstrations for the purpose of providing medical support or to legal observe?

   Plaintiffs' Answer: Yes
   Defendants' Answer: No

4.   Should the Court enjoin Defendants from deploying tear gas against demonstrators without first issuing an audible warning and notice to disperse, and time to comply with a legitimate dispersal order?

   Plaintiffs' Answer: Yes
   Defendants' Answer: No

5.   Should the Court enjoin Defendants from using pepper spray against non-violent demonstrators who have not committed any crimes or otherwise accused of misdemeanors or civil infractions?

   Plaintiffs' Answer: Yes
   Defendants' Answer: No

6.      Should the Court enjoin Defendants from utilizing chemical irritants against individuals who are already subdued or are otherwise attempting to disperse?

Plaintiffs' Answer: Yes
Defendants' Answer: No

7.      Should the Court enjoin Defendants from utilizing chemical irritants against individuals who have not been accused of any crimes?

Plaintiffs' Answer: Yes
Defendants' Answer: No

8.      Should the Court enjoin Defendants from utilizing rubber bullets against demonstrators who have not committed any crimes or are otherwise accused of misdemeanors or civil infractions?

Plaintiffs' Answer: Yes
Defendants' Answer: No

9.      Should the Court enjoin Defendants from placing demonstrators in chokeholds?

Plaintiffs' Answer: Yes
Defendants' Answer: No

10.     Should the Court enjoin Defendants from ramming demonstrators with their vehicles or using moving vehicles for crowd control?

Plaintiffs' Answer: Yes
Defendants' Answer: No

11.     Should the Court enjoin Defendants from using the LRAD Sound Cannon?

Plaintiffs' Answer: Yes
Defendants' Answer: No

12.     Should the Court enjoin Defendants from removing protective face masks from individuals who are shielding themselves from Covid-19 or otherwise

denying individuals the ability to replace or reposition their protective facial masks or maintaining social distance?

Plaintiffs' Answer: Yes
Defendants' Answer: No

13. Should the Court enjoin Defendants from tightening zip ties to the point in which an individual's hands lose circulation, intentionally or to a standard that a reasonable trained police officer would be aware such injury is possible. If an arrestee alerts an officer that they have lost circulation to their hands or are otherwise in pain the officer must give attention and remedy the issue by removing or loosening the zip ties?

Plaintiffs' Answer: Yes
Defendants' Answer: No

14. Should the Court enjoin Defendants denying timely medical attention to individuals they have arrested or otherwise seized?

Plaintiffs' Answer: Yes
Defendants' Answer: No

15. Should the Court enjoin Defendants from denying arrestees access to water and restrooms for extended periods of time?

Plaintiffs' Answer: Yes
Defendants' Answer: No

16. Should the Court enjoin Defendants from deliberately subjecting arrestees to torturous conditions including, but not limited to, placing arrestees in oppressively hot vehicles for several hours or placing restrained arrestees outdoors in the sun for several hours without shade or water?

Plaintiffs' Answer: Yes
Defendants' Answer: No

17. Should the Court enjoin Defendants from arresting, or otherwise seizing, any demonstrator and/or demonstrators en masse unless they have individualized probable cause to believe that such individual(s) committed a crime justifying arrest?

Plaintiffs' Answer: Yes
Defendants' Answer: No

18.   Should the Court enjoin Defendants from arresting individuals attending
      demonstrations for the purpose of providing medical support or to legal
      observe.  To facilitate DPD's identification of these individuals, Medics will
      be clearly marked with a large red cross and legal observers will be wearing
      a National Lawyers' Guild issued or authorized Legal Observer hat (a neon
      green hat)?

      Plaintiffs' Answer: Yes
      Defendants' Answer: No

## CONTROLLING AUTHORITIES PER LOCAL RULE 7.1

*Scott v. Clay County*, 205 F.3d 867 (6th Cir. 2000)

*Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009);

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006)

*Thaddeus–X v. Blatter*, 175 F.3d 378 (6th Cir. 1999)

*Bd. of County Comm'rs v. Brown*, 520 U.S. 397 (1997)

## INTRODUCTION

Since May 29, 2020, Defendants (collectively "DPD") have repeatedly responded to peaceful demonstrations for equal rights under the law for Black Detroiters with unnecessary, unreasonable, and excessive violence, subjecting non-violent demonstrators to, among other things, tear-gas, pepper-spray, beatings, rubber bullets, deafening and disorienting sound cannons, police vehicles, flash grenades, chokeholds, and cordoning them off in small groups ("kettled"), and arresting en masse without probable cause. DPD has made it clear that it will continue to use violence against peaceful demonstrators without Court intervention.

Plaintiffs argue that the DPD's use of less-lethal, "crowd control" weapons and violates their First Amendment right to protest and their Fourth Amendment right to be free from excessive force. Plaintiffs seek an order enjoining Defendant City of Detroit and their agents and employees from utilizing the specific excessive tactics against demonstrators as listed within the accompanying Motion.

## STATEMENT OF FACTS

Plaintiffs incorporate by reference the factual allegations contained in their Verified Complaint. (*Verified Complaint,* Doc. No. 1, hereafter "*VC*") Those facts may be summarized as follows:

After the death of George Floyd, Plaintiffs, alongside hundreds of residents of Detroit and the surrounding area, joined thousands around the country to demand

justice for Mr. Floyd in a continuation of the "Black Lives Matter" movement. The demonstrations have been overwhelmingly peaceful. However, DPD, with the endorsement of Defendants Michael Duggan and James Craig, immediately and consistently responded with unreasonable, unnecessary, and excessive force.

