UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DETROIT WILL BREATHE, et al.,

      Plaintiffs,

v.

CITY OF DETROIT, et al.,

      Defendants.

Case No. 2:20-cv-12363

Hon. Laurie J. Michelson

**AMICI CURIAE BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION AND THE AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................. iii

INTEREST OF AMICI CURIAE ......................................................................... 1

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 5

   I.     The First Amendment Requires Dismissal of Defendants' Civil
          Conspiracy Claim Because It Seeks to Punish Constitutionally
          Protected Speech and Association .............................................................. 5

        A.     The First Amendment Protects Criticism of the
              Government, Even If Angry or Profane .............................................. 5

        B.     Speech Encouraging, But Not Inciting, Violence Is
              Constitutionally Protected ................................................................. 7

        C.     A Protest Movement Is Not a Conspiracy .......................................... 9

        D.     Plaintiffs' Alleged Statements and Association Are
              Protected and Thus Cannot Support Civil Liability ......................... 10

   II.    The First Amendment Bars Defendants' Counterclaim to the Extent
         It Seeks Relief Arising From Purportedly False Statements .................... 16

        A.     The First Amendment Requires a Plausible Allegation of
              Actual Malice ................................................................................... 17

        B.     The First Amendment Bars Claims Based on Statements of
              Opinion About Police Misconduct .................................................. 20

CONCLUSION .................................................................................................. 25

CERTIFICATE OF SERVICE ........................................................................... 26

## INDEX OF AUTHORITIES

**Cases**

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002)...........................................7, 14

*Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006) .......................................................6

*Berry v. Schmitt*, 688 F.3d 290 (6th Cir. 2012) ............................................... 21, 22

*Bible Believers v. Wayne Cnty.*, 805 F.3d 228 (6th Cir. 2015)...........................7, 11

*Boos v. Barry*, 485 U.S. 312 (1988).........................................................................6

*Boulger v. Woods*, 917 F.3d 471 (6th Cir. 2019)....................................... 21, 24, 25

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)..............................................................7

*Carey v. Brown*, 447 U.S. 455 (1980) .................................................................1, 13

*City of Houston v. Hill*, 482 U.S. 451 (1987) ..........................................................6

*Cohen v. California*, 403 U.S. 15 (1971)..................................................................6

*Connick v. Myers*, 461 U.S. 138 (1983)...................................................................5

*Ewing v. Lucas Cnty. Dep't of Job, & Family Servs.*, No. 3:12-CV-743, 2012 WL 6048992 (N.D. Ohio Dec. 5, 2012).............................................20

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ............................................... 12, 17, 23

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)............................................ 18, 20

*Ghanam v. Does*, 845 N.W.2d 128 (Mich. Ct. App. 2014) ............................. 24, 25

*Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975)....................................5

*Gray v. Udevitz*, 656 F.2d 588 (10th Cir. 1981) .....................................................18

*Greene v. Barber*, 310 F.3d 889 (6th Cir. 2002) .....................................................6

*Healy v. James*, 408 U.S. 169 (1972) ......................................................................8

*Hess v. Indiana*, 414 U.S. 105 (1973)......................................................15

*Higgins v. Kentucky Sports Radio, LLC*, 951 F.3d 728 (6th Cir. 2020)......... 7, 8, 14

*Hildebrant v. Meredith Corp.*, 63 F. Supp. 3d 732 (E.D. Mich. 2014)..................18

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988).......................................6, 17

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) ....................................11

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014)................................................................................................15

*McCurdy v. Montgomery Cnty.*, 240 F.3d 512 (6th Cir. 2001) ............................5, 6

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) ...............................20

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)..............................................21

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)............................ passim

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)................................... passim

*Noto v. United States*, 367 U.S. 290 (1961).................................................... 3, 8, 15

*Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018).........................................8, 14

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264 (1974) ....................................................................24

*Porter v. City of Royal Oak*, 542 N.W.2d 905 (Mich. Ct. App. 1995)....................23

*Rosenblatt v. Baer*, 383 U.S. 75 (1966).................................................................18

*Roth v. United States*, 354 U.S. 476 (1957)..............................................................5

*Sandul v. Larion*, 119 F.3d 1250 (6th Cir. 1997)......................................................6

*Snyder v. Phelps*, 562 U.S. 443 (2011).................................................................5, 6

*Temborius v. Slatkin*, 403 N.W.2d 821 (Mich. Ct. App. 1986)...............................15

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949)....................................................4

*Tomkiewicz v. Detroit News, Inc.*, 635 N.W.2d 36 (Mich. Ct. App. 2001)...... 18, 20

## Constitutional Provisions

U.S. Const. amend. I ........................................................................ passim

## Statutes

Communications Decency Act, 47 U.S.C. § 230 ....................................14

## Other Authorities

Hackman, Rose, *Police Tell Detroiters to Buy Guns in City Riven by Race Issues and Crime*, The Guardian (Aug. 17, 2014)........................................23

