IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

                               )

DETROIT WILL BREATHE et al.,   )

                               )

    *Plaintiffs/Counter-Defendants,*   )           Case No. 20-CV-12363

                               )

            v.                 )           Hon. Laurie J. Michelson

                               )

CITY OF DETROIT, et al.,      )

                               )

    *Defendants/Counter-Plaintiffs.*   )

_____ )

**MOTION OF PROTECT THE PROTEST TASK FORCE
FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF**

*Amici* Protect the Protest respectfully requests that this Court grant permission to file the accompanying brief as *Amicus Curiae*. In support of this motion, Protect the Protest Task Force states as follows:

1. "Protect the Protest" Task Force ("PTP") is a coalition of 27 nonprofit organizations with over 40 lawyers that works to address the threat that Strategic Lawsuits Against Public Participation (SLAPPs) pose to those engaged in public interest advocacy. PTP provides direct legal and advocacy support to public interest actors – such as activists, community organizers, journalists, and small media organizations. PTP tracks incidents of censorship and efforts to suppress and protect political speech within the

United States, including anti-SLAPP statutes of the kind at issue in this case. PTP member organizations have advised hundreds of clients who have been victimized by frivolous SLAPP lawsuits designed to inhibit otherwise protected First Amendment activity.

2. *Amici* have an interest in ensuring that protesting activity is not chilled by the filing of spurious counter-claims such as City of Detroit et al.'s, here.

3. *Amici* have a unique perspective, understanding, and experience regarding the identification of frivolous lawsuits aimed at retaliating against protect speech activites, otherwise known as SLAPP lawsuits.

4. Here, PTP believes that Counter-Plaintiffs' counterclaim is a SLAPP, designed to suppress political speech and that the counterclaim should be dismissed at the pleadings stage. Not dismissing this case will have a chilling effect on all speech by all who would speak out in defense of an important cause.

5. As required by Local Rule 7.1(a), before filing this motion, undersigned counsel contacted counsel for the Plaintiffs/Counter-Defendants and counsel for the Defendants/Counter-Plaintiffs to ascertain whether this motion would be opposed. Counsel for Plaintiffs/Counter-Defendants consented to the filing and do not oppose; undersigned counsel did not receive a reply from counsel for Defendants/Counter-Plaintiffs. In the interest of time,

undersigned counsel respectfully requests leave to file the accompanying

brief without consent from both parties.

6. PTP's proposed amici curiae brief accompanies this motion.

For these reasons, PTP respectfully requests that this Court grant leave to

file the accompanying *Amici Curiae* brief.

Respectfully submitted,

/s/ *Marianne Dugan*

Marianne Dugan
The Civil Liberties Defense Center
1430 Willamette St. #359
Eugene, Oregon 97401
(541) 687-9180
MDugan@CLDC.org

November 6, 2020

No. 20-CV-12363

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DETROIT WILL BREATHE, et al.,

*Plaintiffs/Counter-Defendants,*

v.

CITY OF DETROIT, et al.,

*Defendants/Counter-Plaintiffs.*

_____

BRIEF OF *AMICI CURIAE* "PROTECT THE PROTEST" TASK FORCE
IN SUPPORT OF PLAINTIFFS/COUNTER-DEFENDANTS

_____

Marianne Dugan
Lauren Regan
Rebecca Chapman
The Civil Liberties Defense Center
1430 Willamette St. #359
Eugene, Oregon 97401
(541) 687-9180


*Counsel for Amici Curiae*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................... i

INTERESTS OF AMICI CURIAE ........................................................... 1

SUMMARY OF ARGUMENT .............................................................. 1

ARGUMENT ........................................................................................ 2

   I.   COUNTER-PLAINTIFF'S SINGLE COUNTERCLAIM OF CIVIL
       CONSPIRACY IS A QUINTISSENTIAL SLAPP ...................................... 3

