UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DETROIT WILL BREATHE, et al.,

    Plaintiffs,

v.

CITY OF DETROIT, et al.,

    Defendants.

Case No. 20-12363
Honorable Laurie J. Michelson

**OPINION AND ORDER GRANTING PLAINTIFFS/COUNTER-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIM [46]**

Plaintiffs Detroit Will Breathe and 14 individuals ("DWB," for convenience) brought this case to challenge the response of Detroit police to protest activity in the City of Detroit, seeking both injunctive and monetary relief. After the Court entered a temporary restraining order enjoining the Detroit Police from using certain tactics against peaceful protesters, the parties agreed to a Joint Order to Preserve the Status Quo in lieu of the Court deciding Plaintiffs' motion for a preliminary injunction. The City of Detroit and the other defendants ("the City") then filed a counterclaim for civil conspiracy against all of the plaintiffs. Plaintiffs (aka the Counter-Defendants) now seek to dismiss the counterclaim for failure to state a claim. The parties' positions are fully briefed and are further supported by several amicus briefs, such that oral argument is not necessary. *See* E.D. Mich. LR 7.1(f). Because the City fails to state a claim for civil conspiracy, the motion to dismiss is GRANTED.

**I.**

Protests began in Detroit in late May 2020, in response to the death of George Floyd during his arrest by Minneapolis police officers. Almost-daily demonstrations continued throughout the

summer. DWB alleges that from the start, Detroit police responded to peaceful demonstrations with beatings, tear gas, pepper spray, rubber bullets, sound cannons, flash grenades, chokeholds, and mass arrests without probable cause. (ECF No. 1, PageID.3.) The City provides a different story, alleging that the protests "repeatedly turned violent, endangering the lives of police and the public." (ECF No. 43, PageID.608.)

There is significant dispute over the details of what happened at these protests. These facts will be pursued during discovery. But for the purposes of deciding the motion to dismiss, the Court must accept the well-pled factual allegations in the City's countercomplaint as true and draws reasonable inferences from those allegations in the City's favor. *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

Detroit Will Breathe was founded on June 4, 2020 and incorporated as a domestic nonprofit corporation on June 23, 2020. (ECF No. 46, PageID.651.) DWB describes itself as "an integrated, youth-led, militant organization fighting against police brutality and systemic racism in Detroit." Detroit Will Breathe Home Page, https://perma.cc/XW9R-NRRL. DWB regularly organized marches and other protests throughout the summer of 2020 (and continues to do so today). *Id.* The events are open to the public and advertised on a variety of social-media platforms. (ECF No. 43, PageID.609.) The City alleges that Plaintiffs Nakia Wallace, Tristan Taylor, and Jazten Bass are members of DWB. (ECF No. 43, PageID.609.)

Although protests occurred throughout the summer of 2020, both parties focus principally on clashes at protests that occurred between May 29 and June 2, on July 10, on August 22, and on September 5, 2020. (ECF No. 4, PageID.166; ECF No. 43, PageID.610–624.)

A.

*May 29, 2020–June 2, 2020*. Again, taking as true the allegations in the counterclaim, the protests in Detroit began on May 29, 2020, in response to the death of George Floyd. (ECF No. 43, PageID.610.) On that day, multiple Detroit police officers sustained injuries as a result of thrown objects, and a number of protestors were arrested. (*Id.* at PageID.611.)

On May 31, Detroit Mayor Mike Duggan declared a state of emergency and implemented an 8:00 p.m. curfew. (*Id.*) Protests continued after the curfew, and DPD issued a number of warnings to disperse before deploying tear gas. (*Id.*) Additional police officers suffered injuries from objects thrown at them. (*Id.* at PageID.611–612.)

On June 2, protests again continued after curfew. DPD officers claim they issued at least seven directives to disperse that protestors failed to obey. (*Id.* at PageID.612–613.)

Although DWB did not yet exist at this time, the City alleges that Plaintiffs Taylor, Bass, Lillian Ellis, and Lauren Rosen were in attendance at these protests. (*Id.* at PageID.612.)

*June 28, 2020*. On this date, DWB organized a protest in southwest Detroit. The City claims that during the protest Plaintiff Bass jumped on the hood of a police car and banged on it in a manner that was threatening to the police officers and damaged the vehicle. (*Id.* at PageID.614.)