On the first night of demonstrations (May 29, 2020) Detroit police deployed officers in riot gear, who attacked and beat demonstrators using their batons and shields. They pepper-sprayed demonstrators and launched canisters of tear gas indiscriminately into the crowd. Officers brutally beat and arrested Plaintiff G. Branch, who attended as a volunteer medic, while growling "welcome to Detroit, bitch" into their ear, then threatened them with felony charges if they returned to protest again. Approximately 60 people were arrested and many more were beaten, pepper-sprayed, and tear-gassed. G. Branch has not attended a demonstration since.

Despite DPD's show of force, hundreds more demonstrators returned to the streets the next day -- and almost every day since. As the demonstrations continued, Defendants' violence escalated. Every night between May 29 and June 2, 2020, DPD responded to the demonstrations with beatings, tear gas, pepper spray, and mass arrests. On May 31, 2020, Defendant Duggan implemented a citywide curfew of 8:00 P.M., which DPD enforced exclusively against Black Lives Matter demonstrators. That night, in addition to the tactics and weaponry described above, officers shot indiscriminately at demonstrators, including Plaintiff A. Nahabedian,

with rubber bullets. On June 2, 2020, DPD officers deployed an LRAD sound cannon, causing injury and possibly permanent hearing loss to demonstrators including Plaintiffs L. Rosen and L. Ellis. On June 28, 2020, officers plowed through a group of demonstrators, including Plaintiff J. Bass, with their police SUVS.

On July 10, 2020, DPD shot and killed Hakim Littleton. As the demonstrations grew to include calls for an investigation, police again escalated their use of excessive force. Officers, including Defendant Officers Hornshaw and Erard, pepper-sprayed, tear-gassed, and brutally beat Plaintiffs T. Taylor, O. Puente, L. Brennan, Z. Kolodziej, I. Saleh and N. Wallace. I. Saleh was left with a fractured hip. T. Taylor, Z. Kolodziej, and N. Wallace were arrested. One officer held N. Wallace with an extended chokehold. When N. Wallace asked an officer "do they pay you enough to defend murderers?", he told her to "shut the fuck up before I make you the next victim."

On August 22, 2020, Plaintiff Detroit Will Breathe hosted a gathering at the intersection of Woodward and John R in downtown Detroit. Participants danced, sang, played music, blew bubbles, read books, and chatted with one another. They described the atmosphere as relaxed, festive, and jovial - "like a block party" -- until Defendants, continuing their pattern and practice of using excessive force against nonviolent demonstrators, deployed officers in riot gear to attack the group. Officers again deployed pepper spray, tear gas, and smoke canisters, charged into the crowd,

and began to tackle and beat demonstrators with their batons, shields, and fists. As on the prior days, the officers -- not the demonstrators -- initiated the chaos. Multiple people, including demonstrators, bystanders, and legal observers, were beaten and arrested. Plaintiff A. Anest was beaten so severely that he was hospitalized for five days with a collapsed lung and broken rib. Plaintiff C. Arnold was tackled, detained, handcuffed, and then pepper-sprayed directly in the face as she lay helpless, pinned to the ground by multiple officers. Plaintiff M. Henige was dragged down Woodward Avenue by her feet and legs.

Plaintiffs also incorporate by reference the factual allegations contained in the attached declarations which consistently confirm that it was DPD officers who initiated violence against Plaintiffs and the other demonstrators and that they have done so as a matter of policy and practice. Some notable excerpts include:

- "I saw someone (who I couldn't at first identify) with multiple officers on top of him, we all screamed, pleading for them to get off of him (he ended up in the hospital for stitches on his face, which was covered in blood when I finally identified him." - M. Henige *(Exhibit A)*

- "It was clear that riot police took joy and amusement in causing major bodily damage and pain to demonstrators...I have been marching with DWB since about day #2 and can confirm this is a pattern with Detroit Police Department." - L. Rosen *(Exhibit B)*

- "...One protestor...doubled over and wailed in pain. I have never heard another human make a noise like I heard her make. It was guttural and it brought tears to my eyes. Once she was finally able to speak, she told us it was her zip ties that were causing her so much pain...her hands were somewhere between grey, blue, and purple….her zip ties were so tight that it took them several

minutes to cut them off. This poor young woman continued to cry out in pain the entire time." - C. Arnold (*Exhibit C*)

- "The police never addressed the crowd, immediately approaching, I saw them assault people next to me who were not resisting." - A. Kaplowitz (*Exhibit D*)

- "A 4'11" woman who has also been with us since June was repeatedly beaten in the face and is now streaming blood. I have never seen anything like this… All around us people are being hit, shoved to the ground, piled on by multiple officers." - B. K. Saginaw (*Exhibit E*)

- "I pulled my car away from the curb to leave...the officer nearest me opened my driver's side door and grabbed my left arm to try to pull me out of the car...I told them I was caught in my seat belt and they continued to pull on my twisted arm to drag me out of the vehicle...We were also mocked, laughed at, and bullied by nearly every one of the officers." - C. Sumbler (*Exhibit F*)