Hunter, George, *Untruthful Detroit Cops a Problem In Court Cases, Experts Say*, The Detroit News (Sept. 23, 2019)..........................................23

Ignaczak, Nina Misuraca, *Detroit Police Officer Uses Chokehold on Protestor Nakia Wallace During Rally Against Police Shooting*, Detour Detroit (July 14, 2020) .....................................................................23

Nakia Wallace Interview, Fox 2 Detroit at 2:44 (June 15, 2020)...........................13

## INTEREST OF AMICI CURIAE[1]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with nearly two million members and supporters dedicated to the principles embodied in the Constitution and our nation's civil rights laws. The American Civil Liberties Union of Michigan is a state affiliate of the ACLU. As stated more fully in Amici's Motion to File Amici Curiae Brief, Amici have appeared before courts throughout the country in First Amendment cases, including to defend protest and challenge police abuses, as direct counsel and amicus curiae.

## INTRODUCTION

Since the deaths of George Floyd and Breonna Taylor at the hands of law enforcement officers, protesters—including Plaintiffs—have gathered almost daily around Detroit to protest systemic racism and police violence. Although such political protest "has always rested on the highest rung of the hierarchy of First Amendment values," *Carey v. Brown*, 447 U.S. 455, 467 (1980), police have responded to several of these protests with additional violence. In August, Plaintiffs filed a lawsuit challenging violence carried out against protesters by the Detroit Police Department ("DPD"). Rather than confine themselves to defending the suit

---

[1] Amici confirm that no party or counsel for any party authored this brief in whole or in part, and that no person other than amici or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

on its merits, Defendants filed a counterclaim that attempts to use the judiciary to accomplish what police violence has not: to silence Plaintiffs.

Plaintiffs have banded together to protest and speak out (vociferously, to be sure) against police brutality and city leaders. The only things that connect Plaintiffs are their shared viewpoints, their association with Detroit Will Breathe, and their status as plaintiffs in this lawsuit. The counterclaim attempts to hold Plaintiffs civilly liable for conspiracy based on this protected speech and association. None of the alleged statements challenged in this lawsuit constitute unprotected speech, whether as incitement or defamation. And the counterclaim is all the more troubling because Defendants are public officials, meaning that they seek to challenge Plaintiffs' criticisms and condemnations of public officials—speech that constitutes the lifeblood of a democracy and that lies at the beating heart of the First Amendment.

Defendants' counterclaim is dangerous and it is chilling. The theory behind it could have been used to justify imposing ruinous liability on generations of civil rights protesters, including Martin Luther King, Jr., César Chávez, Angela Davis, and A. Philip Randolph. For example, Defendants complain of:

- A tweet urging people to gather to protest the police killing of a young Black man, ECF No. 43, PageID.614–615 ¶ 61;

- An Instagram post complaining about the Detroit city council's failure to take up a resolution in support of protesters and attributing the delay to political pressure from Mayor Duggan and Police Chief Craig, ECF No. 43, PageID.617 ¶ 87;

- Statements urging the ouster of Chief Craig and assailing his leadership and trustworthiness, ECF No. 43, PageID.618, 623 ¶¶ 88, 121–122;

- Statements criticizing the DPD as exhibiting a "wild, wild west . . . mentality," "lying on stand," constituting a "terroristic force in our neighborhood," and having a "murderous and brutal nature," ECF No. 43, PageID.618 ¶¶ 88, 90–92;

- Statements by Plaintiff Wallace complaining of having been placed in a chokehold by a DPD officer (an act that was captured in photographs and covered in local media), *id.* ¶ 89.

The counterclaim appears to be based on Plaintiffs' protected statements in two ways—both of which run afoul of the First Amendment. First, Defendants argue that Plaintiffs' speech demonstrates that they conspired to engage in violent or destructive acts committed by other protesters. *See* ECF No. 43, PageID.625 ¶¶ 132–33. But it has long been established—in cases arising out of civil rights protests against systemic racism—that the First Amendment protects protesters and protest organizers from liability for the violent or destructive acts of others that they do not specifically direct, incite, or intend. Absent such a rule, "one in sympathy with the legitimate aims of . . . an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 919 (1982) (quoting *Noto v. United States*, 367 U.S. 290, 299–300 (1961)). This principle requires dismissal of the counterclaim. Plaintiffs' speech does not rise to

the level of incitement, direction, or ratification and so cannot form the basis for holding Plaintiffs liable for the violent or illegal acts of others.

Second, Defendants seek a declaratory order that Plaintiffs' speech is defamatory. *See* ECF No. 43, PageID.626 ¶ C. This request would be risible were it not such a serious attack on Plaintiffs' First Amendment rights. The First Amendment protects "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The vast majority of the statements Defendants decry as "false" are constitutionally protected statements of opinion. And there are no allegations supporting an inference that Plaintiffs uttered any of the proposed statements with "actual malice," as would be required to support a defamation claim.  Thus, any claims arising from Plaintiffs' purportedly false statements must be dismissed.