  II.  THE COUNTERCOMPLAINT FAILS TO ALLEGE
      WITH SPECIFICITY ANY SPEECH OR CONDUCT
      THAT IS NOT PROTECTED BY THE FIRST AMENDMENT. .............. 7

      a. The Countercomplaint Fails to Sufficiently Allege Any
        Non-Speech Acts. ........................................................................... 9

      b. The Noerr-Pennington Doctrine Provides a Mechanism For Early
        Dismissal of Claims Based on First Amendment Protected Activity ........ 12

CONCLUSION .................................................................................... 15

# TABLE OF AUTHORITIES

## Cases

*Agema v City of Allegan*, No. 1:12-CV-417, 2014 WL 249374
 (WD Mich, January 22, 2014), aff'd in part 826 F3d 326 (CA 6, 2016)............. 15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)............................................ 13

*Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776 (6th Cir. 2007) ............... 14

*Eastern Rail. Pres. Conf. v. Noerr Motor FRGT., Inc.,* 81 S.Ct. 523 (1961) ..... 2, 14

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)............................. passim

*Scales v. United States*, 367 U.S. 203 (1961) ........................................................ 12

*Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018)......................................... 12

*VIBO Corp., Inc. v. Conway*, 669 F.3d 675 (6th Cir. 2012) ............................... 2, 13

## Other Authorities

Dwight H. Merriam & Jeffrey A. Benson, *Identifying and Beating a Strategic
 Lawsuit Against Public Participation,* 3 DUKE ENVTL. L & POLICY REV. 17, 19
 (1993) ................................................................................................................. 7

George Pring, *SLAPPs: Strategic Lawsuits against Public Participation*, 7 PACE
 ENVTL. L. REV. 3, 4 (September 1989) ........................................................... 2, 3

## INTERESTS OF AMICI CURIAE[1]

*Amici curiae* are nonprofit nongovernmental human rights, environmental, civil rights, and free speech organizations that have joined together through the "Protect the Protest" task force ("PTP") to protect the First Amendment rights of public interest advocates against the threat of Strategic Lawsuits Against Public Participation ("SLAPP suits"). A more detailed description of *Amici* is set forth in Appendix A. *Amici* have relevant, first-hand knowledge of the consequences of these abusive lawsuits, which have the purpose and effect of chilling important perspectives on issues of significant public concern. *Amici* are interested in this case in opposition to the use of vexatious litigation to weaponize courts against the free expression of ideas.

## SUMMARY OF ARGUMENT

The counterclaim of civil conspiracy that Counter-Plaintiffs City of Detroit *et al.* filed against Counter-Defendants Detroit Will Breathe *et al.* was intended to manipulate the legal system as a way to bully, retaliate, and silence DWB, rather than seek legitimate judicial redress. Such a frivolous lawsuit is a quintessential

---

[1] *Amici* confirm that that no party or counsel for any party authored this brief in whole or in part, and that no person other than *amici* or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

1

SLAPP suit. The right to protest is fundamental and protected under the First Amendment.

SLAPP suits pose particular dangers not only to the individuals and organizations they target, but also to our society, to human rights, and to the rule of law. SLAPPs pose an existential threat to civil society, free speech, and democracy. *See*, George Pring, *SLAPPs: Strategic Lawsuits against Public Participation*, 7 PACE ENVTL L. REV. 3 (September 1989).

Although the Michigan legislature has not enacted statutory anti-SLAPP law, Michigan courts recognize the common law protections of the U.S. Supreme Court's Noerr-Pennington line of Petition Clause cases. This line of cases makes it crystal clear that views expressed to government officials and agencies are protected First Amendment activity as long as they are seeking "a government result." *See, Eastern Rail. Pres. Conf. v. Noerr Motor FRGT., Inc.,* 81 S.Ct. 523 (1961); *NAACP v. Claiborne Hardware Co*., 458 U.S. 886 (1982); *VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 683–86 (6th Cir. 2012).