*July 10, 2020*. DWB organized a last-minute protest in response to the shooting of Hakim Littleton in Detroit. (*Id.*) In publicizing the protest, DWB tweeted "RAPID RESPONSE CALL TO ACTION: Detroit Police Department killed a 19 year old today. Our planned march is cancelled so that the movement can respond to the injustice! Get to 7446 McNichols Rd. as soon as you can!" (*Id.* at PageID.614–615.) During the protest, the City claims that protestors ignored police directives and threw objects like rocks and bleach at officers. (*Id.* at PageID.615.) Police

3

officers also had physical altercations with some of the plaintiffs while attempting to detain them. (*Id.* at PageID.615–616.) For example, the City alleges that Zachary Kolodziej lunged at officers multiple times and had to be physically restrained on the ground. (*Id.*) And while Wallace claims that officers placed her in a chokehold that day (ECF No. 1, PageID.35), the City says, "the Officer taking Counter-Defendant Wallace down lost her hold, which caused her arms to momentarily touch Wallace's neck." (*Id.* at PageID.616.) A final plaintiff, Olivia Puente, allegedly pushed against an officer's protective shield. (*Id.* at PageID.617.)

*August 22, 2020*. On August 22, DWB organized a protest to "occupy[] the intersection of Woodward and John R to demand the immediate end of Operation Legend and the withdrawal of federal agents sent to Detroit by the Trump administration to terrorize Black and Brown communities. We aren't leaving until the feds leave." (*Id.* at PageID.620 (quoting a DWB tweet).) DWB later tweeted "Come down here if you would like to support us and help us hold this space." (*Id.*) Plaintiff Taylor also posted a video on Facebook telling people "So if you ain't doing nothing and you wanna…be a part of the movement that's taking up space, we're here. We ain't leaving until they make us leave." (*Id.* at PageID.621.) According to the City, DWB "did not obtain a permit in conjunction with this self-proclaimed 'occupation' during which they blocked off streets, obstructed traffic, and stood in the road." (*Id.*) The City alleges that the following plaintiffs were present at the protest: Taylor, Bass, Wallace, Puente, Iman Saleh, Lauren Rosen, Margaret Henige, Amy Nahabedian, Caylee Arnold, and Alexander Anest. (*Id.*)

After protestors blocked all lanes of traffic on Woodward Avenue, DPD officers issued orders to disperse and told the protestors "that their gathering was no longer a lawful assembly." (*Id.* at PageID.622.) DPD officers were injured during DPD's efforts to disperse the crowd. (*Id.*) The City also alleges that Plaintiffs Taylor, Wallace, Henige, Arnold, Nahabedian, and Lillian Ellis

4

were arrested that night for "obstructing police" and "disorderly conduct." (*Id.* at PageID.622–623.)

***September 5, 2020***. On September 5, DWB called on protestors to gather to celebrate this Court's temporary restraining order. (*Id.* at PageID.624.) During the march, some protestors stood on the outside dining barrier of a local restaurant and "disrupted patrons' dinners." (*Id.*) It is not clear from the counterclaim whether the City alleges that any individual plaintiffs were involved in this incident. Later that evening, some individuals, who may have participated in the march, spray painted a city statue. (*Id.*)

**B.**

The City also pleads facts related to communications made by DWB and its "members" to the media and on social-media platforms. Throughout the summer, DWB and a number of individual plaintiffs made statements to the press and on social media about the protests and the police response.

The City first points to the following statement Plaintiff Wallace made on Fox2 News on June 15:

> I don't think that there's a space for Detroit Will Breathe to condone or not condone violence, right? People are angry and people are going to express that anger. Detroit Will Breathe has clearly set forward our program and what it is that we are doing. But what we are never going to do is tell young people who are passionate and who are upset and who are angry that they don't have a right to be angry and they don't a right to express that anger. Because this is what happens when you kill people. This is what happens when you make it clear that life is indispensable to you that particularly Black and brown lives don't matter. There's going to be a price to pay for that.

(ECF No. 43, PageID.610; ECF No. 46, PageID.653 (citing Interview, Fox2 News at 2:44 (June 15, 2020), https://www.fox2detroit.com/video/696779.)).