- "Myself and the other demonstrators stood in line in solidarity chanting "we don't see no riot here, why are you in riot gear" with no intention of moving forwards towards the police and made no actions that could have been interpreted as such." - K. Waterman (*Exhibit G*)

- "I was just standing still. I didn't touch any officer nor did I throw anything and yet an officer singled me out and sprayed my face with the red liquid (pepper spray). The look in this man's face was pure anger and hatred." - A. Loper (*Exhibit H*)

- "Being injured and asking for help, one officer spit and said "you volunteered, you deserve it"...another officer... [said] "stop protesting or we will fuck you up" and pointing to his private part location." - F. Muthana (*Exhibit I*)

- "I saw nobody on the riot line reach for a zip tie, attempt to take a protestor's arm, or turn anyone around to make an arrest. The first and only actions i saw on their approach were riot shields and batons hitting still non-violent demonstrators." - B. Vanderveen (*Exhibit J*)

## DISCUSSION

In issuing the requested injunctive relief, the Court must consider Fed. R. Civ. P. 65, as well as the following four factors: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest. ***Southern Glazers Distribs. of Ohio, LLC v. Great Lakes Brewery Co***., 860 F.3d 844, 849 (6th Cir. 2017)*.* These four considerations are factors to be balanced, not prerequisites that must be met. ***Id.*** Here, all four factors favor granting preliminary injunctive relief.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor." ***Obama for America v. Husted***, 697 F.3d 423, 436 (6th Cir. 2012). In such cases, "the likelihood of success on the merits is a legal question and there is little dispute of the facts in the record." ***Liberty Coins, LLC v. Goodman***, 748 F.3d 682, 689 (6th Cir. 2014). The facts alleged by Plaintiffs herein have been routinely documented through the press and social media and are supported through the allegations in the Verified Complaint and attached declarations.

### A.  Plaintiffs are likely to succeed on their excessive force claims under the Fourth Amendment

The success of Fourth Amendment claims under 42 U.S.C 1983 generally depends on whether the DPD officer's use of force was objectively reasonable.

6

*Graham v. Connor*, 490 U.S. 386, 392-399 (1989). To determine whether the force used to affect a seizure is permissible under the Fourth Amendment, courts weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. This balancing analysis requires an assessment of the particular facts and circumstances surrounding the seizure, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Scott v. Clay County*, 205 F.3d 867, 876–77 (6th Cir. 2000) (*quoting Graham*, 490 U.S. at 396–97). In the absence of these three factors, the Sixth Circuit has consistently held that a police officer's use of disproportionate force is unreasonable under the Fourth Amendment, even where circumstances involve an unruly crowd. *See, e.g., Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006); *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009); *Crawford v. Geiger*, 656 Fed. Appx. 190 (6th Cir. 2013).

    1.  *The Plaintiffs were accused of minor crimes or no crime at all*

The commission of a minor crime by an unarmed person is not sufficient to weigh in favor of unreasonable use of force in a *Graham* analysis. *See Grawey*, 567 F.3d at 311-312. In *Grawey*, a police officer pepper-sprayed the plaintiff after the plaintiff first attempted to flee the scene of a domestic altercation but then stopped running. *Id.* at 306-307. The court held that the officer's use of pepper-spray was

unreasonable because the plaintiff's crime, disturbing the peace, was "relatively minor," and the plaintiff was not actively resisting arrest at the time the officer sprayed him. *Id.* at 311. Here, Plaintiffs, if accused of a crime at all, were accused of disturbing the peace or lesser civil infractions. No Plaintiff has actively resisted arrest. Yet DPD, unprovoked, has utilized unreasonable force and deployed "non-lethal" weapons against unarmed demonstrators on a regular basis.

2. *The Plaintiffs posed no immediate threat to the safety of the officers or others*

Throughout months of demonstrations, no Plaintiff (or demonstrator on information and belief) has been charged with assaulting a DPD officer. In fact, demonstrators were sitting, dancing, playing instruments, blowing bubbles, and chanting "Why are you in riot gear? We don't see a riot here" prior to DPD officers charging them at full speed, batons swinging rather than even attempting to make arrests. Others who were beaten attended the demonstration as non-participant medics or simply were standing on the sidewalk observing. Defendant Chief James Craig's obtuse attempt at justifying the brutality of August 22, 2020 was a claim that a demonstrator shined a laser pointer at an officer. *(Exhibit K)*

3. *The Plaintiffs were not actively resisting or attempting to evade arrest*

As stated throughout the Verified Complaint and attached affidavits, the Plaintiffs were not actively resisting or attempting to evade arrest. *(See VC and Exhibits A-J)* DPD's first move was force and the use of "non-lethal" weapons *prior*

8

to attempting to make arrests in each relevant encounter with Plaintiffs. In fact, many Plaintiffs were actively attempting to comply with officers by voluntarily placing their hands behind their back and standing still when officers used force on them.

> ### 4. It was a violation of the Fourth Amendment when Defendants used batons, riot shields, and excessive physical force to brutalize Plaintiffs and other demonstrators.

Within their Verified Complaint, Plaintiffs have provided ample evidence that DPD viciously beat them with batons, riots shields, and other physical force without provocation, without any Plaintiff posing a threat to officers, without resistance, and without warning. DPD took these extreme actions knowing that Plaintiffs were unarmed and were either accused of minor crimes or no crime at all.