If Plaintiffs have committed crimes, Defendants have the power to prosecute them for those crimes. But vociferous—and, yes, angry—criticism of public officials and institutions is not a crime, nor is protest. To the contrary, such speech is precious precisely because it can "create[] dissatisfaction with conditions as they are, or even stir[] people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 896 (1949). Defendants may not punish Plaintiffs for such speech, nor may they ask the courts to do so. For those reasons, the counterclaim must be dismissed.

## ARGUMENT

**I.     The First Amendment Requires Dismissal of Defendants' Civil Conspiracy Claim Because It Seeks to Punish Constitutionally Protected Speech and Association.**

**A.     The First Amendment Protects Criticism of the Government, Even If Angry or Profane.**

"Since the day the ink dried on the Bill of Rights, '[t]he right of an American citizen to criticize public officials and policies  . . . [has been] central [to the] meaning of the First Amendment.'" *McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 520 (6th Cir. 2001) (quoting *Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975)). The First Amendment was designed "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). It reflects a "profound national commitment to the principle that debate on public issues"—including police brutality and institutional racism—"should be uninhibited, robust, and wide-open[.]" *N.Y. Times*, 376 U.S. at 270. In particular, speech on "public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

The First Amendment's protections extend to sharp criticisms of public officials.  *N.Y. Times*, 376 U.S. at 270. Indeed, they extend to the "vulgar," the profane, and the profoundly offensive. *See, e.g., Cohen v. California*, 403 U.S. 15,

20 (1971) (wearing a jacket saying "Fuck the Draft" was constitutionally protected); *Snyder*, 562 U.S. at 456, 469. That is because, "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos v. Barry*, 485 U.S. 312, 322 (1988) (internal quotation marks omitted) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)).

Applying these principles, courts have repeatedly held that angry speech directed at police officers, including insults, profanity, and complaints of incompetence or ill will, is protected. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). Indeed, the Sixth Circuit has held that the First Amendment protects everything from "using [foul] language, cussin', ranting and raving" at a police officer, *Barnes v. Wright*, 449 F.3d 709, 718 (6th Cir. 2006) (alteration in original); to characterizing a police officer as an "asshole" and "stupid," *Greene v. Barber*, 310 F.3d 889, 895–96 (6th Cir. 2002); to telling an officer that one doesn't have to do the "sh*t" the officer orders one to do, *McCurdy*, 240 F.3d at 520; to directing "the . . . words and gesture 'f—k you'" at officers, *Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997).

**B.      Speech Encouraging, But Not Inciting, Violence Is Constitutionally Protected.**

It is a longstanding "principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is *directed to* inciting or producing *imminent* lawless action *and is likely to incite* or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (emphases added). Thus, "[t]he *Brandenburg* test precludes speech from being sanctioned as incitement" unless three requirements are met: "(1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc).

This means that "[s]peech that does not 'specifically advocate' for listeners to take unlawful action does not constitute incitement." *Higgins v. Kentucky Sports Radio, LLC*, 951 F.3d 728, 736 (6th Cir. 2020) (quoting *Bible Believers*, 805 F.3d at 245). The bar for incitement is high. Communications are protected "[e]ven if [they] have the 'tendency . . . to encourage unlawful acts,' and even if the speaker intended the communications to have that effect." *Id.* at 736–77 (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002)). Furthermore, advocating "the moral propriety or even moral necessity for a resort to force and violence" is protected

7

because it is "not the same as preparing a group for violent action and steeling it to such action." *Noto*, 367 U.S. at 297–98.

Applying these principles in *Brandenburg*, the Supreme Court vacated the conviction of a criminal defendant who was a leader of the Ku Klux Klan and who had told armed Klan members that it was "possible that there might have to be some revengeance [sic] taken" against politicians who supported the rights of Black or Jewish persons. 395 U.S. at 446. Similarly, the Supreme Court has held that government officials could not prohibit the speech and assembly of a student group, even if that group had a "repugnant" "philosophy of violence and disruption." *Healy v. James*, 408 U.S. 169, 187 (1972). And in *Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018), when then-candidate Trump reacted to protesters at his political rally by repeatedly urging his impassioned followers to "get 'em out of here," the Sixth Circuit held that his statements did not rise to incitement, even though the protesters were in fact removed forcefully by Trump's supporters, and even though his words "may arguably have had a tendency to encourage unlawful use of force." *Id.* at 610 (emphasis omitted). Given the high bar for incitement, it necessarily follows that "a party cannot be sued for incitement merely because it failed to condemn the behavior of others with sufficient firmness or clarity." *Higgins*, 951 F.3d at 738.