In addition to failing to state a claim pursuant to Rule 12(b)(6), the Countercomplaint also fails to allege any non-protected First Amendment activity and must be dismissed.

<u>**ARGUMENT**</u>

**I.   COUNTER-PLAINTIFF'S SINGLE COUNTERCLAIM OF CIVIL CONSPIRACY IS A QUINTISSENTIAL SLAPP.**

The goal of a SLAPP is to stop citizens or groups from exercising their political right to free speech, to punish them for engaging in such speech, or to deter others from doing the same in the future. SLAPPs accomplish this nefarious goal by masquerading as legitimate lawsuits designed to survive a motion to dismiss for failure to state a claim, thus forcing defendants into expensive and lengthy litigation. SLAPPS usually are camouflaged as torts: defamation, business torts such as interference with business relations, judicial torts, conspiracy or RICO claims, and nuisance.

Over three decades ago, Professor George Pring warned of a new and disturbing trend he had observed: American citizens were being sued simply for "speaking out on political issues." George Pring, *SLAPPs: Strategic Lawsuits against Public Participation*, 7 PACE ENVTL L. REV. 3, 4 (September 1989). Chillingly, Pring described SLAPPS as "dispute transformation devices, a use of the court system to empower one side of a political issue, giving it the unilateral ability to transform both the forum and the issue in dispute." *Id*. at 12. Unfortunately, SLAPPs have proliferated since Pring first coined the term SLAPP. Indeed, as reflected in the instant counterclaim, SLAPPs remain a tool deployed by powerful interests to silence those who disagree with them.

SLAPPs strike at a wide variety of traditional American political activities. Historically, people and organizations have been sued for reporting violations of law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature, lobbying for legislation, campaigning in initiative or referendum elections, filing agency protests or appeals, or even speaking out on social media. Most troubling to *Amici*, however, is the growing trend of powerful corporations and political entities suing those engaging in First Amendment protected protests and boycotts.[2]

*Amici* have substantial experience representing individuals and groups who have been "SLAPPed." As members of the Protect the Protest task force, *Amici* have not only successfully defended citizens and groups from bullying SLAPPs, but also have advocated for Anti-SLAPP laws, and educated activists and lawyers nationally on how to avoid and defend against SLAPPs. In 2019, *Amici* successfully defended nine residents of the town of Weed, California, who spoke out against a corporation that claimed it owned the rights to the town's main source of spring-fed drinking water.[3] With *Amici*'s assistance, the suit was successfully

---

[2] *The First Annual SLAPP Awards*, PROTECT THE PROTEST, https://protecttheprotest.org/2019/02/25/the-first-annual-slapp-awards-2018/ (collecting and summarizing bullying corporate SLAPP activity in 2018) (last visited November 4, 2020).
[3] *The 'Weed 9' Water Activists Win as Logging Company Drops SLAPP Lawsuit*, PROTECT THE PROTEST, https://protecttheprotest.org/2019/12/19/the-weed-9-water-

unmasked as a SLAPP and dismissed. The nine citizens had nothing to do with the property dispute (or quiet title action); the corporation named them as defendants simply for spite and intimidation.

*Amici* have also been actively involved in defending activists from the oil and energy industry's attempt to use RICO- conspiracy-based SLAPPs to attack and silence people and groups who are attempting to protect land, water, and Indigenous Rights from exploitation and corporate profiteering.[4] *Amici* have helped community activists in Alabama defend themselves from a defamation SLAPP brought by a landfill operator after they opposed the dumping of hazardous coal ash in a landfill in their town.

SLAPPs are not limited to environmental activism. *Amici* have provided legal defense to nonprofit organizations, activists, community organizers, media organizations, and journalists in SLAPP cases around the country. *Amici* also actively engages in SLAPP policy discussions and has advocated for the adoption of Anti-SLAPP laws at the federal level, as well as the state level. Recently *Amici* assisted with the drafting of Anti-SLAPP laws or amendments to laws in Texas,

---

activists-win-as-logging-company-drops-slapp-lawsuit/ (last visited November 4, 2020).