The City also quotes Facebook posts from DWB members. On June 28th, Plaintiff Bass posted on his Facebook account after the protest that day: "THIS COP TRIED TO KILL ME AND OTHERS TONIGHT!!!!! FIRE AND JAIL HIM FOR ATTEMPT VEHICULAR MAN SLAUGHTER!!!!" (ECF No. 43, PageID.614.) And in mid-July, Wallace posted on her Facebook page, "Why can [Detroit police officers] run over protestors? . . . CRAIG HAS TO GO!!!!!" (*Id.* at PageID.618.)

Defendants also claim that videos posted to DWB's social media accounts show unidentified protestors "encouraging violence or endorsing violence against police officers, promoting the destruction and defacing of property, and disrupting the lives of Detroit residents." (*Id.* at PageID.609.) But they do not identify any specific posts.

Finally, the City notes that on August 26th, Plaintiff Taylor stated during a live interview, "That's why Chief Craig has to go. That's why he has to go because he reigns over the police department which has given the green light to whatever the officers feel like they want to do." (*Id.* at PageID.623.)

## C.

Based on these allegations, the City filed a counterclaim alleging one count of civil conspiracy. (ECF No. 43.) The City alleges that Plaintiffs "conspired with one another with the intent to and for the illegal purpose of disturbing the peace, engaging in disorderly conduct, inciting riots, destroying public property, resisting or obstructing officers in charge of duty, and committing acts of violence against" Detroit police officers. (ECF No. 43, PageID.625.)

DWB now moves to dismiss the counterclaim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 46.)

II.

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under the plausibility framework of *Iqbal* and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Sixth Circuit continues to recognize the "viability of the short and plain language of Federal Rule of Civil Procedure 8." *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012). Accordingly, detailed factual allegations are not required to survive a motion to dismiss. *Id.* (citing *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009)). But they must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

III.

In its counterclaim, the City alleges a single count of civil conspiracy under Michigan law. (ECF No. 43, PageID.625.) DWB argues that several defects doom the City's counterclaim. The City disagrees.

A.

The Court begins with DWB's argument that the City fails to plead a civil conspiracy claim because the City does not allege an actionable underlying tort.

Under Michigan law, "[a] civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 486 N.W.2d 351 (Mich. Ct. App. 1992). "[T]he plaintiff must show that 'there is a single plan, that the alleged

7

coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.'" *Roche Diagnostics Corp. v. Shaya*, 427 F. Supp. 3d 905, 924 (E.D. Mich. 2019) (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). The existence of an agreement may be inferred from the "circumstances, acts and conduct of the parties." *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1341 (E.D. Mich. 2011) (quoting *Temborius v. Slatkin*, 403 N.W.2d 821, 828 (Mich. Ct. App. 1986)).

Importantly though, "[c]ivil conspiracy is not a claim of its own; 'it is necessary to prove a separate, actionable tort.'" *Prudential Def. Sols., Inc. v. Graham*, No. 20-11785, 2020 WL 6382862, at *9 (E.D. Mich. Oct. 30, 2020) (quoting *Advoc. Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003) and *Early Detection Center, P.C. v. N.Y. Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. Ct. App. 1986)); *see also McCarthy v. Sosnick*, No. 293482, 2011 WL 4424344 (Mich. Ct. App. Sept. 22, 2011) (reiterating that "any civil conspiracy must be accompanied by a separate, actionable tort."); Michigan Non-Standard Jury Instr. Civil § 15:1 (listing as an element that must be proved, "The defendant committed a separate, actionable tort as part of the conspiracy.").

The City does not appear to dispute that it does not plead an underlying actionable tort. Instead, the City argues that it is enough to allege that DWB and its members conspired to "commit unlawful actions." (ECF No. 54, PageID.810.) So the City seems to argue that a civil conspiracy does not actually require an underlying actionable tort, but simply unlawful activity.

But the City does not offer any cases, nor has the Court been able to find any, that support the proposition that a civil conspiracy claim can be maintained without facts (or at this stage, factual allegations) establishing an underlying actionable tort, i.e., a civil wrong for which a remedy may be obtained. *Tort*, Black's Law Dictionary (11th ed. 2019). The reason for the

8

Case 2:20-cv-12363-LJM-DRG   ECF No. 61, PageID.883   Filed 03/10/21   Page 9 of 14

requirement of an underlying actionable tort becomes clear upon consideration of a few basic principles. A civil conspiracy "[can]not exist in the air," *Early Detection Center*, 403 N.W.2d at 836, because the "cause of action does not result from the conspiracy but from the acts done." *Roche v. Blair*, 9 N.W.2d 861, 863 (Mich. 1943). So a conspiracy claim is only actionable if the underlying conduct the defendants are accused of is also actionable. In the context of a suit for damages, civil wrongs (i.e. torts) are actionable. But criminal conduct is actionable only if there is a corresponding private right of action.