The Sixth Circuit has routinely found equal or *lesser* brutality to be a valid Fourth Amendment claim. In ***Solomon v. Auburn Hills Police Dept.,*** a Fourth Amendment excessive force claim was allowed to proceed when a police officer shoved an individual into a wall, injuring her, when the suspect was arrested on a minor charge, did not pose a threat to the safety of officers or others, and did not attempt to flee or resist arrest. 389 F.3d 167 (6th Cir. 2004); *see also **Jones v. City of Cincinnati***, 521 F.3d 555 (6th Cir. 2008) (plaintiff established viable claims for excessive force and failure to provide medical care where police officers beat decedent with batons, used pepper spray after handcuffing him, and used their combined weight to hold him down). In ***Schreiber v. Moe***, the court acknowledged

9

"it is difficult to conceive of a law-enforcement interest that would have been served by punching [plaintiff] in the face over 20 times with enough force to fracture his facial bones." 596 F.3d 323, 332 (6th Cir. 2010). Here, it is difficult to conceive the law-enforcement interest in routinely beating non-resisting demonstrators with batons and riot shields prior to even attempting to place them under arrest. Rather than facing an arrest for incidents of civil disobedience, if even valid, Plaintiffs have suffered concussions, fractures, broken ribs, bruises, hospitalization, and other shocking injuries without justification.

   5. *It was a violation of the Fourth Amendment when Defendants fired rubber bullets at demonstrators*

In **Ciminillo**, the Sixth Circuit found that a jury could find an officer liable for excessive force for shooting with a beanbag propellant an unarmed individual who was slowly approaching officer with hands in a "surrender" position. 434 F.3d 461. Here, DPD shot at demonstrators just standing nearby or dispersing as ordered without any warning. Plaintiff Nahabedian was shot in the chest by a rubber bullet, without warning or provocation, while attempting to disperse after being engulfed in tear gas. *(VC at 123-133)*. She was not arrested or accused of a crime. Notably, felony assault with a dangerous weapon charges have been issued against DPD officer D. Debono after he fired rubber bullets at three journalists. *(**Exhibit L**)*

   6. *It was a violation of the Fourth Amendment when Defendants used chokeholds against Plaintiff Nakia Wallace and other demonstrators*

Plaintiff Nakia Wallace witnessed a DPD officer placing his knee on a young demonstrator's neck in a technique eerily reminiscent of that used to murder George Floyd. After N. Wallace shouted, "Get off his neck!" a DPD officer, in some kind of sick irony, seized and placed N. Wallace herself in a chokehold. *(VC at 136-146)* The use of a chokehold constitutes deadly force as a matter of law. ***King v. United States***, 917 F.3d 409, 431 (6th Cir. 2019). DPD later issued a baseless "disorderly conduct" misdemeanor ticket to N. Wallace – a minor crime. Even if the arrest and ticket were legitimate, they would not justify the officer's use of a deadly chokehold, which was excessive and a violation of N. Wallace's Fourth Amendment rights.

7. *It was a violation of the Fourth Amendment when Defendants utilized deadly force by ramming Plaintiff Jazten Bass and other demonstrators with a police vehicle*

It has been settled law for a generation that, under the Fourth Amendment, "[w]here a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." ***Tennessee v. Garner***, 471 U.S. 1, 11 (1985). Yet, Defendants drove an SUV directly through a crowd of demonstrators striking Plaintiff Bass and continuing at high speed with him hanging onto the hood for his life. J. Bass, who was simply leading the march back to its starting point so demonstrators could go home, posed no immediate threat to the officer inside the vehicle. *(VC at 147-158)* There is no objectively reasonable justification for the officers' use of deadly force.

11

8. *It was a violation of the Fourth Amendment when Defendants deployed chemical irritants to injure and deter Plaintiffs and other demonstrators*

In **Champion v. Outlook Nashville, Inc.,** the Sixth Circuit held that it was clearly established that using pepper spray on an individual already subdued, and putting pressure on his back while he was in a face-down prone position, constitutes excessive force. 380 F.3d 893 (6th Cir. 2004). Yet that was exactly what DPD officers did to Plaintiff Caylee Arnold. *(VC at 177-182)*

The Sixth Circuit has also allowed Fourth Amendment claims to proceed where officers sprayed an individual with pepper spray but did not inform him that he was under arrest or that he committed any crime, and did not warn him that they would use pepper spray. **Atkins v. Township of Flint**, 94 F. App'x 342, 349 (6th Cir. 2004). This fact pattern mirrors that of each Plaintiff who has been sprayed.

9. *It was a violation of the Fourth Amendment when Defendants deployed a Long Range Acoustic Device ("LRAD") to injure and deter Plaintiffs and other demonstrators*

The use of the LRAD has not been previously tested in the Sixth Circuit. However, the Second Circuit rejected a defendants' motion to dismiss, a claim of excessive force regarding an LRAD, finding the use of LRAD was unreasonable because the protesters presented minimal security threat beyond traffic disruption, were not actively resisting, and suffered substantial physical injuries – exactly the same circumstances presented in the case at bar. *See* **Edrei v. Maguire**, 892 F.3d 525, 537-38 (2nd Cir. 2018). Moreover, the court found that the officers did not

12

attempt to temper or limit the amount of force they deployed (for example, with an audible dispersal warning), supporting the proposition that the officer's use of LRAD was disproportionate to the risks posed by the protesters. *Id.* at 538.