For the same reasons, the Supreme Court has refused to hold protest organizers liable for harm resulting from unlawful conduct that occurred at the

8

protests absent evidence of actual incitement by the organizers. *See Claiborne Hardware*, 458 U.S. at 916. The facts of *Claiborne Hardware* are illuminating. Charles Evers, the NAACP's field secretary in Mississippi, organized and led a months-long boycott against white-owned shops to protest racial discrimination. In speeches given at the outset of the boycott, Evers stated that the police could not protect boycott defectors in their homes "at night," *id.* at 902, and added that "'uncle toms' who broke the boycott would 'have their necks broken' by their own people," *id.* at 900 n.28. During the course of the boycott, violent acts were in fact perpetrated by unknown boycott supporters against some of the defectors. *Id.* at 933.

Nonetheless, the Supreme Court held that Evers could not be held liable for incitement, reasoning that "[a]n advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause." *Id.* at 928. In the absence of any evidence that Evers' speeches resulted in, or were likely to result in, *imminent* unlawful action, the Court concluded that "they must be regarded as protected speech," out of respect for "the 'profound national commitment' that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* at 928 (quoting *N.Y. Times*, 376 U.S. at 270).

**C.    A Protest Movement Is Not a Conspiracy.**

As the Court further explained in *Claiborne Hardware*, "[a] massive and prolonged effort to change the social, political, and economic structure of a local

environment cannot be characterized as a violent conspiracy simply by reference to the ephemeral consequences of relatively few violent acts." *Id.* at 933. To justify the imposition of civil liability against protest organizers and participants, there must be an "evidentiary basis for concluding that specific parties agreed to use unlawful means" and a "recogn[tion]" of "the importance of avoiding the imposition of punishment for constitutionally protected activity." *Id.* at 933–34. Thus, "[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence." *Id.* at 920. Rather, associational liability for unlawful violence could be imposed only against those individuals who "authorized, ratified, or directly threatened" the unlawful acts. *Id.* at 929. Courts "must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees." *Id.* at 934.

### D. Plaintiffs' Alleged Statements and Association Are Protected and Thus Cannot Support Civil Liability.

Applying the principles discussed above, Defendants have not pled an actionable civil conspiracy tort that survives First Amendment scrutiny. They have pled only that some protesters engaged in illegal activity and that Plaintiffs engaged in protected speech, assembly, and association—none of which can constitutionally serve as a basis for holding Plaintiffs liable for inciting any of the illegal conduct. Defendants have also alleged that some of the individual Plaintiffs engaged in individual acts of criminal conduct, but neither these alleged instances nor Plaintiffs'

10

constitutionally protected speech establish a conspiracy that can render Plaintiffs liable for the violent or criminal acts of other protesters.

Plaintiffs' denunciations of Mayor Duggan or Chief Craig and calls for Craig's resignation, ECF No. 43, PageID.618, 623 ¶¶ 88, 121–22, their descriptions of DPD as dishonest, brutal, or harmful to Detroit's community, ECF No. 43, PageID.618 ¶¶ 88, 90–92, and their perceptions (whether accurate or not) of prior incidents of police violence, ECF No. 43, PageID.614, 618, 620 ¶¶ 58, 89, 93, 100, are all textbook examples of constitutionally protected speech. Not a single one of these statements satisfies a single prong—let alone all three prongs—of the *Brandenburg* test. None explicitly or implicitly urges the use of violence or lawless action. None demonstrates the speaker's intent that violence or lawless action follow. And not one of them was likely to result in imminent violence or lawlessness.[2] *See Bible Believers*, 805 F.3d at 245. Far from incitement, such

---

[2] The content of the speech in question alone is quite sufficient to establish that it is protected and cannot rise to the level of incitement. But the degree to which Defendants' allegations evade the temporal connection between Plaintiffs' speech and actual acts of violence and lawlessness—central to the "imminence" requirement, *see James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002)—is also conspicuous. The Counterclaim fails to plead the dates or times of when some statements were uttered, let alone tether them to any particular act of violence, *see, e.g.,* ECF No. 43, PageID.610 ¶¶ 24–26. And Defendants' description of alleged illegal activity at each round of protests fails to plead a connection between that illegality or violence and any prior statements by Plaintiffs. As to the first round of protests, there is no allegation that *any* particular action or act of speech by *any* plaintiff preceded any alleged violence or lawlessness at protests on May 29–June 2. ECF No. 43, PageID.610–613. As to the SUV incident on June 28, there is no

"speech concerning government affairs . . . is the essence of self government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).