[4] *How a Corporate Assault on Greenpeace is Spreading* BLOOMBERG BUSINESSWEEK, https://www.bloomberg.com/news/articles/2017-08-28/how-a-corporate-assault-on-greenpeace-is-spreading (last visited July 9, 2020).

Kentucky, Virginia, and Colorado.[5]

Over the past several years, through their work defending against SLAPPs and educating the legal community about SLAPPs, *Amici* have seen SLAPPs proliferate in the U.S. and around the world. It is clear that any activist, organizer, or private citizen speaking out on any political issue, typically on behalf of the less-popular or less-powerful, is at risk of facing a SLAPP.

Public political dissent has never been more crucial and, through the power of the internet, has become even more accessible to all. SLAPPs pose particular dangers, not just to individuals, but to our society, human rights, and the rule of law. SLAPPs target advocates, community leaders, journalists, professors, whistleblowers, and everyday people who exercise their Constitutional rights. Their true purpose is to silence criticism and inhibit dissent. Although the majority of SLAPPs are eventually dismissed, a SLAPP does not need to result in a judgment on the merits to have its intended effect. A meritless lawsuit can take years to resolve, draining a defendant's resources, reputation, and morale. And that is precisely the point.

---

[5] Joe Mullin, *Critical Free Speech Protections Are Under Attack in Texas*, ELECTRONIC FRONTIER FOUNDATION (March 14, 2019), https://www.eff.org/deeplinks/2019/03/critical-free-speech-protections-are-under-attack-texas (last visited June 28, 2020); *Factsheet: Kentucky's Anti-SLAPP Legislation*, Protect The Protest, http://www.protecttheprotest.org/wp-content/uploads/2020/02/Kentucky-SLAPP-Factsheet.pdf (last visited June 28, 2020).

Every hallmark of a SLAPP can be found in Counter-Plaintiffs' case. Counter-Plaintiffs have cast a wide net, alleging facts in their claim that are only tangentially linked to named Counter-Defendants; Counter-Plaintiffs only filed the counterclaim after being told that their specious attempt to limit the TRO could not be granted, in part, because they had not brought any claims against Counter-Defendants – an attempt to remain in litigation as long as possible; and, most importantly, the sole claim of civil conspiracy arises entirely out of Counter-Defendants' First Amendment protected activity on matters of public interest. Indeed, this Court easily and correctly held that Counter-Defendants were entitled to a TRO in part because they had a likelihood of success in prevailing on their claim that Counter-Plaintiffs' conduct was motivated by Counter-Defendants' First Amendment protected activity. ECF #18, Opinion and Order, September 4, 2020, 7.

Although defamation claims are the most common type of claim brought by SLAPP plaintiffs, conspiracy claims such as civil and RICO conspiracy are increasing as a popular device for SLAPP bullies. *See* Dwight H. Merriam & Jeffrey A. Benson, *Identifying and Beating a Strategic Lawsuit Against Public Participation*, 3 DUKE ENVTL L & POL'Y REV. 17, 19 (1993). SLAPP suits like the one Counter-Plaintiffs have filed against DWB demonstrate the real dangers posed by these suits; anyone who has the courage to speak out on political issues against

7

the interests of the powerful runs the risk of being subjected to SLAPP harassment via the lengthy and expensive process of defending themselves from a frivolous lawsuit as well as potentially crushing damages.

The civil conspiracy counterclaim brought by Counter-Plaintiffs here is a quintessential SLAPP: a brazen attempt to silence and punish those who advocate for a matter of public interest attempting to masquerade as a legitimate lawsuit.

## II.   THE COUNTERCOMPLAINT FAILS TO ALLEGE WITH SPECIFICITY ANY SPEECH OR CONDUCT THAT IS NOT PROTECTED BY THE FIRST AMENDMENT.