This distinction is illustrated by two cases from Michigan federal courts. In *Mead v. County of St. Joseph*, No. 1:06-CV-555, 2008 WL 441129 (W.D. Mich. Feb. 13, 2008), plaintiffs alleged that the defendants conspired to violate the Michigan Strip Search Law. The Court found that, as with most criminal laws, "a person may not bring a private cause of action under the Michigan Strip Search Law, and as a result there is no underlying cause of action in Plaintiff's civil conspiracy count. Without an underlying cause of action, there can be no claim of civil conspiracy." *Id*. at *7. And in *Carson Real Estate Companies v. CoStar Group Inc.*, the court noted that a civil conspiracy claim could be premised on an extortion count because Michigan law recognizes a private right of action for extortion. No. 10-CV-13966, 2011 WL 4360021, at *6 (E.D. Mich. June 30, 2011), report and recommendation adopted sub nom, *Carson Real Estate Cos. v. Constar Grp., Inc.*, No. 10-CV-13966, 2011 WL 4360017 (E.D. Mich. Sept. 19, 2011) (internal citation omitted). But the court ultimately dismissed the plaintiff's conspiracy claim because the plaintiff failed to plead facts to support the underlying torts of extortion and unfair competition. *Id.*

The unlawful actions that the City pleads Plaintiffs engaged in include obstructing traffic, failing to obey lawful police orders, disorderly conduct, disturbing the peace, and inciting to riot.

9

(ECF No. 54, PageID.811.) These unlawful actions are either misdemeanors or local-ordinance violations. Nowhere in the counterclaim does the City allege that any plaintiffs conspired to commit a tort that is actionable under Michigan law.

So, like the plaintiff in *Mead*, Defendants here have not established that they have a private right of action against Plaintiffs for, or that Michigan law recognizes any civil torts based on, the alleged criminal offenses. And thus, they cannot establish an underlying cause of action to support their civil conspiracy claims. This is also analogous to the cases that routinely dismiss Michigan civil conspiracy claims after the underlying (tort) claims are dismissed. *See, e.g.*, *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 486 N.W.2d 351, 359 (Mich. Ct. App. 1992) ("Because Admiral has failed to state any tortious action, its conspiracy action must also fail."); *Estate of Roush ex rel. Hardy v. Laurels of Carson City, L.L.C.*, No. 317406, 2014 WL 7004021, at *5 (Mich. Ct. App. Dec. 11, 2014) ("[P]laintiff's ability to prevail on its claim of civil conspiracy requires it to prevail on at least one of these underlying torts."); *Weingrad v. Jones*, No. 342873, 2019 WL 5275032, at *7 (Mich. Ct. App. Oct. 17, 2019), *appeal denied*, 947 N.W.2d 802 (Mich. 2020) ("[P]laintiff failed to sufficiently allege that any underlying tort occurred and thus did not state a claim for civil conspiracy.").

Because the City does not allege that any plaintiff committed any underlying tort, their civil conspiracy claim fails.

**B.**

Even if the City could allege an underlying tort or is not required to do so, its civil conspiracy claim would still fail because it does not allege sufficient facts to infer that Plaintiffs conspired to commit any form of unlawful activity—and especially that all of the alleged co-conspirators shared in a common conspiratorial objective to engage in such unlawful activity.

10

"Pleading requirements governing civil conspiracies are relatively strict." *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008). "[V]ague and conclusory allegations unsupported by material facts will not be sufficient" to state a claim for conspiracy. *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

As a general matter, the City does not plead any specific allegations of any specific plaintiff conspiring with another to commit an unlawful act. The City focuses on allegedly unlawful actions that occurred at the protests without alleging that any specific plaintiffs agreed to commit those acts.