Here, Plaintiffs' first notice that the LRAD was being deployed was the screeching wail of the LRAD itself. Like the plaintiffs in *Edrei*, Plaintiff Rosen has suffered auditory pain, migraines, tinnitus, and hearing loss as a result of the LRAD. *(TC 183-196); Edrei* at 531.

> 10. *It was a violation of the Fourth Amendment when Defendants restrained Plaintiffs and other demonstrators with intentionally tightened zip ties*

In *Vance v. Wade*, the Sixth Circuit held it to be a triable claim where a Plaintiff alleged that officers handcuffed him excessively and unnecessarily tightly, ignored his pleas that cuffs were too tight, and alleged physical injury. 546 F.3d 774 (6th Cir. 2008). Plaintiff Kolodziej makes this identical claim, begging officers to loosen his zip ties as he was losing feeling in his hands and ultimately suffering from symptoms of lasting nerve damage. *(VC at 210-225)* Plaintiffs witnessed police officers continuing this practice as recently as August 22, 2020, when C. Arnold saw a young woman doubled over, wailing in pain, as her hands turned blue. *(Exhibit C)*

> B. Plaintiffs are likely to succeed on claims that they were subjected to punitive, unnecessary, and torturous conditions in violation of the Fourth Amendment.

Fourth Amendment standards apply while an arrestee is still within the custody of arresting officers. *Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002). As

discussed throughout their Verified Complaint, Plaintiffs have suffered numerous Fourth Amendment violations while in the custody of DPD. Plaintiffs, some pepper-sprayed and/or bleeding from blunt force trauma, were intentionally placed in oppressively hot vehicles without ventilation or access to water for several hours in 90-degree summer heat. Additionally, Plaintiffs have alleged DPD turned the heat on and deliberately took their time getting to holding facilities (or Little Caesar's Arena) – violating their clearly established rights. *See Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002) (officers not entitled to qualified immunity for detaining plaintiff while they searched a next-door home, where he was held three hours in handcuffs in police cruiser with windows up and air conditioning off on a 90-degree day).

Next, Plaintiffs A. Anest and Z. Kolodziej pleaded with DPD for medical attention as they suffered significant injuries, but their cries fell upon deaf ears. In fact, DPD refused to allow on-site medical staff to examine A. Anest while detaining him for several hours, eventually just leaving him on the street critically injured and disorientated, again violating his clearly established rights. He required five days' hospitalization. *See Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005) (officers not entitled to qualified immunity for failing to provide medical attention to decedent when officers subjected him to beating, close-range pepper spray, body compression and restraints creating obvious need for medical care).

C. Plaintiffs are likely to succeed on claims that they were falsely arrested in violation of the Fourth Amendment.

14

"It is clearly established that an arrest without probable cause violates the Fourth Amendment." ***Donovan v. Thames***, 105 F.3d 291, 297-98 (6th Cir. 1997). Throughout the demonstrations, DPD has arrested hundreds of peaceful demonstrators without probable cause, including Plaintiffs T. Taylor, G. Branch, N. Wallace, J. Bass, L. Ellis, M. Henige, A. Nahabedian, Z. Kolodziej, C. Arnold, and A. Anest. As discussed throughout, numerous demonstrators have been arrested without hearing an audible disbursement order or while attempting to comply with officer instructions. Others were arrested seemingly for being in the area at the time.

D. <u>Plaintiffs are likely to succeed on their First Amendment claims.</u>

The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. ***Hartman v. Moore***, 547 U.S. 250, 256 (2006).  In order to sustain a retaliation claim under the First Amendment, a plaintiff must show that (1) he engaged in a protected conduct, (2) an adverse action was taken against him which would deter a person of ordinary firmness from continuing to engage in the alleged misconduct, and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. ***Thaddeus–X v. Blatter***, 175 F.3d 378, 394 (6th Cir. 1999). These elements are easily satisfied here.

*1. Plaintiffs engaged in activity protected by the First Amendment*

The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,

and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. ***Leonard v. Robinson***, 477 F.3d 347 (6th Cir. 2007). Private citizens' rights to criticize public officials and policies reflects "the central meaning of the First Amendment." ***Glasson v. City of Louisville***, 518 F.2d 899, 904 (1975) Here, there is no reasonable dispute that Plaintiffs' conduct, participating in demonstrations against police abuse and unequal rights under the law for Black citizens, is activity protected under the First Amendment.

2. *The use of force against Plaintiffs and mass arrests of Plaintiffs have chilled their First Amendment rights*

Plaintiffs need not show they were actually deterred from exercising their right to free speech, but rather must show the actions were "capable of deterring a person of ordinary firmness from exercising his or her right[s]." ***Thaddeus–X v. Blatter***, 175 F.3d 378, 398 (6th Cir.1999) (en banc) The threshold for the deterrent effect of retaliation is especially low because "there is no justification for harassing people for exercising their constitutional rights." ***Id.***

In a recent case also dealing with police use of force against Black Lives Matters activists, a district court held that police officers may not indiscriminately use less-than-lethal force against peaceful protesters, even when other protesters in the crowd may be engaging in violence. *See **Black Lives Matter Seattle-King County v. City of Seattle, Seattle Police Department***, No. 2:20-cv-00887-RAJ, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020) (***Exhibit M***). In *Black Lives Matter*

*Seattle-King County*, police officers faced instances of assault by some in the protest, but the plaintiffs' conduct was, according to the court, "passionate but peaceful." ***Id.*** While the court acknowledged the difficulty of balancing public safety interests and speech rights, it based its holding on the importance of the plaintiffs' "constitutional right to protest." ***Id.***

In the instant case, there have been little to no allegations of assault against DPD officers. Indeed, Plaintiffs' passionate protesting actions have been overwhelmingly peaceful, and it would be improper for Defendants to suppress the plaintiffs' First Amendment activities based on speculative conduct of others.