Similarly, Plaintiffs' social media posts urging readers to assemble to protest on July 10 and August 22 contain nary a word (nor implication) suggesting that protesters should act violently or unlawfully. As discussed above, the First Amendment does not tolerate holding those who urge others to protest liable for the violent actions of those others. "The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct . . . that itself is not protected." *Claiborne Hardware*, 458 U.S. at 908. Quite

---

allegation that Plaintiff Bass coordinated with any other Plaintiff, ECF No. 43, PageID.613–614, and the Counterclaim only raises allegations about Bass's allegedly "false" speech that *post-dated* the incident and therefore could not have incited anyone to act unlawfully, ECF No. 43, PageID.614 ¶ 58. As to the Hakim Littleton protests on July 10, the only alleged speech by Plaintiffs prior to the protests is a tweet urging people to join a protest. ECF No. 43, PageID.614–615 ¶ 61. By contrast, Defendants have an entire section complaining about Plaintiffs' speech in the "*aftermath* of the protest on July 10"—speech that plainly could not have incited the events of July 10. ECF No. 43, PageID.617–620 (emphasis added). Finally, with respect to the August 22 protest on Woodward Avenue, the primary allegation is that Plaintiffs issued a call to protest—a call conspicuously lacking any encouragement whatsoever to violence or illegality, *see, e.g.,* ECF No. 43, PageID.621 ¶ 104 (complaining of Plaintiff Taylor's notably non-violent statement that "if you ain't doing nothing and you wanna . . . be a part of the movement that's *taking up space*, we're here." (first alteration in original) (emphasis added)). There is no allegation whatsoever of anything any Plaintiff said to incite violence on Woodward, and Defendants themselves acknowledge that the protest was legal until the protesters were told to disband. ECF No. 43, PageID.622 ¶ 111 ("When issuing these warnings [to disperse], DPD officers instructed Counter-Defendants that their gathering was *no longer* a lawful assembly." (emphasis added)).

the contrary, public protest and picketing (and urging others to protest and picket) is an "exercise of . . . basic constitutional rights in their most pristine and classic form." *Carey*, 447 U.S. at 466 (alteration in original) (internal citation and quotation marks omitted).

To be sure, Defendants have pled that criminal acts occurred at some of the protests. But they come nowhere near pleading a specific *and imminent* connection establishing that any of the *Plaintiffs'* speech incited such (alleged) illegality. The closest Defendants come are two statements, but an examination of each statement shows that neither satisfies the test for incitement.

First, during a television interview, Nakia Wallace allegedly responded to the question of whether Detroit Will Breathe "condone[s]" violence by saying "I don't think there's a space for Detroit to . . . not condone violence, right? People are angry and are going to express that anger . . . What we're never going to do is tell young people who are passionate and who are upset and who are angry that they don't have a right to be angry and they don't have a right to express that anger." ECF No. 43, PageID.610 ¶ 26 (alterations in original). Even disregarding that Defendants' misleading use of ellipses (literally) elides Wallace's true sentiments,[3] her speech

---

[3] *See* Nakia Wallace Interview, Fox 2 Detroit at 2:44 (June 15, 2020), https://www.fox2detroit.com/video/696779 ("I don't think that there's a space for Detroit Will Breathe *to condone* or not condone violence, right? People are angry and people are going to express that anger. *Detroit Will Breathe has clearly set forth our program and what it is that we are doing.* But what we are never going to do is

was clearly protected. At *most*, Wallace "failed to condemn the behavior of others"—but that is protected by the First Amendment. *Higgins*, 951 F.3d at 738. Moreover, on its face the statement does not demonstrate that Wallace intended for her statement to incite violence, and there is no allegation that the statement—which was made in a calm tone several minutes into a lengthy TV interview—occurred in the heat of the moment in front of a crowd that could be (or was) incited to violence. Nor does Wallace come close to "'specifically *advocat[ing]*' for listeners to take unlawful action"—as would be required to constitute incitement. *Nwanguma*, 903 F.3d at 610 (emphasis added) (quoting *Free Speech Coal.*, 535 U.S. at 253).

Second, Defendants allege that, at some unspecified time, Detroit Will Breathe "shared" a video of some (unspecified) protester saying that "non-violence is no longer their shield or the answer" and suggesting that protestors take police "badges and teeth." ECF No. 43, PageID.610 ¶ 24. There is no allegation that this comment (which was not even spoken by Plaintiffs but merely reposted on social media)[4] was posted at a time or in a manner such that it actually would be capable

---

tell young people who are passionate and who are upset and who are angry that they don't have a right to be angry and they don't a right to express that anger. Because this is what happens when you kill people. This is what happens when you make it clear that life is indispensable to you — that particularly Black and Brown lives don't matter. There's going to be a price to pay for that." (emphasis added)).

[4] Even if reposting another person's video could properly be characterized as adoption or ratification of their speech, Plaintiffs' liability for this video would be precluded by § 230 of the Communications Decency Act, 47 U.S.C. § 230, which

of imminently inciting any particular act of violence against particular officers or was intended to have that effect. Posting a video online is not the same as actively enraging a live audience. "[A]dvocacy of illegal action at some indefinite future time" is protected speech that may not be punished. *Hess v. Indiana*, 414 U.S. 105, 108 (1973); *see Noto*, 367 U.S. at 297–98; *Claiborne Hardware*, 458 U.S. at 929. Detroit Will Breathe's sharing of the video is, therefore, protected speech.