Were one to excise the protected speech-related allegations from Counter-Plaintiffs' complaint, the resulting document would be spare indeed. Plaintiffs fail to allege with specificity any speech or conduct by Counter-Defendants that is not protected by the First Amendment. Counter-Plaintiffs allege a single claim of conspiracy based on allegations that, as part of Counter-Defendants' participation in protests as part of the "Black Lives Matter" movement, they screamed at Counter-Plaintiffs, published false statements about Counter-Plaintiffs, and posted content disagreeable to Counter-Plaintiffs on social media. *See*, ECF No. 43, p. 46-48. Indeed, throughout Counter-Plaintiffs' countercomplaint, they repeatedly and unequivocally refer to the "protests" that gave rise to their allegations and single claim of conspiracy. *Id*. at 48-57. But such statements did not encourage illegal activity, let alone meet the high standard for incitement under *Brandenburg v*.

*Ohio*, 395 U.S. 444 (1969). Rather, they are protected by the First Amendment from forming the basis for civil liability. *See, NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

Specifically, the First Amendment precludes these statements from being a basis for civil liability, because they do not even approach the level of incitement demanded by *Brandenburg*. 395 U.S. 444. That case held that the First Amendment protects even advocacy of violence "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Id. at 447.

In *N.A.A.C.P v. Claiborne Hardware Co.,* the Supreme Court recognized that constitutionally protected activity imposes a special obligation on the Court to critically examine the basis of liability, even where those actions would not otherwise be protected under the First Amendment. 458 U.S. 886, 915-916. As *Claiborne Hardware* made clear, speech thus protected from forming the basis for criminal prosecution is also immunized from forming a basis for civil liability. 458 U.S. at 927-28; see also *id*. at 926-27, 929 (First Amendment bars imposing civil liability in absence of proof defendant authorized, directed, ratified or directly threatened specific tortious activity or incited imminent violence). The statements attributed to Counter-Defendants do not encourage violence, let alone rise to the high level of incitement to imminent violence. "Some videos" on the DWB website

allegedly called for violent conduct, *see* ECF no. 46, ¶23, and Counter-Defendant Nakia Wallace's statement on Fox 2, *id*., ¶26, did not explicitly condemn violence in response to the question of whether Counter-Defendant Detroit Will Breathe condoned violence or not. But these do not show any agreement or coordination between the defendants with respect to acts of violence. Plaintiffs have failed to show coordination between counter-defendants for anything other than protest activity. There is also nothing showing they were responsible for any violent conduct beyond their own (alleged) acts. *Claiborne Hardware* similarly forecloses Plaintiffs' conclusory attempt to brand Counter-Defendants conspirators—and hold them liable for the alleged acts of others—based on this protected speech.

### a. The Countercomplaint Fails to Sufficiently Allege Any Non-Speech Acts.

If a complaint successfully pleads allegations of violence along with non-violent speech acts, "individuals may be held responsible for the injuries that they caused; a judgment tailored to the consequences of their unlawful conduct may be sustained." *Claiborne Hardware* 458 U.S. at 926. This is not such a complaint. In this case, despite attempting to allege *incidents* of threats or physical contact of certain specific counter-defendants, the counter-complaint makes no *claims* against specific individuals for their own violent or unlawful conduct - the only claim is a single count of civil conspiracy. Critically, Counter-Plaintiffs have not alleged, in

more than conclusory fashion, any facts that indicate an agreement to either pursue

lawful goals through unlawful means, or an agreement to pursue unlawful goals.