For example, the City alleges that during the summer's protests, public property was defaced, and individual police officers were injured by thrown projectiles. But they do not plead *who* allegedly did these actions. And they offer no facts to suggest that DWB or any plaintiffs in this case encouraged any protestor to commit these acts. The City argues that they should be given the opportunity to engage in discovery to identify "each individual Plaintiff involved in each specific concerted effort to engage in specific criminal actions." (ECF No. 54, PageID.818.) But pleadings are not placeholders while a party pursues discovery of wrongdoing. Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and thus entitles a counter-plaintiff to "unlock the doors of discovery." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *see also Life For Relief & Dev. v. Charter One Bank, N.A.*, No. 12-CV-13550, 2013 WL 3810255, at *3 (E.D. Mich. July 23, 2013) (explaining that "Plaintiff cannot use discovery to obtain specific facts necessary to craft a plausible complaint, 'even when the information needed to establish a claim . . . is solely within the purview of the defendant or a third party.'" (quoting *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011))). In order to

be entitled to discovery, the City must first allege specific facts from which the Court can infer that DWB engaged in a civil conspiracy, which it has not.

And the City is mistaken that their request is analogous to DWB suing "Doe" officers. In their complaint, DWB pled specific conduct by specific officers and simply used "Doe" where they did not know the name of each officer engaging in the pled conduct. On the other hand, the City admittedly is unable to plead facts about any of the specific individuals that allegedly battered the police officers or defaced public property.

The City's allegations also fail to make a plausible case that Plaintiffs reached the type of agreement required for a civil conspiracy. Their allegations about planning and coordination of the conspiracy are limited to media interviews with individual plaintiffs and posts on social media about attending the protests, but not about any unlawful action. As detailed in the summary of facts above, most of the statements and posts that the City points to in no way suggest an agreement, let alone one to commit unlawful acts. Instead, they simply evidence DWB organizing and publicizing public protests, albeit with occasional strident and passionate language. Moreover, the City alleges in its counterclaim that all Plaintiffs—DWB, and the 14 individual plaintiffs—conspired with one another. (ECF No. 43, PageID.625.) Yet, for the majority of the plaintiffs, the City does not plead a single fact specific to him or her. So the City has not pled sufficient facts that make it plausible to infer that every plaintiff shared in a common conspiratorial objective to engage in unlawful conduct at DWB protests.

The only allegation that could plausibly suggest that Plaintiffs were planning some form of unlawful action is when DWB posted on August 22nd that the group was "occupying the intersection of Woodward and John R" and would not "leav[e] until the feds leave." (ECF No. 43, PageID.620.) But the City itself admits that the gathering began as a lawful assembly and the

12

activity only became unlawful when DPD officers arrived, "instructed [the protestors] that their gathering was no longer a lawful assembly[,]" and ordered them to disperse. (*Id.* at PageID.622.) The Court cannot draw an inference based on these facts that there was an agreement between Plaintiffs to engage in unlawful activity. Moreover, if protesters fail to heed lawful orders to disperse, law enforcement has recourse. A speculative lawsuit that this may have been the result of a civil conspiracy to commit unlawful acts, with the attendant risks to first amendment freedoms, is not one of them.

In sum, the City fails to establish the essential elements of a civil conspiracy claim under Michigan law.[1]

### IV.

Because Defendants fail to plead a plausible claim for civil conspiracy, Plaintiffs' motion to dismiss (ECF No. 46) is GRANTED. When the Defendants received notice of Plaintiffs' intention to file a motion to dismiss, they did not seek to amend the counterclaim. Nor did they amend after the motion was filed, as was their right under Rule 15. And in light of their acknowledgments that the conspiracy claim is not based on any speech torts and that they would need discovery to be able to allege sufficient facts concerning all of the alleged co-conspirators, amendment does not seem viable. Thus, the counterclaim (ECF No. 43) is DISMISSED WITH PREJUDICE.

The Court considered the amicus briefs. (ECF Nos. 47, 49, 55.) The parties' briefing also addressed the arguments by amici. As a result of these arguments and the bases of the Court's ultimate ruling, the Court did not need to rely on the arguments provided by amici and would reach

---

[1] The Court does not need to reach the other arguments for dismissal raised by Plaintiffs.

13

the same conclusion without them. But because they were considered, the motions for leave to file amicus briefs (ECF Nos. 47, 49, 55) are GRANTED.

SO ORDERED.

Dated: March 10, 2021

                                                    s/Laurie J. Michelson
                                                   LAURIE J. MICHELSON
                                                   UNITED STATES DISTRICT JUDGE