   *3.  Defendants' conduct was motivated by Plaintiffs' protected activity.*

While the Defendants' subjective motivation is at issue here, Plaintiffs cannot be required to meet a heightened burden of proof simply because this cause of action includes a motive element. ***Thaddeus-X v. Blatter***, 175 F.3d 378, 386 (6th Cir. 1999). That said, Plaintiffs have produced significant evidence that Defendants' use of excessive force was motivated by Plaintiffs' and other demonstrators' exercise of their First Amendment rights. For example, one officer stated "stop protesting or we will fuck you up" to a demonstrator. ***(Exhibit I)*** Another told Plaintiff N. Wallace to "shut the fuck up before [he] made [her] the next victim." *(VC at 146)* Officers also called demonstrators "animals" and consistently cheered, laughed, high-fived one

another, and gleefully took photos and videos of detainees after attacking demonstrators. *(VC at 55; Exhibit A; Exhibit B)*

E.  Plaintiffs are likely to succeed on their *Monell* claims.

The Supreme Court has long held that municipal governments may only be sued under § 1983 for unconstitutional or illegal municipal policies, and not for unconstitutional conduct of their employees. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978). Where the established policies of the municipality do not violate the constitution directly, municipalities may incur § 1983 liability where they fail to adequately train their personnel such that a constitutional policy is applied in an unconstitutional manner. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). There, however, the plaintiff must show "the failure to train amounts to deliberate indifference to [the] rights of persons with whom the police come into contact." *Id.* at 388. Notably, the Supreme Court acknowledged that "[a]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

Not only has Defendant policymaker Chief Craig continuously authorized the use of force against peaceful demonstrators, he has publicly endorsed the above-described brutality. On June 2, 2020, after DPD, brutalized with batons, teargassed,

18

pepper sprayed, and deployed the LRAD on non-violent demonstrators accused of only minor crimes, or no crime at all, Chief Craig was quoted stating "I'm encouraged, I'm confident in this department and in this city. We're going to get it done" and "[h]ats off to our Detroit Police Department and to our city." *(Exhibit N)* Similarly, policymaker Mayor Duggan was quoted saying "[DPD] did a beautiful job protecting our city." Following the August 22-23, Chief Craig stated that he is "just ecstatic over the men and women in the Detroit Police Department" *(Exhibit O)* and on August 24, 2020 that he was "very proud" of the DPD officers.

Surpassing the egregious conditions in *Bd. of County Comm'rs v. Brown*, here, the rampant violent acts against Plaintiffs *have* been approved by Defendant decisionmakers. Indeed, multiple Doe Officers told arrestees that they were "just following orders" and that the above-described actions were "just orders that they had to follow" as they brutalized and arrested approximately 40 demonstrators on August 22-23, 2020. *(VC at 269)*

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE COURT'S INTERVENTION

"[A]s a matter of law, the continuing deprivation of constitutional rights constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The loss of First Amendment rights, for even a minimal period of time, constitutes irreparable harm. *Overstreet v. Lexington-Fayette Urban Cty. Govt*., 305 F.3d 566, 578 (6th Cir.2002). The Demonstrations in Detroit are ongoing. DPD, with the consistent

endorsement of Chief Craig and Mayor Duggan, has made it clear that they will continue assaulting, teargassing, pepper spraying, and deploying other "non-lethal" weapons on non-violent demonstrators without court interference. Enough is enough. Abundant video evidence has made it clear that Defendants are not interested in whether there is probable cause that an individual committed a significant crime, whether an individual is resisting, whether an individual is a threat, or even whether an individual has even been warned prior to maiming and brutalizing them. Additionally, some individuals, such as Plaintiff G. Branch, have expressed that they are refraining from exercising their peaceful First Amendment rights out of fear that they will be met with brutal violence. *(VC at 278)*

There is a likelihood of repetition as these Plaintiffs plan on participating in future demonstrations which are foreseeably ongoing. To the extent that any Plaintiffs have been deterred from participating, there is a likely repetition that there First Amendment rights would be restrained

## III.   THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINITFFS

"The determination of where the public interest lies [ ] is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." ***Connection Distrib. Co. v. Reno***, 154 F.3d 281, 288 (6th Cir. 1998). Plaintiffs have established *supra* their likelihood of success on their

First Amendment claims. The public's interest in preserving the constitutional right to protest far outweighs any harm that could be experienced by Defendants were this Court to enjoin them from engaging in the unjustified violence described above.

The balance of equities strongly favors Plaintiffs in regard to Plaintiff's Fourth Amendment claims as well. Any hypothetical harm that would come from enjoining Defendants as requested is outweighed by the very real harm experienced by Plaintiffs as described throughout their Verified Complaint and this Motion. Plaintiffs do not seek to stop the police from doing their jobs. They seek an end to the excessive, unjustified, and consistent pattern of violence that has caused serious injury to so many and deterred others from participating in demonstrations at all.