Finally, Defendants allege that some Plaintiffs themselves were arrested for possible criminal acts. But, tellingly, there is no allegation whatsoever that these actions were themselves imminently incited by the speech acts of other plaintiffs, nor that they were anything other than isolated acts in the heat-of-protest—much less that they were the result of an agreement among Plaintiffs. Once all of the protected speech is stripped out of the Complaint, the allegations of arrest fail to establish a central element of a civil conspiracy, namely, the fact of an "agreement, or preconceived plan, to do the unlawful act[s]." *Temborius v. Slatkin*, 403 N.W.2d 821, 828 (Mich. Ct. App. 1986).

As the *Claiborne Hardware* court explained, to the extent "[t]he taint of violence colored the conduct of some of the petitioners[,] [t]hey, of course, may be

---

immunizes a website that both acts as a platform for others and provides content itself from liability for merely selecting something for publication but not materially contributing to it. *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 413–16 (6th Cir. 2014).

held liable for the consequences of their violent deeds." 458 U.S. at 933. But "[t]he burden of demonstrating that it colored the entire collective effort . . . is not satisfied by evidence that violence occurred or even that violence contributed to the success of the [movement]." *Id.* Rather, what is required to support civil conspiracy liability against protest organizers is an "evidentiary basis for concluding that specific parties agreed to use unlawful means." *Id.* Here, Defendants have, at most, pled isolated instances of violence committed by protesters and numerous instances of plainly protected speech by the protest organizers. The conspiracy counterclaim therefore comes nowhere close to satisfying the stringent First Amendment test for holding protest organizers liable for violence or illegality that others engage in at protests. This exposes the vexatious and insidious nature of the Defendants' civil conspiracy counterclaim: to deter core political speech. The counterclaim should be dismissed.

## II.    The First Amendment Bars Defendants' Counterclaim to the Extent It Seeks Relief Arising from Purportedly False Statements.

Defendants also take aim at several of Plaintiffs' alleged statements—all criticisms of the DPD—on the grounds that they are false. *See, e.g.,* ECF No. 43, PageID.608, 614, 617–618, 620, 623 ¶¶ 15, 58, 87–89, 92, 100, 122. While Defendants do not appear to have squarely pled a defamation claim, they seek a declaratory judgment that Plaintiffs defamed Defendants. ECF No. 43, PageID.626 ¶ C. Regardless of the precise label Defendants use to challenge these statements, the counterclaim falls within a "formula[] for the repression of expression" and so

must "be measured by standards that satisfy the First Amendment." *N.Y. Times*, 376 U.S. at 269, 272.

Two of those standards require dismissal of this case: First, Defendants, all public figures, fail to plausibly allege that Plaintiffs spoke with actual malice, as required under longstanding Supreme Court precedent. Second, Plaintiffs' alleged statements are all either protected statements of pure opinion, which are incapable of defamatory meaning, or statements of opinion based upon disclosed facts. As a matter of law, these statements cannot form the basis for a defamation claim.

### A.   The First Amendment Requires a Plausible Allegation of Actual Malice.

The Supreme Court has deemed the "public interest in a free flow of information to the people concerning public officials, their servants" to be "paramount." *Garrison*, 379 U.S. at 77. "It is as much [the public's] duty to criticize [government] as it is the official's duty to administer [government]." *N.Y. Times*, 376 U.S. at 282. And "[t]he sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are intimately involved in the resolution of important public questions." *Hustler Magazine*, 485 U.S. at 51 (marks and citation omitted).

"[W]hen interests in public discussion are particularly strong, as they [are] in th[is] case, the Constitution limits the protections afforded by the law of

defamation." *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). In order to afford the "breathing space essential" to the "fruitful exercise" of First Amendment rights, the Supreme Court has held that plaintiffs who "are properly classed as public figures . . . may recover for injury to reputation only on clear and convincing proof that [a] defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 342 (1974) (internal quotation marks omitted).

Police officers, regardless of rank, are such public figures. They "'have or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.'" *Hildebrant v. Meredith Corp.*, 63 F. Supp. 3d 732, 744 (E.D. Mich. 2014) (quoting *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981)). Indeed, officers "ha[ve] such apparent importance that the public has an independent interest in the[ir] qualifications and performance . . . *beyond* the general public interest in the qualification and performance of all government employees." *Id.* (quoting *Gray*, 656 F.2d at 591) (emphasis added). In addition, "officers are visible to the public, have authorization to use force, and are in such a position that, if they abuse their authority, they may deprive citizens of their constitutional rights." *Id*. (quoting *Gray*, 656 F.2d at 591); *see also Tomkiewicz v. Detroit News, Inc.*, 635 N.W.2d 36, 42-44 (Mich. Ct. App. 2001) (holding that police lieutenant constituted a public figure, collecting Michigan cases holding the same for other law

enforcement personnel, and citing with approval cases holding that various law enforcement officers qualify as public figures).