"Civil liability may not be imposed merely because an individual belonged

to a group, some members of which committed acts of violence. For liability to be

imposed by reason of association alone, it is necessary to establish that the group

itself possessed unlawful goals and that the individual held a specific intent to

further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920. Even the one

statement in the counter-complaint that Counter-Plaintiffs allege was encouraging

violence is a far cry from that, and again can easily be answered by *Claiborne*

*Hardware*: "It is clear that "fighting words" -- those that provoke immediate

violence -- are not protected by the First Amendment. Similarly, words that create

an immediate panic are not entitled to constitutional protection. This Court has

made clear, however, that mere *advocacy* of the use of force or violence does not

remove speech from the protection of the First Amendment." *Claiborne Hardware*,

458 U.S. at 927 (internal citations removed). There is no allegation in the counter-

complaint that any alleged failure to condemn violence immediately incited violent

acts. Importantly, as argued by Counter-Defendants, *see* ECF no. 46, the

countercomplaint, while alleging that some individual Counter-Defendants

committed acts of property destruction or violence, the only allegations regarding

what the Counter-Defendants agreed to, or coordinated on, are related to protest activity; there is no underlying claim relating to the allegations of violent conduct.

Where a political advocacy campaign involves both protected expression and illegal activity, individuals' First Amendment rights are not limited—and they cannot be held liable—simply because their partners in expressive activity violated the law in furtherance of their joint campaign. *Claiborne Hardware*, 458 U.S. at 908, 915-20, 926-27, 934; see also *Scales v. United States*, 367 U.S. 203, 224 (1961) ("In our jurisprudence guilt is personal.").

There are no non-conclusory allegations that Counter-Defendants as an organization authorized or ratified violent or illegal acts. As more thoroughly discussed by Counter-Defendants, *see* ECF no. 46, pp. 10-17, such allegations fail to fulfill the pleading requirements applicable to conspiracy claims in an ordinary case; they certainly fail to satisfy the more searching analysis demanded in First Amendment cases. *See also Sines v. Kessler*, 324 F. Supp. 3d 765, 783-84 (W.D. Va. 2018) (because of pleading requirements and the First Amendment, plaintiffs could not plausibly plead that all rally attendees "were part of one overarching conspiracy").

      **b. The Noerr-Pennington Doctrine Provides a Mechanism For Early Dismissal of Claims Based on First Amendment Protected Activity.**

Although there is no statutory Anti-SLAPP law in Michigan, this Court has a model for addressing frivolous lawsuits arising from protected speech, even if it finds that Counter-Plaintiffs' countercomplaint has sufficiently stated a claim under the *Iqbal/Twombly* standard (which they have not). *See, generally, Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). Under this Court's Noerr-Pennington line of cases, the Petition Clause provides a sweeping protective immunity for publicity campaigns to influence public officials regardless of intent or purpose, if the campaigns are aimed at procuring favorable government action. In this case, it is clear that Counter-Plaintiff's baseless single claim of conspiracy stems entirely from protected "petitioning" for the purpose of seeking redress from the government. Therefore, Counter-Defendants' actions should be immunized under the Noerr-Pennington doctrine.

Importantly, Noerr-Pennington immunity provides a mechanism for early dismissal of frivolous claims based on protected First Amendment activity, similar to that provided by Rule 12(b)(6) and by Anti-SLAPP legislation. *See*, *e.g.*, *VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 683–86 (6th Cir. 2012) (affirming the district court's ruling on a Rule 12(b) (6) motion that the defendants were immunized from suit under Noerr–Pennington).

The Noerr-Pennington doctrine, as established in *Eastern Rail. Pres. Conf. v. Noerr Motor FRGT., Inc.,* 81 S.Ct. 523 (1961), protects individuals from liability when they petition or otherwise attempt to influence the government. This doctrine is designed to clarify the protections provided in the First Amendment "right to petition the government." Given the immense importance placed on free expression, the Noerr-Pennington doctrine is no longer a First Amendment principle particular to antitrust law, but has expanded to an extensive number of areas of the law and applies broadly to speech-related actions with the goal of influencing the government. Importantly, the Supreme Court has applied Noerr-Pennington to a boycott that disrupted and even materially harmed a business, finding that such activity was protected due to the fact that the ultimate goal of the boycott was to seek redress from the government. *N.A.A.C.P v. Claiborne Hardware Co.,* 458 U.S. 886 (1982); *see also* supra, Section II.a, at 10-12.