## IV. COURTS ACROSS THE COUNTRY HAVE ENJOINED SIMILAR POLICE CONDUCT ARISING FROM BLACK LIVES MATTER PROTESTS

Since the nationwide protests against police violence began in May 2020, courts across the country have entered similar TROs enjoining police departments from responding to protests against police violence with projectiles, chemical weapons, and other force. ***Anti Police-Terror Project v. City of Oakland***, Case no. 20-cv-03866-JCS, 2020 WL 4584185 *57-*58 (N.D. Cal. 2020)***(Exhibit P)*** (after four days of excessive force against peaceful demonstrators, enjoining police from ever using projectiles, and significantly limiting the use of chemical weapons); ***Abay et al. v. City of Denver***, Case no. 20-cv-01616-RBJ, 2020 WL 3034161 *5 (D. Col.

2020)(*Exhibit Q*) (after police use of force between May 28 and June 4, enjoining police from use of chemical weapons unless "on-scene supervisor at the rank of Captain or above specifically authorizes such use of force in response to specific acts of violence or destruction of property that the command officer has personally witnessed," further prohibiting use of chemical weapons without time to disperse, and the firing of projectiles into crowds); *Black Lives Matter v. City of Seattle*, Case no. 2:20-cv-00887-RAJ, 2020 WL 3128299 *5-*6 (W.D. Wash. 2020)(*Exhibit M*) (enjoining use of teargas against peaceful demonstrators and also requiring repeated use of alternative de-escalation tactics in the face of violence or property destruction before using teargas); *Don't Shoot Portland v. City of Portland*, Case no. 3:20-cv-00917-HZ, 2020 WL 3078329 *4 (D. Oreg. 2020)(*Exhibit R*) (same); *Woodstock et al. v. City of Portland*, Case no. 3:20-cv-1035-SI, 2020 WL 3621179 (D. Oreg. 2020)(*Exhibit S*) (enjoining police from arresting, shooting, or beating journalists and legal observers).

In fact, a court has denied a TRO in only one case having to do with the police use of force in response to the recent protests, specifically alleging the targeting of journalists. *See Goyette v. City of Minneapolis*, Case no. 20-cv-1302, 2020 WL 3056705, *3, *5 (D. Minn. 2020) (*Exhibit T*). There, a TRO was denied because of the unprecedented—and unlikely to repeat—circumstances under which force was used, including the burning of a police station, because the police had not repeated

the use of force in any other circumstances, *Id.* at *3, and because the police had already voluntarily entered into a temporary restraining order prohibiting the complained of tactics. *Id.* at *5. Here, there have been no such unprecedented circumstances—protests have been almost entirely peaceful—and police have repeatedly used the complained of tactics over many months.

Additionally, unlike the police in these other cases, DPD's actions have been more violent, more obviously based on a hostility to protesters' message, and have been used more consistently over a longer period of time. For example, in Oakland and Denver, the police's actions largely involved the use of tear gas, pepper spray, and rubber bullets. *Anti Police-Terror Project v. Oakland*, 2020 WL 4584185 at *8-*16 (*Exhibit P*); *Abay v. Denver*, 2020 WL 3034161 at *1 (*Exhibit Q*). Here, DPD has not only used tear gas, pepper spray, and rubber bullets—they have choked demonstrators, beaten demonstrators with shields and batons, punched demonstrators, kicked demonstrators, verbally abused demonstrators, deliberately injured them using zip ties, deliberately removed their masks to pepper spray them in the face, left them in heated vehicles, and hit demonstrators with their cars.

Likewise, DPD's actions have been more clearly motivated by the content of plaintiff's message. In *Black Lives Matter v. Seattle*, the court inferred the police's response was partially motivated by the demonstrators' message because police targeted gas on peaceful demonstrators, and deployed gas on demonstrators that

were dispersing. 2020 WL 3128299 at *4 (*Exhibit M*). Here, not only did DPD use force on peaceful demonstrators, they made statements to demonstrators expressing hostility to their message, and engaged in repeated, needless cruelty against demonstrators, even after they had been arrested or restrained. Further, in other cases, TROs have issued based on only a few nights of police use of teargas and rubber bullets. *See e.g.* ***Anti Police-Terror Project v. Oakland***, 2020 WL 4584185 at *8-*16 (*Exhibit P*) (TRO issued after four days). Here, the DPD has engaged in repeated acts of violence against demonstrators over the course of months, from May 29, when protests began, until as recently as August 22, 2020.