*New York Times v. Sullivan* is instructive. There, the Supreme Court considered a defamation claim brought against the publishers of a two-paragraph advertisement that accused police of unleashing " an unprecedented wave of terror" against civil rights demonstrators.  376 U.S. at 256. It was "uncontroverted that some of the statements contained in the two paragraphs were not accurate descriptions" of the events that had occurred. *Id.* at 258. The Supreme Court nonetheless held that, "as an expression of grievance and protest on one of the major public issues of our time," the speech "would seem clearly to qualify for . . . constitutional protection." *Id.* at 271. In so holding, the Court established the actual malice standard that governs here: public figures claiming defamation must establish that the challenged statements were made "with knowledge that [the statements were] false or with reckless disregard of whether [they were] false or not." *Id.* at 280.  The Court held that "even if the advertisement was not 'substantially correct,'" the opinion it expressed "was at least a reasonable one, and there was no evidence to impeach the witness' good faith in holding it." *Id.* at 286.

To plead actual malice, a public figure must plead facts that "if true, would constitute *clear and convincing* evidence that actionable language was motivated by actual malice." *Ewing v. Lucas Cnty. Dep't of Job, & Family Servs.*, No. 3:12-CV-

743, 2012 WL 6048992, at *11 (N.D. Ohio Dec. 5, 2012), *aff'd in relevant part*, No. 13-3010, slip op. at 3 (6th Cir. July 31, 2013); *see Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (similar). Reckless disregard "is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher in fact entertained serious doubts concerning the truth of the statements published." *Tomkiewicz*, 635 N.W.2d at 46 (citation omitted).

The counterclaim at issue here is conspicuously devoid of any actual malice allegations, much less sufficient ones. The only allegation that comes remotely close is Plaintiff Taylor's statement that he viewed DWB's message about the killing of Hakim Littleton on one point as "unclear"—not false, much less intentionally or recklessly so. *See* ECF No. 43, PageID.619 ¶ 97. For this reason alone, Defendants' counterclaim challenging Plaintiffs' purportedly false statements must be dismissed.

### B. The First Amendment Bars Claims Based on Statements of Opinion About Police Misconduct.

In addition, the claim must be dismissed because it is based entirely on statements of opinion, including those that are based on disclosed facts. "Under the First Amendment there is no such thing as a false idea." *Gertz*, 418 U.S. at 339. While statements of fact capable of defamatory meaning may be actionable, statements of opinion are not. *Id.* In order for a statement to be facially actionable in a defamation suit, it must be "sufficiently factual to be susceptible of being proved

true or false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990); *see also Berry v. Schmitt*, 688 F.3d 290, 303 (6th Cir. 2012).

Here, Defendants challenge two social media posts stating that "[Chief] Craig has to go," ECF No. 43, Page ID.618, 623 ¶¶ 88, 122, including one opining that Craig "reigns over the police department [and] has given the green light to whatever the officers feel like," ECF No. 43, PageID.623 ¶ 122, and another asking "[w]hy" Detroit police officers can "run over protestors," ECF No. 43, PageID.618 ¶ 88. They also take issue with a tweet calling DPD's "nature" "murderous and brutal," *id.* ¶ 92, a Facebook post conjecturing that a specific "cop tried to kill me and others tonight," ECF No. 43, PageID.614 ¶ 58, and a criticism stating that the "mentality of [Craig's] officers . . . is unacceptable," ECF No. 43, PageID.618 ¶ 90.[5]

Such denunciations of public officials—comparable to simply calling them "despicable"—are "paradigmatic statements of opinion." *Boulger v. Woods*, 917 F.3d 471, 482 (6th Cir. 2019). These statements—opining, for example, on the nature and mentality of officers—are not susceptible of being proven true or false. And, as noted above, courts recognize the unique importance of First Amendment protections when the speech at issue criticizes government officials. "It is a prized American privilege to speak one's mind . . . on all public institutions, and this

_____

[5] It is worth noting that the individuals alleged to have made this statement and others are not Plaintiffs in the case. Equally, some of the purportedly defamed officers are not Defendants.

opportunity is to be afforded for vigorous advocacy no less than abstract discussion." *N.Y. Times*, 376 U.S. at 269 (cleaned up).

Defendants also challenge a number of alleged statements that express opinions on the basis of disclosed facts. For example, they take issue with the following Instagram post: "City councilmembers have been holding up a resolution to drop all charges against protestors for nearly a month. This delay tells us . . . that Mayor Duggan and Chief Craig want them to kill the resolution." ECF No. 43, PageID.617 ¶ 87. The post sets forth the facts on which the opinion is based: the councilmembers' delay. And Defendants have not alleged that those statements of fact were false. Similarly, Defendants point to several statements of opinion about shooting by police that were explicitly based on "body cam footage." ECF No. 43, Page ID.619, 620 ¶¶ 93, 99, 100.