This Court has also applied the Noerr-Pennington doctrine broadly outside of its antitrust origins. "The Sixth Circuit has instructed that although the Noerr–Pennington doctrine was initially recognized in the antitrust field, "the doctrine is, at bottom, founded upon a concern for the First Amendment right to petition and, therefore, has been applied to claims implicating that right." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007); *Agema v City of Allegan*, No. 1:12-CV-417, 2014 WL 249374, at *9 (WD Mich, January 22, 2014),

14

aff'd in part 826 F3d 326 (CA 6, 2016). Applying the Noerr-Pennington doctrine to the instant case reveals that Counter-Plaintiffs utterly fail to allege a claim based on any non-protected activity; the countercomplaint must be dismissed.

## **CONCLUSION**

Given the historical importance of public protests, the First Amendment singles out this particular form of expressive conduct for explicit constitutional protection. If advocates and political organizers are vulnerable to liability for organizing and participating in protests, they are likely to stop such First Amendment-based advocacy altogether.

This Court cannot permit our legal system to be used as a tool to suppress protected political speech. Counter-Plaintiffs' bad-faith and wholly baseless civil conspiracy claim should be unequivocally dismissed.

Respectfully submitted.

*/s/ Marianne Dugan*

Marianne Dugan
The Civil Liberties Defense Center
1430 Willamette St. #359
Eugene, Oregon 97401
(541) 687-9180
MDugan@CLDC.org

November 6, 2020

15

# APPENDIX A

## SPECIFIC IDENTITIES AND INTERESTS OF AMICI CURIAE

The following *amici curiae* join in this brief:

**Protect the Protest** is a coalition of nonprofit organizations dedicated to protecting free speech, freedom of assembly, and peaceful dissent from meritless lawsuits designed to chill the exercise of those fundamental rights.

### MEMBERS OF THE "PROTECT THE PROTEST" TASK FORCE

**The Civil Liberties Defense Center** is a nonprofit organization that defends environmental and social justice activists against SLAPP suits and other constitutional attacks in state and federal courts around the country. CLDC is an active participant in the PTP coalition's litigation, advocacy, education and outreach work.

**The Electronic Frontier Foundation i**s the leading nonprofit organization defending civil liberties in the digital world. Founded in 1990, EFF champions user privacy, free expression, and innovation through impact litigation, policy analysis, grassroots activism, and technology development. It works to ensure that rights and freedoms are enhanced and protected as our use of technology grows.

**The International Corporate Accountability Roundtable ("ICAR")** harnesses the collective power of progressive organizations to push governments to create and enforce rules over corporations that promote human rights and reduce

A-1

inequality. ICAR's membership is composed of 40 human rights, environmental, labor, and development organizations. ICAR serves as a leader and the coordinator of the Protect the Protest Task Force.

**Palestine Legal** is a non-profit legal and advocacy organization specifically dedicated to protecting the civil and constitutional rights of people in the U.S. who speak out for Palestinian freedom. Palestine Legal has advised hundreds of clients whose rights have been violated because of censorship campaigns targeting speech supporting Palestinian rights.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2020, I electronically filed the foregoing **UNOPPOSED MOTION OF PROTECT THE PROTEST TASK FORCE FOR LEAVE TO FILE AMICUS CURIAE BRIEF** and **BRIEF OF AMICUS CURIAE PROTECT THE PROTEST IN SUPPORT OF PLAINTIFFS'/COUNTER-DEFENDANTS' MOTION TO DISMISS** with the Clerk of the Court using the ECF system which will send notification to all counsel of appearance.

<u>/s/ Marianne Dugan</u>

Marianne Dugan
The Civil Liberties Defense Center
1430 Willamette St. #359
Eugene, Oregon 97401
(541) 687-9180
MDugan@CLDC.org

November 6, 2020