A TRO is even more warranted here as protests in Detroit have been almost entirely free of violence or property damage. In other cities, TROs have issued where police responded to property destruction and looting, *Id.* at *17-*22 (*Exhibit P*), where demonstrators threw projectiles at police, ***Black Lives Matter v. Seattle***, 2020 WL 3128299 at *4 (*Exhibit M*); ***Don't Shoot Portland v. Portland***, 2020 WL 3078329 at *1 (*Exhibit R*), and even where a government building was damaged with fire. *Id.* at *4. In each of these cases, courts have recognized that police must engage in preventative measures and targeted, individualized enforcement, not mass repression. ***Black Lives Matter v. Seattle***, 2020 WL 3128299 at *3 (*Exhibit M*) ("the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct,

rather than to suppress legitimate First Amendment conduct as a prophylactic measure"). As another court noted, "property damage is a small price to pay for constitutional rights—especially the constitutional right of the public to speak against widespread injustice. If a store's windows must be broken to prevent a protestor's facial bones from being broken or eye being permanently damaged, that is more than a fair trade. If a building must be graffiti-ed to prevent the suppression of free speech, that is a fair trade. The threat to physical safety and free speech outweighs the threat to property." *Abay*, 2020 WL 3034161 at *5 (*Exhibit Q*)

Yet, here, DPD was not responding to any property destruction by Plaintiffs or demonstrators, nor engaging in targeted arrests. Rather, the DPD was arbitrarily and indiscriminately using force against peaceful demonstrators. Thus, just as courts have done in other jurisdictions, this court should issue a TRO in this case.

## **CONCLUSION**[1]

**WHEREFORE**, Plaintiffs respectfully request this Court (a) grant this Motion for a temporary restraining order and preliminary injunction; and (b) grant Plaintiffs any other such relief as the Court deems just and proper under the circumstances.

---

[1] In addition, while Federal Rule of Civil Procedure 65(c) provides "no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant," in the Sixth Circuit, "the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.,* 55 F.3d 1171 (6th. Cir. 1995) Here, no bond should be required because Defendants will not incur monetary loss as a result of the injunction because the injunction would only require it to comply with Constitutional law and cease the use of excessive force. (see 11A Wright, Miller & Kane, Federal Practice & Procedure 2d ¶ 2954 (2006) (courts may "dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant").

Respectfully submitted,

**SCHULZ LAW PLC**

By:  /s/   Jack W. Schulz
Jack W. Schulz (P78078)
Amanda M. Ghannam (P83065)
SCHULZ LAW PLC
PO Box 44855
Detroit, MI 48244
(313) 246-3590
jackwschulz@gmail.com
amandamghannam@gmail.com
*On behalf of the National Lawyers Guild,*
*Detroit/Michigan Chapter*
*Attorneys for Plaintiffs*

Dated:       August 30, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DETROIT WILL BREATHE,**
**TRISTAN TAYLOR, NAKIA WALLACE,**                    Case No.
**JAZTEN BASS, LAUREN ROSEN, LAURYN**              Hon:
**BRENNAN, AMY NAHABEDIAN, ZACH**
**KOLODZIEJ, LAUREN BRANCH,**
**LILLIAN ELLIS, OLIVIA PUENTE,**
**IMAN SALEH, MARGARET HENIGE,**
**CAYLEE ARNOLD, AND ALEXANDER ANEST,**

              Plaintiffs,

vs.

**CITY OF DETROIT,** a municipal corporation,
**MAYOR MICHAEL DUGGAN,** acting in his official
and individual capacities, **CHIEF JAMES CRAIG,** acting in his official
and individual capacities, **OFFICER STEPHEN ANOUTI, SERGEANT**
**TIMOTHY BARR**, **OFFICER DAVID HORNSHAW, OFFICER MARIAH**
**ERARD,** and **OFFICER DOES 1-100 inclusive,**
acting in their respective individual capacities, all jointly and severally,

              Defendants.

_____/

Jack W. Schulz (P78078)                Julie H. Hurwitz (P34720)
Amanda M. Ghannam (P83065)          William H. Goodman (P14173)
SCHULZ LAW PLC                         Melissa A. Brown (P79127)
PO Box 44855                             GOODMAN HURWITZ & JAMES,
Detroit, MI 48244                        PC
(313) 246-3590                           1394 E. Jefferson Ave.
jackwschulz@gmail.com                   Detroit, MI 48207
amandamghannam@gmail.com             (313) 567-6170
*On behalf of the National Lawyers*      jhurwitz@goodmanhurwitz.com
*Guild, Detroit/Michigan Chapter*        bgoodman@goodmanhurwitz.com
*Attorneys for Plaintiffs*                mbrown@goodmanhurwitz.com
                                          *On behalf of the National Lawyers*
                                          *Guild, Detroit/Michigan Chapter*
Sean Riddell (P81302)                   *Co-counsel for Plaintiffs*
The Riddell Law Firm PLLC

400 Renaissance Center, Ste. 2600
Detroit, MI 48243
(313) 497-0074
sriddell@riddelllawfirm.com
*On behalf of the National Lawyers*
*Guild, Detroit/Michigan Chapter*
*Co-counsel for Plaintiffs*

_____/

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2020, I electronically filed the foregoing PLAINTIFFS' MOTION TO TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION and BRIEF IN SUPPORT OF MOTION with the Clerk of the Court using the ECF system which will send notification to all counsel of appearance. Additionally, I certify that a copy of the foregoing documents was submitted First Class mail to the following: *City of Detroit,* 2 Woodward Ave., Suite 500 Detroit, MI 48226.

Respectfully submitted,

SCHULZ LAW PLC

By: __/s/ Jack W. Schulz__ .
Jack W. Schulz (P78078)
Amanda M. Ghannam (P83065)
SCHULZ LAW PLC
PO Box 44855
Detroit, MI 48244
(313) 246-3590
jackwschulz@gmail.com
amandamghannam@gmail.com
*On behalf of the National Lawyers Guild,*
*Detroit/Michigan Chapter*
*Attorneys for Plaintiffs*

Dated:        August 30, 2020

2