"[A] statement based on fully disclosed facts is only actionable where the facts are themselves false and demeaning." *Berry*, 688 F.3d at 303 (quotation marks and citation omitted). That is because, when "the factual basis for [an] opinion [i]s stated, [listeners are] free to form another, perhaps contradictory opinion from the same facts." *Id.* at 303–04 (quotation marks and citation omitted). The statements discussed above cannot be defamatory as a matter of law because they disclose the bases for the speakers' opinions.

Each of the statements Defendants challenge as false "touch[es] on an official's fitness for office"; in particular, they discuss officials' "dishonesty, malfeasance, [and] improper motivation"—all topics that the Supreme Court has recognized deserve special First Amendment scrutiny.[6] *Garrison,* 379 U.S. at 77. In addition, statements "refer[ring] to an individual's internal motivation"—for example, whether an officer drove into a crowd in order to kill protesters or for another reason, *see* ECF No. 43, PageID.614 ¶ 58—is an example of "a non-

---

[6] Truth is also an absolute defense to defamation. *See Porter v. City of Royal Oak*, 542 N.W.2d 905, 909 (Mich. Ct. App. 1995). And although this Court cannot independently assess the truth of the alleged claims given the procedural posture of the case, it is nonetheless striking how many of Plaintiffs' allegedly "false" claims are expressly supported by well-established media sources. For example, Defendants complain that Nakia Wallace "falsely" accused the DPD of lying on the stand. ECF No. 43, PageID.618 ¶ 88. *But see* George Hunter, *Untruthful Detroit Cops a Problem In Court Cases, Experts Say*, The Detroit News (Sept. 23, 2019), https://www.detroitnews.com/story/news/local/detroit-city/2019/09/23/untruthful-detroit-cops-problem-court-cases-experts-say/2263442001/. Similarly, Defendants complain that Plaintiffs "falsely" accuse Chief Craig of exhibiting a "wild, wild, west" mentality and encouraging people to "just get your guns and just start shooting." ECF No. 43, PageID.618 ¶ 90. *But see* Rose Hackman, *Police Tell Detroiters to Buy Guns in City Riven by Race Issues and Crime*, The Guardian (Aug. 17, 2014), https://www.theguardian.com/money/2014/aug/17/police-guns-detroit-crime-race-cost-issues ("Detroit police chief James Craig—nicknamed 'Hollywood' for his years spent in the LAPD and his seeming love of being in front of the camera – has repeatedly called on 'good' and 'law-abiding' Detroiters to arm themselves against criminals in the city."). And Defendants complain that Plaintiff Nakia Wallace falsely accused a DPD officer of placing her in a chokehold. ECF No. 43, PageID.618 ¶ 89. *But see* Nina Misuraca Ignaczak, *Detroit Police Officer Uses Chokehold on Protestor Nakia Wallace During Rally Against Police Shooting*, Detour Detroit (July 14, 2020), https://detourdetroiter.com/detroit-protester-nakia-wallace-put-in-chokehold/ (publishing a photo of Wallace in a police chokehold).

verifiable statement . . . because no plausible method to confirm the veracity exists." *Boulger*, 917 F.3d at 481. And, as the Supreme Court has recognized, "intemperate, abusive, or insulting language" can "be an effective means to make [a] point." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 282 (1974). Such "loose language" is a way to "demonstrate . . . strong disagreement" with the person being criticized, and it is protected. *Id.*

Michigan courts agree. "Terms such as 'blackmailer,' 'traitor,' 'crook,' 'steal,' and 'criminal activities' must be read in context to determine whether they are merely exaggerations of the type often used in public commentary. If a reasonable reader would understand these epithets as merely 'rhetorical hyperbole' meant to express strong disapproval rather than an accusation of criminal activity or actual misconduct, they cannot be regarded as defamatory." *Ghanam v. Does*, 845 N.W.2d 128, 144 (Mich. Ct. App. 2014). Plaintiffs' passionate statements decrying DPD fall into this category of protected speech.

Moreover, tweets, Facebook posts, and Instagram posts—the bulk of what Defendants challenge as false here—are inherently likely to count as opinion based on their context, particularly when the feeds in question reflect an account holder with strong opinions they express through social media. "Courts that have considered the matter have concluded that Internet message boards and similar communication platforms are generally regarded as containing statements of pure

opinion rather than statements or implications of actual, provable fact." *Ghanam*, 845 N.W.2d at 144; *see also Boulger*, 917 F.3d at 482. This, too, is a basis for dismissing Defendants' request for relief relating to alleged defamation.

## CONCLUSION

For these reasons, this Court should dismiss Defendants' counterclaim with prejudice.

Respectfully submitted,

/s/ Philip Mayor
Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
pmayor@aclumich.org
dkorobkin@aclumich.org

Vera Eidelman
Brian Hauss
Speech, Privacy & Technology Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org
bhauss@aclu.org

Attorneys for Amici Curiae

Dated: November 6, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

/s/ Philip Mayor
Philip Mayor (P81691)